

No. 22-14031-DD

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

MICHAEL J. POLELLE,

*Plaintiff-Appellant*

v.

*CORD BYRD,* in his capacity as Secretary of State of Florida, and RON TURNER,

in his capacity as Supervisor of Elections for Sarasota County, Florida,

*Defendant-Appellees*

Appeal from the United States District Court for the Middle District of Florida

No. 8:22-cv-1301-SDM-AAS

_____

**APPELLANT'S OPENING BRIEF**

_____

Michael J. Polelle, Pro Se

1102 Ben Franklin Dr. Unit 511

Sarasota, Florida  34236

(941) 388-1840   mpolel2@uic.edu

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 11th Cir.R.26.1-1(a), the Plaintiff-Appellant, Michael J. Polelle, does hereby certify that the following persons or entities have an interest in the outcome of this case or appeal:

1. Bentley Goodrich Kison

2. Bentley, Morgan R.

3. Busse, Stephanie

4. Byrd, Cord

5. Davis, Ashley E.

6. Gaillard, Ashley E.

7. McVay, Brad

8  Merryday, Hon. Steven, U.S. District Judge

9. Polelle, Michael J.

10.Voters registered in Florida with "No Party Affiliation"

By: _____
Michael J. Polelle, Pro Se
1102 Ben Franklin Drive   Unit 511
Sarasota, Florida  34236
Tel: (941) 388-1840  Email: mpolel2@uic.edu

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff, Appellant, Michael J. Polelle, respectfully requests the opportunity to present an oral argument on appeal.

This case involves fundamental questions concerning the compatibility of the Florida closed-primary system with the Equal Protection Clause and the First Amendment rights accorded some four million Florida voters registered as politically unaffiliated and whether they will be allowed to seek judicial redress for violation of those constitutional guarantees.

# TABLE OF CONTENTS

**Certificate of Interested Persons and Corporate Disclosure Statement ... C- 1**

**Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i**

**Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii**

**Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v**

**Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1**

**Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1**

**Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3**

**Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5**

**Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7**

I. The District Court erred in holding Polelle lacked standing as a municipal

taxpayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. The District Court erred in holding that Polelle lacked

traditional standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           A. Injury in fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           B. Traceability and Redressability . . . . . . . . . . . . . . .  15

           C. Distinguishable Precedent . . . . . . . . . . . . . . . . . . .  18

III. The overbreadth doctrine grants Polelle standing to argue the First

.Amendment rights of political parties against Florida's closed primaries. . . . 20

IV. The Florida closed-primary system violates Polelle's First Amendment rights

of speech and association. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.  Florida's closed primaries compel Polelle to subsidize

        political parties with his county real estate taxes. . . . . . . . . . . 23

    B. Florida's closed primaries violate First Amendment rights of

        speech and political association either in themselves or

        as part of a unified system, together with general elections, for

        selecting officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1. Florida's closed primaries violate the First Amendment in

           themselves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2. The unified system of closed primaries coupled with general

           elections violates First Amendment rights in the general

           elections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28

V. Florida's closed-primary system violates the Equal Protection Clause of the

    Fourteenth Amendment and Art. VI Sec. 5(b) of the Fla. Const. art. VI, §5(B)

    arbitrarily and capriciously exacerbates this discrimination. . . . . . . . . . . . 33

    A. The exclusion of politically unaffiliated voters from Florida primaries

        violates the Equal Protection Clause. . . . . . . . . . . . . . . . . . . . . . . . . 33

    B. The Fla. Const, art.VI, § 5(b)   arbitrarily and capriciously exacerbates

        this discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VI. Under Supreme Court precedent the First Amendment and Equal Protections rights of politically unaffiliated voters are compatible with the First Amendment rights of political parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

iv

## TABLE OF AUTHORITIES

**Cases:**

*American Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*
567 F.3d 278 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Board of Airport Com'rs of Los Angeles v. Jews for Jesus, Inc.*
482 U.S. 569 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brinkman v. Francois*
184 So.3d 504 (Fla. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*California Democratic Party v. Jones*
530 U.S. 567 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Carrington v. Rash*
380 U.S. 69 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Clingman v Beaver*
544 U.S. 581 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 40

*Coal. for Good Governance v. Kemp*
558 F. Supp. 3d 1370 (N.D. Ga. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Flast v. Cohen*
392 U.S., 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

* *Fla. State Conf. of NAACP v. Lee*
566 F. Supp. 3d 1262 (N.D. Fla. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

* *Frothingham (Massachusetts) v. Mellon*
262 U.S. 447 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

* *FT Cosmetics FL, Inc. v. City of Miami Beach*
866 F.3d 1290 (11th Cir.2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

v

*Gray v. Sanders
  372 U.S. 368 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 31

*Harrell v. The Fla. Bar
  608 F.3d 1241 (11ᵗʰ Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hill v. Stone
  421 U.S. 289 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Jacobson v. Sec'y of State
  974 F.3d 1236 (11ᵗʰ Cir. 1236 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Janus v. AFSCME, Council 31
  __U.S.__, 138 S.Ct. 2448 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Kusper v. Pontikes
  393 U.S. 23 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lacasa v. Townsley
  883 F.3d 1231 (S.D. Fla.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Laufer v. Arpan LLC
  29 F. 4ᵗʰ 1268 (11ᵗʰ 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

League of Women Voters of Fla., Inc. V. Lee
  595 F.Supp. 3d 1042 (N.D.Fla.2022), stay pending appeal, 32 F.4ᵗʰ 1363 (11ᵗʰ Cir.
  2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.
  148 F.3d 1231 (11ᵗʰ Circ.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Lujan v Defenders of Wildlife
  504 U.S. 555 ( 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*Moore v. Ogilvie
  394 U.S. 814 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Morse v. Republican Party of Va.
  517 U.S, 186 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

* *Nielsen* v. DeSantis
467 F. Supp. 3d 1261 (N.D. Fla. 2020) . . . . . . . . . . . . . . . . . . . . 17

*Osborn v. Cox*
369 F.3d 1283 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*Pelphrey v. Cobb Cnty. Ga.*
547 F.3d 1263 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 9-10

* *Reynolds v. Sims*
377 U.S. 533 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rutan v. Republican Party of Ill.*
497 U.S. 62 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*Smith v. Allwright*
321 U.S. 649 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 43

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

*Tashjian v. Republican Party of Conn.*
479 U.S. 208 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Terry v. Adams*
345 U.S. 461 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Classic*
313 U.S. 299 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Wollschlaeger v. Governor, State of Fla.*
848 F.3d 1293 (11th Cir. 2017) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

vii

*Washington State Grange v. Washington Republican Party
552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-43

*Wesberry v. Sander
376 U.S. 1 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

West Virginia State Bd. of Educ. V. Barnette
319 U.S. 624 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Williams v. Rhodes
393 U.S. 23 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Constitutions:**
* U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

* U.S. Const. amend. XIV§1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

* Fla .Const. art.VI §5(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Statutes:**
28 U.S.C §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23

42 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §1343(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fla.Stat. §97.012 (14) (16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

Fla.Stat. §97.022(1) (a) (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fla.Stat. §97.055 (1) (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fla.Stat. §99.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fla.Stat. §99.061 (4) (a) (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

* Fla.Stat. §101.021 . . . . . . . . . . . . . . . . . . . . . . . 3, 5-6, 11, 15, 20-22, 25-26, 33

Fla.Stat. §102.031 (g) . . . . . . . . . . . . . . . . . . . . . 14

**Other Authorities:**

Bill King, "What Our Founding Fathers Said About Political Parties,"

https://billkingblog.com/what-our-founding-fathers-said-about-political-parties. 27


Fla. Dept. of State (last updated: 12/9/2022)

https://dos.myflorida.com/elections/data-statistics/voter-registration-

statistics/voter-registration-reports/voter-registration-by-party-affiliation/ . . . 35


James Kirley, "Monday Chat: Universal primaries a 2-edged sword in Florida," TC

Palm, digital news for Treasure Coast Newspapers in Florida (posted 8/12/2012

online) https://archive.tcpalm.com/news/monday-chat-universal-primaries-a-2-

edged-sword-in-florida-ep-382139559-343066032.html/ (legislative background of

this Universal Primary amendment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

"Tia: Florida's write-in provision is worse than you think," *Tallhassee Democrat* (published Nov. 25, 2016) https://www.tallahassee.com/story/opinion/editorials/2016/11/25/opinion-floridas-write-provision-worse-think/94292282/ ("No write-in candidate has ever won a Florida election.") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38


Tia Mitchell, "Tia Mitchell: Using write-in candidates to close primaries is voter disenfranchisement," *The Florida Times Union (*Jacksonville.com) (published 5/13/2016) https://www.jacksonville.com/story/news/politics/2016/05/13/tia-mitchell-using-write-candidates-close-primaries-voter/15710329007/ ("[A]t least 900,000 Florida voters were shut out of voting in 15 House and Senate races because of write-in candidates that year [2016]. By my count, it happened nine more times in 2014."). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1331 and §1343(3), the district court had jurisdiction over this action brought under 42 U.S.C. §1983 by Plaintiff-Appellant, challenging Florida's election law. After the district court entered a final order on November 3, 2022, granting Defendant-Appellees' motions to dismiss the action and disposing of all claims, Plaintiff-Appellant filed a timely notice of appeal on November 30, 2022. This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether Polelle, a taxpayer resident and voter registered as politically unaffiliated, has municipal taxpayer standing to challenge on the basis of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment the spending of his tax dollars and the tax dollars of others like him on county-run political primaries from which they are excluded because of their political beliefs

Whether Polelle also has standing, at the pleading stage in this case, to allege on the basis of the First Amendment and Equal Protection Clause that his exclusion from political primaries because of political belief constitutes a continuing injury-in-fact which is directly traceable to the actions of Defendants-Appellees and which is capable of being favorably redressed

1

Whether Polelle has overbreadth standing under the First Amendment to raise the

violation of the First Amendment rights of political parties in Florida unable to

open up their primaries to politically unaffiliated voters like him

Whether Florida's closed primaries violate Polelle's First Amendment rights either

in themselves  by excluding him from political primaries or because, together with

subsequent general elections, the primaries constitute part and parcel of a unified

and integrated system of public elections so that such primary exclusions are an

abridgement of his right to vote in general elections

Whether Florida's closed-primary system violates the Equal Protection Clause of

the Fourteenth Amendment because Polelle and other voters registered as

politically unaffiliated are classified separately from other registered voters solely

on the basis of political belief

Whether the First Amendment and Equal Protection rights of Polelle and other

politically unaffiliated Florida voters are compatible with the First Amendment

right of association accorded political parties.

2

## STATEMENT OF THE CASE

Polelle alleges in his Complaint that he is a resident of the City of Sarasota located in the County of Sarasota (Doc.1, R.5) and that he has been registered in that county as a voter of "No Party Affiliation" ever since he first registered on August 26, 2011 (Doc.1, R.7). Despite his political conviction not to support or identify with a political party, he has been legally required to pay an annual ad valorem real estate tax to the county since at least 2011. The payments from him and other county voters not politically affiliated go into a county fund which Defendant-Appellee, Ron Turner, Sarasota County Supervisor of Elections, draws upon to pay for the operation of primary elections conducted by his office and from which Polelle is excluded by Florida statute (Doc.1, R.8-9).

In 2020 the Sarasota County Supervisor of Elections spent $752, 307.56 to hold the Presidential Preference Primary of March 17, 2020 and another $1,000,043.33 for the remaining primaries on August 18, 2020 (Doc.1-R.9). The Florida closed-primary statute found in Fla. Stat. §101.021 (2022) barred him from these and other primaries because of his choice not to associate with political parties or otherwise support them. Defendant-Appellees, Cord Byrd, the Florida Secretary of State, as the chief elections officer in Florida, and Ron Turner, the Sarasota County Supervisor of Elections have jointly and severally combined their

3

power of office to honor and enforce the closed-primary system of Florida (Doc.1, R.9-10).

On June 6, 2022, Michael J. Polelle filed his Complaint in the Middle District of United States District Court for Florida (Doc.1). He sued both Defendants, Cord Byrd in his capacity of Florida Secretary of State and Ron Turner in his capacity as Sarasota County Supervisor of Elections, under 42 U.S.C. Sec, 1983 for violations of his First Amendment and Equal Protection rights under the Fourteenth Amendment and requested only a declaratory judgment and a permanent injunction as relief from these violations.

On July 8 Defendant Byrd filed a first motion to dismiss the Complaint (Docs. 8). Defendant Turner also filed a first motion to dismiss on July 12 (Doc.9) On July 12 and 13 the motions were terminated and defense counsel were notified by the District Court to refile "with correct event code" (Docs.10&11). On July 13 Defendant Byrd filed an amended motion to dismiss (Doc.12) and the next day Defendant Turner also filed an amended motion to dismiss. On July 18 Polelle filed his response to the amended motions to dismiss (Doc.14, R.111).

On November 3, 2022 the District Court granted the amended motions to dismiss the Complaint (Doc.22) and dismissed the action for lack of standing and

4

failure to state a claim (R.152-53). On November 30 Polelle filed a Notice of

Appeal with the Eleventh Circuit of the United States Court of Appeals.

**Standard of Review**: The standard of review for both the legal conclusions

of the District Court and the issue of standing is *de novo*. *Pelphrey v. Cobb Cnty,*

*Ga.*, 547 F.3d 1263, 1268 & 1279 (11th Cir. 2008).

## SUMMARY OF THE ARGUMENT

Michael J. Polelle, a resident of Sarasota County, Florida, when required to

state his political affiliation or nonaffiliation by the county in order to register as a

voter chose on principle to register with "No Party Affiliation." That choice based

on political conviction and belief barred him and continues to bar him from

participating in the county-run and county-subsidized primaries of political parties

where opposing candidates face off in the subsequent general election.

He argues that Fla. Stat. §101.021 (2022) mandating this Florida closed-

primary system is an unconstitutional form of voter suppression incompatible with

the First Amendment and Equal Protection Clause of the Constitution ,

Polelle further argues he has standing either under the straight-forward and

settled doctrine of municipal taxpayer standing or under the more complex injury-

5

traceability-redressability analysis to raise these constitutional issues. In addition, the overbreadth doctrine of standing allows him to raise the First Amendment rights of political parties in Florida who under the closed-primary prohibition of Fla. Stat. §101.021 (2022) would not be allowed to open up their primaries to politically unaffiliated voters like Polelle

He believes he should also prevail on the merits of the case because the Florida closed-primary system is either a violation of the First Amendment and Equal Protection Clause in itself or as part of a unified and integrated electoral system that impairs the voting equality of the politically unaffiliated.

The declaratory and injunctive relief he seeks for his right to participate in county-run and county-subsidized primaries so long as he remains politically unaffiliated is compatible with the rights of association enjoyed by political parties under the First Amendment as found in Supreme Court precedents.

6

## ARGUMENT

## I. <u>THE DISTRICT COURT ERRED IN HOLDING POLELLE LACKED STANDING AS A MUNCIPAL TAXPAYER.</u>

In *Frothingham (Massachusetts) v. Mellon*, 262 U.S. 447, 486 (1923), the Supreme Court reasserted the legal principle allowing standing for municipal taxpayers: "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." This rule remains bedrock law.

In *Pelphrey v. Cobb Cnty, Ga.*, 547 F.3d 1263 (11th Cir. 2009) taxpayers of Cobb County, Georgia, alleged that county and other officials had violated the Establishment Clause in selecting leaders of different religions to offer invocations at governmental meetings. 547 F.3d at 1266-1268. The district court held the taxpayers had standing to successfully challenge defendants for the years 2003-2004 because impermissible motivation excluded certain faiths because of their belief. The district court awarded nominal damages for Establishment Clause violations in those years. 547 F.3d at 1268.

In affirming the district court, the Eleventh Circuit in *Pelphrey* stated: "The standing of municipal taxpayers to challenge, as unconstitutional, expenditures by local governments remains settled law."547 F.3d at 1280. Noting that it was not alone in this regard, this Court also said: "Our sister circuits have also recognized the standing of municipal taxpayers to challenge unconstitutional expenditures and

7

have applied similar standards (string citations omitted from Third, Seventh, Sixth, and First Circuits)." 547 F.3d at 1281.

Despite this solid precedent, the District Judge relegated Polelle's standing argument to a singular footnote with these words and a citation in explanation. (Doc.22, R.152):

Polelle's argument for standing as a taxpayer is equally unavailing. Polelle acknowledges that taxpayers generally lack standing in federal court to challenge a federal or state expenditures, but Polelle urges taxpayer standing based on a First Amendment exception to the general rule. This exception is inapplicable because Polelle fails to demonstrate that the government's payment of money to support the primary election violates the First Amendment. *See Hein v. Freedom from Religion Found., 551 U.S. 587, 593(2007).* (citation and internal quotation marks omitted).

The District Court appears to have mistakenly conflated two separate taxpayer standing arguments made in Polelle's Response to the Amended Motions to Dismiss where Polelle made arguments for normal municipal taxpayer standing but also for an extension of *Flast v. Cohen*, 392 U.S. 83 (1968) from its narrow exception allowing federal taxpayers to challenge laws violating the Establishment Clause to state taxpayer standing involving the other First Amendment rights of speech and political association ("A. TAXPAYER STANDING": Doc.14, R. 111-12).

In *Pelphrey v. Cobb Cnty., Ga.,* 547 F.3d 1263 (11th Cir.2008) this Court noted a similar confusion: "The district court relied on *Flast* to conclude that the

8

taxpayers had standing as municipal taxpayers, but this reliance was misplaced. *Flast* pertains only to *federal* taxpayers and does not apply to municipal taxpayers." 547 U.S. at 1280.

Although Polelle did admittedly argue in Response to the Amended Motions to Dismiss that *Flast* should be extended to other First Amendment issues besides the Establishment Clause (Doc.14, R.112-13), he does not make a *Flast* argument on appeal because further reflection and research, including this Court's decision in *Pelphrey* , indicate such an argument would be unavailing. However, Polelle has raised the alternate ground of municipal taxpayer standing below and raises the argument for municipal taxpayer standing again before this Court in his opening brief.

The District Court's citation to *Hein*, therefore, is beside the point. In *American Atheists, Inc. v., City of Detroit Downtown Dev. Auth.,* 567 F.3d 278, 287 (6th Cir. 2009) the Sixth Circuit held in the course of finding no violation of the Establishment Clause that municipal taxpayer standing existed without any limitations imposed by *Hein* because one of American Atheists' members was a City of Detroit taxpayer. The appellate court stated:

*Flast* and *Hein* have no application here. As *Frothingham* explained, and as we have since held, the general rule against taxpayer standing does not extend to municipal taxpayer suits. *Flast's* exception to *Frothingham*—and thus *Hein's*

9

exception to *Flast*—does not affect American Atheists' standing to challenge the municipal agency's grants (citations omitted). 567 F.3d at 286

## II. THE DISTRICT COURT ERRED IN HOLDING THAT POLELLE LACKED TRADITIONAL STANDING.

This Court has recognized both municipal taxpayer standing and "traditional" standing. *Pelphrey v. Cobb Cnty., Ga.*, 547 F.2d 1263, 1279 (11th Cir. 2008) ("The taxpayers have both traditional and taxpayer standing to challenge the constitutionality of the prayer practice of the Planning Commission)."

Even without the more complicated "traditional" standing test discussed below in this brief, the Supreme Court in *Gray v. Sanders,* 372 U.S, 368 (1963) took it as a given that a voter challenging Georgia's county unit system in a primary had standing to raise equal protection objections: "We also agree [with the district judge] that appellee, like any person whose right to vote is impaired, has standing to sue. (citations omitted)." 372 U.S. at 375.

In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) the Supreme Court held that plaintiff organization had standing to challenge as a First Amendment violation a statute criminalizing false statements about political candidates  and to seek declaratory and injunctive relief. ("To establish Article III standing, a plaintiff must show (1) an injury in fact (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood

10

that the injury will be addressed by a favorable decision. (internal citation and quotation marks omitted)." 573 U.S. at 157-58

The corollary case of *Wollschlaeger v. Governor, State of Florida,* 848 F.3d 1293 (11th Cir. 2017) (en banc) in the Eleventh Circuit concluded that physicians also had standing to sue for a preliminary injunction under the essentially same considerations as stated in the *Driehaus* case above. The physicians sued state officials alleging that threatened enforcement of Florida's Firearm Privacy Act violated the First Amendment and the Equal Protection Clause by inhibiting the physicians from discussing the issue of firearms possessed by their patients.

"To have standing under Article III, a plaintiff must have suffered or be imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision. (citation and internal quotation marks omitted.)" 848 F.3d at 157-58 (en banc)

## A. INJURY IN FACT

Polelle alleges in ¶ 9 of his Complaint that "Defendants have prohibited him from voting in any party primary by enforcement of § 101.021, Fla. Stat. (2021) [section number mistyped as § 101.102 in filed copy of Complaint]." (Doc. 1, R. 7). In First Amendment cases the injury-in-fact element is to be liberally construed. *Harrell v. The*

11

*Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir.2010) ("Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced (citation omitted)."

In *Laufer v. Arpan LLC*, 29 F. 4th 1268 (11th Cir.2022) a disabled tester for violations of ADA regulations had adequately alleged standing to sue for information omitted on a hotel website even though she had no intention to visit the hotel. She claimed she had suffered intangible injuries of frustration and humiliation. In a concurring opinion Justice Newsom noted that the Supreme Court's observation that constitutional violations can also satisfy Article III requirements, though intangible, seems "obviously correct." 29 F. 4th at 1285.

Being barred by law from voting in a primary his taxes help fund is a particularized and concrete harm, both tangible and intangible, to his rights under the First and Fourteenth Amendments. As long as the Florida closed-primary system exists in its present form Polelle will not be allowed to vote in party primaries to select candidates for a general election. Nothing is uncertain about that particularized and concrete fact of predicable and repeated electoral exclusion that has caused him frustration. Exclusion from political primaries has dampened his desire to vote in general elections where the limited number of viable candidates, normally only two, one a Democrat and the other a Republican, were chosen without input by politically unaffiliated voters in Florida.

12

that a plaintiff must have an objectively reasonable belief about the likelihood of disciplinary action.)

Although he is prepared to do, it would be an exercise in futility to require Polelle to crash an upcoming party primary election in Florida by refusing to change his voter affiliation from "No Party Affiliation" to a party affiliation and yet demanding to vote in that primary at the risk of being ejected from the polling place or arrested. Plaintiff will not be allowed to vote. No uncertainty exists as to that concrete and particular set of facts.

In order to vindicate his First Amendment and Equal Protection Clause claims, the law of standing does not require Polelle to violate or attempt a violation of Florida's election law before challenging it in the courts. *Susan B. Anthony List*, 573 U.S. at 159 ("Specifically, we have held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder (citation and internal quotation marks omitted)."

If Polelle were to appear at a polling place and insist on his constitutional right to vote in primaries, the supervisor of election could have him removed by law enforcement if his insistence became "unruly or disruptive." Fla. Stat. §102.031(g) (2022). Reflecting Florida's heightened and scrupulous concern for electoral legality, an Office of Election Crimes and Security has also been recently set up within the Florida Department of State for receiving and investigating alleged occurrences of "election law violations or election irregularities." Fla. Stat. § 97.022(1) (a) (b) (2022).

14

Defendants cannot deny that Florida's "Closed Primary" provision Fla. Stat. §

101.021(2022) effectively prohibits the Plaintiff, who is registered to vote with "No Party

Affiliation," from voting in  party primaries so long as he holds fast to his political

conviction of non-party affiliation. The only socially appropriate way for him to validate

his political beliefs is through this court of law without a need to first break the law.

*Coal. for Good Governance v. Kemp*, 558 F. Supp. 1370, 1380 (N.D. Ga. 2021) ("This

requirement [credible threat of prosecution] is also satisfied where the government has

not disavowed prosecuting persons who violate the challenged legislation (citation

omitted)."

## B. TRACEABILITY AND REDRESSABILITY

In naming both the Florida Secretary of State and the Sarasota County Supervisor

of Elections as Defendants, Polelle ensured the traceability and redressability of the

injury-in-fact committed jointly or severally by these Defendants.  Plaintiff alleges in ¶ 5

of his Complaint (Doc.1, R.5-6), and Florida law confirms, that aside from other relevant

duties as chief election officer of the state, the Florida Secretary of State must "Provide

written direction and opinions to the supervisors of elections on the performance of their

official duties with respect to the Florida Election Code or rules adopted by the

Department of State." Fla. Stat. §97.012 (16) (2022).

More than that, the Florida Secretary of State must bring and maintain lawsuits ".

. . to enforce the performance of any duties of a county supervisor of elections or any

official performing duties with respect to chapters 97 through 102 and 105 or to enforce

15

compliance with a rule of the Department of State adopted to interpret or implement any of those chapters." Fla. St *(14) (2022).*

As is axiomatic in tort law, there can be more than one cause that contributes to an injury. Where two defendants are jointly and severally responsible each cannot escape liability by saying that but for the actions of the other the harm would not have occurred. This principle is implied in the way *Loggerhead Turtle v. v. Cnty. Council of Volusia Cnty., Fla.,* 148 F.3d 1231, 1247 (11th Cir.1998) analyzed the issue of standing. Sea turtles had standing for a county's refusal to ban beach-driving and artificial lights despite the county's claim that the current regulations in four municipalities did not permit the regulation sought.

The court acknowledged that for standing purposes an injury cannot be the result of an independent third-party action but also said: "On the other hand, standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties (citation omitted)." *Loggerhead Turtle*, 148 F.3d at 1247.

The failure to regulate in *Loggerhead Turtle* did not defeat the traceability and redressability required for standing any more than would the failure to regulate defeat standing as regards the Secretary of State. "We agree with the Turtles that they have shown a sufficient causal connection to seek to hold Volusia County liable for 'harmfully' inadequate regulation of artificial beachfront lighting in the non-party municipalities of Daytona Beach, Daytona Beach Shores, Ormond Beach and New Smyrna Beach." 148 F.3d. at1249.

16

*In Jacobson v. Sec'y of State,* 974 F.3d 1236, 1242 (11th Cir. 2020), this Court's

finding of an absence of traceability and redressability by the Secretary of State does not

apply here because the *Jacobson* court gave as an independent reason for its decision that

no Supervisor of Elections was named a party: "The voters and organizations' failure to

join the Supervisors as defendants is an independent reason that they lack standing to

maintain this action." *Jacobsen, 974 F.3d* at 1253. In this case, however, Polelle has sued

the Sarasota Supervisor of Elections as well as the Florida Secretary of State.

Other decisions have recognized that assuming an injury-in-fact, both the

Secretary of State and Supervisors of Elections may have traceable and redressable duties

under the Florida Election Code. In a consolidated action to challenge Florida's election

procedures the federal district court held that certain injuries were fairly traceable to and

redressable by both the Florida Secretary of State and Supervisors of Election. *Nielsen v.*

*DeSantis*, 469 F.Supp.3d 1261, 1267 (N.D. Fla. 2020) ("An injury is traceable to a

defendant if the defendant has a role in implementing or enforcing the provision that

causes the injury. For most of the provisions at issue, this includes both the Secretary of

State and the Supervisors of Elections."). See also, e.g.*, Fla, State Conf. of NAACP v.*

*Lee*, 566 F.Supp.3d 1262, 1263-64 (N.D.Fla.2021) (drop box restriction traceable to and

redressable by Florida Secretary of State and Supervisors of Election) and *League of*

*Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1074-75 (N.D. Fla. 2022)

(rejection of claim by Secretary of State that intentional injury-in-fact must be redressed

17

by 67 Supervisors of Election in each of Florida's counties), *stay of district court order pending appeal*, 32 F.4th 1363 (11th Cir.2022).

## C. DISTINGUISHABLE PRECEDENTS.

In *Lacasa v. Townsley*, 883 F. Supp. 1231 (S.D. Fla 2012) the district court relied on footnote 5 in *California Democratic Party v. Jones*, 530 U.S. 567, n 5 (2000) to find a lack of standing in challenging Florida's close-primary system.  But footnote 5 in *California Democratic Party* did not mention standing for good reason. The California Democratic Party and other political parties---not individual voters ---had sued.  The standing of individuals like Polelle was not an issue in that case.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563-64 (1992) held that two members of an environmental organization lacked standing to challenge governmental regulations refusing to protect animal in foreign countries. The two conjectured that "some day" they might visit endangered animals in foreign countries. This conjectural set of facts is not the case at bar where primaries are a recurring phenomenon quite specific when and where they will take place and are conveniently located near voters.

In *Osburn v. Cox*, 369 F.3d 1283, 1285-87 (11th Cir.2004) Georgia--- unlike Florida --- had an open-primary system allowing any registered voter to vote in any party primary on the day of the primary. Five individuals who had voted in the Democratic primary claimed the open-primary system violated their rights under the First. Fourteenth, and Fifteenth Amendments, as well as the Voting Rights Act, by allowing

18

Republicans and other voters who were not "Democratic" to cross over and vote in the Democratic primary and defeat the incumbent Congresswoman, their preferred candidate.

Polelle submits that the *Osburn* decision affirming a dismissal for lack of standing is correct but not because of the standing dictum. The decision adopted the district judge's reasoning that the United States Supreme Court has implicitly required that "only the party proper and not individual members of the party" may challenge a state's regulation of a political party's primary. *Osburn*, 369 F.3d at 1287. For politically unaffiliated voters like Polelle, this interpretation would mean no legal recourse at all because by definition they are not members of political parties.

In fact, contrary to the District Court's reasoning, the Supreme Court does allow individual voters to challenge state primaries. It allowed not only the Oklahoma Libertarian Party but "several Oklahomans who were registered members of the Republican and Democratic Parties" to challenge Oklahoma's semi-closed primary law which allowed political parties to open up their primaries to registered Independents but not to voters of an opposing party. *Clingman v. Beaver*, 544 U.S. 581, 584 (2005). Likewise, in *Kusper v. Pontikes*, 414 U.S. 51 (1968), Mrs. Pontikes had individual standing to successfully challenge an Illinois statute regulating primaries.

*Osburn* comes to the correct result simply because the alleged injury-in-fact was purely hypothetical in that case. Who could tell whether a crossover voter was sufficiently "Democratic" to qualify as a true Democrat? Unlike Polelle in this case who is not allowed to vote in party primaries, the *Osburn* plaintiffs voted in the primary of

19

their choice and were simply "outvoted in relation to selecting the candidate of their

preference." *Osburn*, 369 F.3d at 1288.

## III. *THE OVERBREADTH DOCTRINE GRANTS POLELLE STANDING TO ARGUE THE FIRST AMENDMENT RIGHTS OF POLITICAL PARTIES AGAINST FLORIDA'S CLOSED PRIMARIES.*

In his written response to Defendants' amended motions to dismiss, Polelle stated:

Far from dooming Plaintiff's Complaint at the outset, these cases actually provide a constitutional blueprint for the replacement of the Florida closed primary system. If anything, *Tashjian v. Republican Party of Connecticut*, 479 U.S.208 (1986) provides another reason why 101.021, Fla. Stat. (2021) is unconstitutional. That statutory provision flatly makes it unlawful for any voter to cast a ballot in any primary other than the primary of the party with which the voter is registered. Contrary to the holding of *Tashjian*, a political party in Florida would not be allowed to open up its primary to voters not affiliated with a party even if the political party wanted to. (R.at 126)

The District Court was aware of this argument because it addressed the argument

in its opinion: "Because no political party joins this action or otherwise objects to Section

101.021, this action warrants dismissal for lack of standing." (Doc 22, R.at 152). But the

doctrine of overbreadth in First Amendment cases is unrelated to the options of joinder or

the filing of an amicus brief by political parties. The overbreadth doctrine of standing

stands on its own.

In *Tashjian v. Republican Party of Conn.,* 479 U. S 208 (1986), the Republican

Party of Connecticut adopted a rule to allow unaffiliated or "independent" registered

voters to participate in Republican primaries. The party sought declaratory and injunctive

relief because the closed-primary statute prevented the rule from becoming effective. The

20

Supreme Court upheld the decisions of the lower courts that the closed-primary statute

violated the associational rights of the Republican Party under the First Amendment. The

closed-primary statute failed the strict-scrutiny test because Connecticut failed to show a

compelling governmental interest in retaining a closed-primary when a political party

desires to open its primaries up to unaffiliated voters. 479 U.S. at 557 ("The interests

asserted by appellant in defense of this statute are insubstantial.").

Contrary to the unequivocal ruling in *Tashjian,* the following statutory wording in

Fla. Stat. § 101. 021 (2022) plainly prohibits any non-party members, including those

politically unaffiliated, from voting in a party primary whether or not the party allows it.

In a primary election a qualified elector is entitled to vote the official primary
election ballot of the political party designated in the elector's registration, and no
other. It is unlawful for any elector to vote in a primary for any candidate running
for nomination from a party other than that in which such electors is registered.

Because First Amendment rights to speak and associate politically are so

vital to our democratic society, the Supreme Court has upheld the doctrine of

overbreadth to allow standing to raise the rights of third parties not involved in the

litigation, In *Bd. of Airport Com'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S.
569,575 (1987)*, a minister for Jews for Jesus, Inc., was barred from handing out

free religious literature in an area of the Los Angeles International Airport because

of a sweeping ban on all "First Amendment activities."

21

In affirming the violation of First Amendment rights, the Supreme Court upheld use of the overbreadth doctrine to strike down the ban because no conceivable governmental interest justified so absolute an abridgement of speech. The Court concluded the overbreadth doctrine applies even if the party raising the First Amendment rights of those not before the court loses on the merits as to their own case:

Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court----those who desire to engage in legally protected speech but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. (citation and internal quotation marks omitted). 482 U.S. at 574.

In *FT Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290 (11th Cir. 2017) this Court applied the overbreadth doctrine where cosmetic retailers obtained a preliminary injunction against anti-solicitation and anti-handbilling ordinances. This Court applied the overbreadth doctrine of *Jews for Jesus, Inc.,* by holding that even those attacking the ordinances on commercial- speech grounds had standing to raise the First Amendment rights of retailers who might have noncommercial-speech grounds to object. 866 F. 3d at 304. ("Similarly, here, the prohibition of 'any' message about 'any' good or service provided by a business is overbroad.")    Section 101.021 cannot survive the advent of *Tashjian.*

22

## IV. FLORIDA'S *CLOSED-* PRIMARY SYSTEM VIOLATES POLELLE'S FIRST AMENDMENT RIGHTS OF SPEECH AND ASSOCIATION.

### A. FLORIDA'S CLOSED-PRIMARIES COMPEL POLELLE TO SUBSIDIZE POLITICAL PARTIES WITH HIS COUNTY REAL ESTATE TAXES

Justice Jackson wrote in *West Virginia State Bd. of Educ. V. Barnette, 319*

*U.S. 624, 642 (1943)*:

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

Polelle alleges in his First Claim for relief under 42 U.S.C. sec. 1983 a

violation of the First Amendment Freedom from Compelled Speech or Compelled

Association. Doc.1, R.at 5).  Abridgements of any citizen's First Amendment right

to vote based on their political beliefs or nonbeliefs are as unacceptable under the

First Amendment as abridgements based on race or gender. No second-class

citizenship exists when it comes to the right to vote.

In *Janus v. AFSCME, Council 31*, ---U.S. ---, 138 S.Ct. 2448 (2018) the

Supreme Court declared that the right to exercise or not exercise political speech or

political association lies at the very heart of the First Amendment.  Overruling

prior precedent, the Supreme Court in *Janus* held that an Illinois law compelling

23

non-union members of a public employee union to pay agency fees to the union violated the First Amendment. "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." 138 S.Ct. at *2463.* "Because the compelled subsidization of private speech seriously impinges on First Amendment rights, it cannot be casually allowed." *138 S.Ct.* at 2464.

Likewise, Polelle, in his status as a municipal taxpayer, is being forced to subsidize speech and support party primaries when he cannot vote in such primaries except by changing his public voter registration to falsely and deceptively claim membership in a political party that goes against his conscientious conviction of nonassociation with political parties.

Without deciding whether "strict scrutiny" applied, the Supreme Court struck down this Illinois law with the use of "exacting scrutiny" and rejected a rationality test for evaluating the state' interest.

Not even the state's interest in labor peace, avoiding "free riders" and other concerns was sufficient to withstand this level of scrutiny. *138 state* at 2465. Just as those concerns were insufficient in *Janus,* any alleged Florida interest would also be insufficient to withstand the exacting scrutiny of *Janus.* More specifically, any concern by Florida about preventing "raiding" of a party's primary by rival

24

political parties is beside the point because Plaintiff's Complaint only asks that voters registered with "No Political Party" be allowed to vote in primaries (Doc.1, R.10-11).

Even a federal taxpayer may properly claim a violation of the Establishment Clause where government uses public funds to improperly aid religious belief, *Flast v. Cohen*, 392 U.S. 83 (1968). If the Establishment Clause of the First Amendment clearly bars the traditional European practice of tithing federal taxpayers to subsidize one or many organized religions, surely the First Amendment's rights to free speech and association prohibit the tithing of municipal taxpayers to fund one organized political party or many organized political parties. Freedom of and from religious and political creeds lies at the core of the First Amendment.

## B. FLORIDA'S CLOSED PRIMARIES VIOLATE FIRST AMENDMENT RIGHTS OF SPEECH AND POLITICAL ASSOCIATION EITHER IN THEMSELVES OR AS PART OF A UNIFIED SYSTEM, TOGETHER WITH GENERAL ELECTIONS, FOR SELECTING OFFICIALS.

### 1. Florida's closed primaries violate the First Amendment in themselves.

Section 101.021 of the Florida Election Code provides:

In a primary election a qualified elector is entitled to vote the official primary election ballot of the political party designated in the elector's registration, and no other. It is unlawful for any elector to vote in a primary for any candidate running for nomination from a party other than that in which such elector is registered.

25

This Florida statute, which is a statutory form of voter suppression, provides the necessary state action for application of the First Amendment. It is also clear that a voter, such as Polelle, who has continuously been registered to vote in Sarasota County as a voter with "No Party Affiliation" (NPA), is not allowed to vote in primaries covered by Section 101.021.

The fundamental right of free speech and association necessarily implicit in the act of voting is now protected by the First Amendment as well as the Equal Protection Clause. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968) ("We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the states.").

A rejoinder to Polelle's claim might be that the Florida closed-primary does not abridge his First Amendment rights because he is free to vote in the party primary of his choice so long as he has changed his non-affiliated registration to affiliation with a political party recognized by the State of Florida twenty-nine days prior to the primary in question. Fla. Stat. § 97.055((1) (2) (2022).

26

However, the rejoinder misses the mark in that government cannot put impermissible conditions on the exercise of fundamental constitutional rights. Defendants make an offer to Polelle and approximately four million politically unaffiliated Florida voters like him: Give up your political convictions opposed to party membership and just register with a party twenty-nine days before a primary and you will have your vote. What's the problem?

The problem is that the abridgement violates the First Amendment right not to associate with political groups or to support their speech. An offer to religious agnostics permitting them to apply for a governmental position so long as they register as members in any organized religion of their choice would be met with instantaneous First Amendment rejection,. And yet the political freedom, as well as the religious freedom, to not go along to get along is also constitutionally protected.  The First Amendment protects the right of citizens to be political agnostics or atheists, as well as true believers, when it comes to party politics as much as protects an equivalent religious freedom.  George Washington and other leading Founders disdained the deleterious effects of political parties. Bill King, "What Our Founding Fathers Said About Political Parties," https://billkingblog.com/what-our-founding-fathers-said-about-political-parties/

In *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72  (1990) the Supreme Court held that it violated the First Amendment rights of public employees for a

27

governmental official to base employment decisions on affiliation with a political party or support for that party, where no vital governmental interest was involved.

The *Rutan* opinion noted that for at least a quarter century the Court had made it clear that even persons who have no right to a governmental benefit may not be denied that benefit by infringing a constitutionally protected interest, such as freedom of speech. "For if the government could deny a benefit to person because of his constitutionally protected speech or association, his exercise of this freedom would in effect be penalized or inhibited. This would allow the government to produce a result which (it) could not command directly (citation and internal quotation marks omitted)."

The Florida closed primary places an unconstitutional condition on the right of Polelle to exercise First Amendment rights. His only choice is between a constitutionally impermissible rock and hard place. He either betrays his political beliefs by deceptively claiming to become a party adherent so he can vote in primaries, or else he adheres to those nonaffiliation beliefs and forfeits his right to vote in a government-run and government-financed primary which his taxes help to support. It is the classic Catch-22 that would render constitutional rights ineffective if accepted as a general principle.

**2. The unified system of closed primaries coupled with general elections violates First Amendment rights in the general election.**

28

The symbiotic relationship between party primaries and general elections in Florida is alleged in the Second Claim for Relief in Polelle's Complaint ( Doc,1, R. 7) with statutory citations for the following statements regarding Florida election law (Doc.1, R.10-11):

The Florida Constitution provides a popularly known but seldom used Universal Primary Contest in which all voters may vote in a party primary if all candidates for office have the same party affiliation and will have no opposition in the general election. The Florida Constitution also provides that it is the policy of the state to provide for state-wide elections in which all qualified candidates will compete effectively. The expenses of holding all elections for county or state offices shall be paid in the same manner and by the same officers as in general elections. All laws that apply to general elections also apply to special elections or special primary elections to fill a vacancy in office or nominations. Finally, all registered voters, including those not politically affiliated may vote in nonpartisan primary elections for county and circuit judges as well as in any general election for such judges.

The conditioning of Polelle's ability or inability to vote in a political primary crucially affects his vote in a general election. This is especially so since the selection of candidates by the two major parties in a primary practically determines who the candidates will be in a general election. The reality is that Florida's closed

29

primaries abridges not only his right not to participate in a primary but his right to participate equally with other voters in a general election. The Supreme Court has recognized the real-world relation of primaries to general elections.

In finding a violation of the Fifteenth Amendment to exclude voters from Democratic primaries based on race, the Supreme Court noted in *Smith v. Allwright*, 321 U.S.649, 661-664 (1944):

It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State like the right to vote in a general election is a right secured by the Constitution. . . .The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party….When primaries become a part of the machinery for choosing officials, state or federal, as they have here, the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election.

Likewise, in *Terry v. Adams*, 345 U.S. 461 (1953), where the Jaybird faction of the Texas Democratic party, a powerful private group, practically selected candidates for the Democratic primary based on racial exclusion from their group, the Supreme Court still found state action.("The effect of the whole procedure, Jaybird primary plus Democratic primary plus general election is to do precisely that which the Fifteenth Amendment forbids---strip Negroes of every vestige of influence in selecting the officials who control the local county matters that intimately touch the daily lives of citizens.") 345 U.S. at 469-70.

30

*United States v. Classic*, 313 U.S. 299, 319 (1941) involved neither racial

discrimination nor the Fifteenth Amendment, yet the Supreme Court still found

state action when two Louisiana election commissioners altered and falsely

counted votes in a Democratic primary in violation of federal statutes protecting

the rights, privileges, and immunities of voters from violation by those acting

under color of law:

> …[A]n interference with the effective choice of the voters at the only stage of
> the election procedure when their choice is of significance, since it is at the
> only stage when such interference could have any practical effect on the
> ultimate result, the choice of the Congressman to represent the district. The
> primary in Louisiana is an integral part of the procedure for the popular choice
> of Congressman. The right of qualified voters to vote at the Congressional
> primary in Louisiana and to have their ballots counted is thus the right to
> participate in that choice. 313 U.S. at 312 … Moreover, we cannot close our
> eyes to the fact already mentioned that the practical influence of the choice of
> candidates at the primary may be so great as to affect profoundly the choice
> at the general election even though there is no effective legal prohibition upon
> the rejection at the election of the choice made at the primary and may thus
> operate to deprive the voter of his constitutional right of choice.

These earlier cases are not dead law. The Supreme Court in *Gray v. Sanders*,

372 U.S. 368, 380 (1963) relied on their reasoning to hold the Georgia county unit

voting system a violation of the Equal Protection Clause --- even in a primary

election --- because the system weighted rural votes more heavily than urban ones

and even the votes of some rural counties carried more weight than the votes of

other rural counties. The Supreme Court was clear that the right to be free of a

31

diluted vote extends not merely to the general election but to any preliminary election that determines the true weight a vote will wield.

*Moore v. Ogilvie*, 394 U.S. 814, 818 (1969), struck down as a violation of the Equal Protection Clause an Illinois requirement that a petition to nominate candidates of a new political party for a general election had to have 25,000 signatures, including 200 in each of at least 50 Illinois counties. The requirement was found to be an arbitrary and rigid formula creating an undue distinction between more populous counties and less populous counties and giving one group greater voting strength than another. ("All procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote (citations omitted.") 394 U.S. at 819.

In *Morse v. Republican Party of Va., 517 U.S. 186 (1996)* the state Republican Party denied plaintiffs the opportunity to become delegates to a state convention to select candidates for a general election because they refused to pay a filing fee. State law allowed political parties the option of selecting candidates by convention or primary. Noting that a convention, just like a primary, narrows the candidate field to the "serious few who have a realistic chance to win the election," the Supreme Court found the filing fee a violation of the Voting Rights Act because the fee proposal was not submitted for preclearance. 517 U.S. at 206. The Court stated: "Exclusion from the earlier stage [political convention or primary], as

32

two appellants in this case experienced, does not merely curtail their voting power, but abridges their right to vote." 517 U.S. at 207.

Whatever doubt existed earlier about applicability of the Fourteenth Amendment to cases brought by individual voters on grounds other than race, such doubt no longer exists. Invidious discrimination against a voter of any race that fails to meet the strict scrutiny test for fundamental rights guaranteed by the Fourteenth Amendment will be struck down. In *Carrington v. Rash*, 380 U.S. 69, 96 (1965) the Supreme Court invalidated a Texas law barring members of the armed forces from voting in any election. 380 U.S. 89, 96 ("…States may not deprive a class of individuals of the vote because of some remote administrative benefit to the State (citation omitted.)."

## V.  FLORIDA'S CLOSED-PRIMARY SYSTEM VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE FLA. CONST. ART VI § 5(B) ARBITRARILY AND CAPRICIOUSLY EXACERBATES THIS DISCRIMINATION.

### A. THE EXCLUSION OF POLITICALLY UNAFFILIATED VOTERS FROM FLORIDA PRIMARIES VIOLATES THE EQUAL PROTECTION CLAUSE.

Fla. Stat. §101.021 (2022) provides:

In a primary election a qualified elector is entitled to vote the official primary election ballot of the political party designated in the elector's registration, and no

33

other. It is unlawful for any elector to vote in a primary for any candidate running for nomination from a party other than that in which such electors is registered.

The issue is whether a state can require an otherwise qualified voter, who is both a local taxpayer and politically unaffiliated on principle, to vote in a party primary in order to be placed on an equal basis with other voters. Politically unaffiliated voters are similarly situated to party voters in that they are all otherwise qualified but yet are invidiously discriminated against by a denial of the right to vote in a government-funded and government-supervised primary system supported by their tax dollars.

Defendants have not contested that Polelle, like other independents registered with "No Party Affiliation," meets the residential, age, and citizenship requirements in order to vote in any election in Florida. Yet he and they are denied the right to vote in government-funded and government-supervised party primaries solely because they refuse to join a political party based on their political beliefs,

In *Hill v. Stone*, 421 U.S. 289 (1975), the Supreme Court affirmed the invalidity of provisions in the Texas Constitution, the Texas Election Code, and the city charter of Fort Worth insofar as they denied the equal protection of non-propertied taxpayers who were not allowed to vote with propertied voters on bond issue of general interest even though they met all other voting requirements. "In *Kramer v. Union Free School District No.15,* 395 U.S. 621, 89 S. Ct. 1886, 23 L.

Ed. 583 (1969), we held that in an election of general interest, restrictions on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." *Hill*, 421 U.S. at 295. Defendants cannot show Florida's closed-primary system would survive the strict scrutiny required by *Hill*.

The Florida interlocked system of primaries and general elections unnecessarily diminishes and dilutes the ultimate voting power of politically unaffiliated voters by locking them out of primaries and narrowing their choice in general elections. Some four million Florida voters, now more than those registered as Democrats, are registered as politically independent. Fla. Dept. of State (last updated: 12/9/2022) https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-by-party-affiliation/

These voters have become second-class citizens insofar as their votes count for less in ultimately selecting the officials who will affect their lives. This distorted system also harms the public interest because the candidates selected for the general election are unlikely to represent the full spectrum of political views held by their constituents and are beholden to the more extreme partisan voters who elected them in party primaries.

35

The Supreme Court has not tolerated such inequality of voting power in cases of legislative reapportionment. In *Reynolds v. Sims*, 377 U.S 533, 556 (1964) the Court stated:

In *Baker v. Carr*, 369 U.S, 186, 82 S. Ct. 691, 7L.Ed. 2d. 663, we held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts. 377 U

To Polelle's knowledge, no court has suggested in the legislative apportionment cases that the underlying principle of one person, one vote is unnecessary because a voter who lives in an urbanized voting district with many more voters should simply move to a neighboring rural community with far fewer voters for a more effective vote in influencing the outcome of an election,. In the interlocked system of govern-run and government-funded support for both primaries and general elections that characterize Florida election law it is as constitutionally unacceptable to abridge equality of voting power in a primary as in in a general election.

In *Wesberry v.Sanders*, 376 U.S. 1, 17-18 (1964), Justice Black, writing for the Supreme Court, thus declared  disproportionate congressional districting a violation of equal protection in words encapsulating Polelle's position:

36

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

## B. THE FLA. CONST. ART.VI § 5(B) ARBITRARILY AND CAPRICIOUSLY EXACERBATES THIS DISCRIMINATION.

The Fla. Const. art.VI, § 5(b), popularly known as the Universal Primary, provides: "If all candidates for an office have the same party affiliation and the winner will have no opposition in the general election, all qualified electors, regardless of party affiliation, may vote in the primary elections for that office."

In 1998 Florida voters passed Art. VI § 5(b) as an amendment to the state's Constitution. James Kirley, "Monday Chat: Universal primaries a 2-edged sword in Florida," TC Palm, digital news for Treasure Coast Newspapers in Florida (posted 8/12/2012 online) https://archive.tcpalm.com/news/monday-chat-universal-primaries-a-2-edged-sword-in-florida-ep-382139559-343066032.html/ (legislative background of this Universal Primary amendment).

In practical effect, this constitutional amendment did not alleviate the unfairness of the closed-primary system. It simply made the effects of closed-primaries even more unbalanced after the Florida Supreme Court interpreted the "no opposition in the general election" phrase to mean that a "write-in candidate" qualified as "opposition" to keep the primary closed, even though no other

37

candidate from an opposing party came forward to challenge the primary victor. *Brinkman v. Francois*, 184 So.3d 504, 514 (Fla. 2016).

Florida write-in candidates do not pay any filing or other fees like other candidates and do not have their name printed on the ballot. Only space is provided on the ballot. Voters must literally write in the candidate's name. Fla. Stat. § 99.061(4)(b) (2022). The only obligation of a write-in candidate is to file qualifying papers to run for office and to take a statutorily prescribed oath. *Id.* at § 99.061(4) (a) (qualifying papers) and §99.021 (oath).

It is not unusual for political parties to use the write-in loophole to close the only primary in town so that only party members in their primary will elect not only their nominee but the winner in a general election without any real-world "opposition." The chances of a write-in candidate ever winning a general election are chimerical. "Our opinion: Florida's write-in provision is worse than you think," *Tallahassee Democrat (*published 11/25/2016) https://www.tallahassee.com/story/opinion/editorials/2016/11/25/opinion-floridas-write-provision-worse-think/94292282/ ("No write-in candidate has ever won a Florida election.").

The Florida Supreme Court's interpretation of the Universal Primary provision opens up a loophole pernicious not only to the equal protection of

38

independent voters registered with "No Party Affiliation but to that of voters from opposing parties. It has perversely become a closed-primary tool on steroids that realistically determines the general election in the guise of a closed primary.

The catch is that where no opposing party fields a candidate for the general election, the party with the only primary in town can put up a crony "write-in: candidate with no chance of winning, simply to keep the primary closed to all other voters besides its own. The result is a general election in which the party candidate will inevitably win by default. This stratagem may benefit the party but it undermines the trust of voters in the fairness of their elections. Although perhaps intended by some as a feeble acknowledgment and attempted palliative for the closed-primary system, the Universal Primary operates fitfully, erratically and in a way that arbitrarily and completely excludes most voters most of the time from having a say in general elections.

Tia Mitchell, "Tia Mitchell: Using write-in candidates to close primaries is voter disenfranchisement," *The Florida Times Union (*Jacksonville.com) (published5/13/2016)https://www.jacksonville.com/story/news/politics/2016/05/13 /tia-mitchell-using-write-candidates-close-primaries-voter/15710329007/ ("[A]t least 900,000 Florida voters were shut out of voting in 15 House and Senate races because of write-in candidates that year [2016]. By my count, it happened nine more times in 2014.").

39

This political chicanery not only discriminates invidiously between members of all political parties in one class and politically unaffiliated voters in another class. It enlarges the unjustifiable discrimination between a class of privileged members from one political party holding the primary and another class consisting of both politically unaffiliated voters and members of opposing political parties.

## VI. UNDER SUPREME COURT PRECEDENT THE FIRST AMENDMENT AND EQUAL PROTECTION RIGHTS OF POLITICALLY UNAFFILIATED FLORIDA VOTERS ARE COMPATIBLE WITH THE FIRST AMENDMENT RIGHTS OF POLITICAL PARTIES.

Plaintiff's Complaint is not barred as a matter of law by the Supreme Court decisions of *California Democratic Party v. Jones*, 530 U.S.567 (2000) and *Clingman v. Beaver, 544 U.S. 581 (2005).*

Polelle does not ask for a specific type of replacement for the Florida closed-primary and would leave that to the representatives of the people in the Florida legislature. All plaintiff contends is that the current version of the Florida close-primary is unconstitutional. The following case analysis indicates how the Plaintiff's First Amendment rights are compatible with the First Amendment rights of political parties.

In *California Democratic Party, 530 U.S. 567 (2000)* the Supreme Court struck down California Proposition 198 as a violation of the associational rights of political parties. California's had changed from closed primaries to "blanket" primaries. The Court explained that in "blanket" primaries each voter's ballot lists every candidate running for

40

each of the offices and permits voters to choose freely among them. 530 U.S. at 570. However, in the California version party candidates only competed against other candidates from the same party and the top vote-getter in each of these intra-party competitions would become that party's candidate for the particular office involved in the general election.

The distinguishing and constitutionally fatal flaw of Proposition 198 was that the candidate from each political party for each office who garnered the most votes became that party's nominee in the general election for the office in question. 530 U.S. at 569 ("This case presents the question whether the State of California may, consistent with the First Amendment to the United States Constitution, use a so-called "blanket" primary to determine a political party's nominee for the general election.").

The "blanket" primary was unconstitutional because it eviscerated the First Amendment right of a party to pick its own nominees. In delivering the opinion of the Supreme Court, Justice Scalia did not condemn "open" primaries which allow political parties to determine their own nominees before opening a primary to all voters. 530 U.S. at 586 ("Respondents' legitimate state interests and Petitioners' First Amendment rights are not inherently incompatible. To the extent they are in this case, the State of California has made them so by forcing political parties to associate with those who do not share their beliefs.").

In fact, the Supreme Court in the subsequent case of *Washington State Grange v. Washington. State Republican Party, 552 U.S. 442, 453 (2008)* upheld as constitutional a

41

"modified blanket" primary which avoided the fatal flaw of having all voters decide a

party's nominee:

> The flaw in this argument [ unconstitutionality of "modified blanket primary"]is that, unlike the California primary, the 1-872 primary does not, by its terms choose the parties' nominees . . . .Whether parties nominate their own candidates outside the state-run primary is simply irrelevant. In fact parties may now nominate candidates by whatever mechanism they choose because I-872 repealed Washington's prior regulations governing party nominations.


The Supreme Court in *Clingman v. Beaver*, 544 U.S. 581, 587 (2005), endorsed

Oklahoma's semi-closed primary system in which a political party may allow voters

registered as Independent to vote in its primary but not voters affiliated with another

political party. The Libertarian Party objected on the basis that it wished to allow all

voters, even those from other parties, to vote in its primaries. The court rejected the attack

on Oklahoma's semi-closed system with these words:

> In *Tashjian,* this Court struck down, as inconsistent with the First Amendment, a closed primary system that prevented a political party from inviting Independent voters to vote in the party's primary. 479 U.S., at 225, 107 S. Ct. 544. This case presents a question that *Tashjian* left open: whether a State may prevent a political party from inviting registered voters of other parties to vote in its primary. *Id.,* at 224, n. 13, 107 S. Ct. 544. As *Tashjian* acknowledged, opening a party's primary "to all voters, including members of other parties, ... raise[s] a different combination of considerations." *Ibid.* We are persuaded that any burden Oklahoma's semiclosed primary imposes is minor and justified by legitimate state interests.


In asking that only registered politically independent voters be allowed to vote in

primaries, Polelle's claim does not fall afoul of the ruling in *Clingman*.

42

The "modified blanket" [sometimes called "open"] primary upheld as constitutional in *Washington State Grange v. Washington State Republican Party, 552 U.S. 442 (2008)* is only one way to replace the unconstitutional Florida closed-primary system. Another way would be to require political candidates or political parties to return to an earlier practice of paying the costs of administering their own primaries. See *Smith v. Allwright, 321 U.S. 649, 664 (1944)* ("The plan of the Texas primary follows essentially that of Louisiana, with the exception that in Louisiana the state pays the cost of the primary while Texas assesses the cost against candidates."). It may even be possible to conduct a separate primary for voters registered as politically unaffiliated.

But whatever the Florida legislature deems constitutionally appropriate, one thing seems clear. Political parties now have it both ways. They exclude politically unaffiliated voters from party primaries but at the same time they require through state action those same voters to pay taxes for those very primaries from which they are excluded. The voter suppression of some four million politically unaffiliated voters in Florida may serve the interests of political parties. It does not currently serve any compelling or heightened state interest for Florida to run an election system based on an unequal and diluted representation of all qualified voters based on their political allegiance.

In general, it is a characteristic of nondemocratic governments that the interests of the political party in power are the same as those of the government and thus to oppose the party is to oppose the government. It is a saving grace of the United States that we are still able to say that political parties and government are distinct and that parties exist to

43

benefit the government and not the other way around. Polelle's cause of action is needed to keep government and political parties separate so that government can work for all of the people and not just political parties at a time where electoral fairness has become a paramount issue.

## CONCLUSION

Wherefore, Michael J. Polelle, Plaintiff-Appellant, requests this Court to reverse the District Court's order dismissing the action filed by him and, in the interest of judicial economy and in light of the fact that questions of law predominate, to enter a judgment as matter of law on the merits for Polelle with appropriate declaratory and injunctive relief , but if the Court thinks otherwise, then to remand this case to the District Court for further proceedings consistent with its opinion, and finally, to order whatever other remedy may seem appropriate and just to this Court.

Respectfully submitted      1102 Ben Franklin Dr.   Unit 511

By: _____   Sarasota, Florida 34236

Michael J. Polelle, Pro Se      Tel: (941) 388-1840   Email: mpolel2@uic.edu

44

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

*Check the appropriate box in section 1, and check the box in section 2.*

1. **Type-Volume**

[✓] This document complies with the word limit of FRAP Rule 32(a)(7)(B)(i) [insert Rule citation]
because, excluding the parts of the document exempted by FRAP 32(f) and
[insert applicable Rule citation, if any], this document contains
[state the number of] 10,357 words.

**or**

[ ] This brief complies with the line limit of FRAP [insert Rule citation] because,
excluding the parts of the brief exempted by FRAP 32(f) and
[insert applicable Rule citation, if any], this brief uses a monospaced
typeface and contains [state the number of] lines of text.

2. **Typeface and Type-Style**

[✓] This document complies with the typeface requirements of FRAP 32(a)(5) and the
type-style requirements of FRAP 32(a)(6).

(s) Michael J. Polelle

Attorney for PRO SE

Dated: January 9, 2023

45

Rev.: 12/16

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF SERVICE

*(Use this form only if service is being made other than through the Court's electronic-filing system.)*

**Michael J Polelle** *vs.* **Cord Byrd et al.** Appeal No. **22-14031-DD**

FRAP 25(b) through (d) (attached) require that at or before the time of filing a paper, a party must serve a copy on the other parties to the appeal or review. Unless the document is being served through the Court's electronic-filing system, the person making service must certify that the other parties have been served, indicating the date and manner of service, the names of the persons served, and their addresses. **You may use this form to fulfill this requirement.** *Please type or print legibly.*

I hereby certify that on (date) JANUARY 17, 2023 , a true and correct copy of the

foregoing (title of filing) **Appellant's Opening Brief** has been (check one):

[✔] sent by mail, postage prepaid

[ ] deposited in the prison's internal mailing system with first-class postage prepaid

[ ] sent by electronic means with the consent of the person being served

[ ] other (specify manner of service) _____

and properly addressed to the persons whose names and addresses are listed below:

1. Ashley E. Davis, Deputy General Counsel, Florida Dept. of State, 500 S. Bronough, Ste.100, Tallahassee FL,32399-0250

2.Bradley R. McVay, Florida Dept. of State, 500 S. Bronough St., Tallahassee FL, 32399-0250

3. Ashley Elizabeth Gaillard, Bentley Goodrich Kison, 783 S. Orange Ave., Sarasota FL, 34236

4.Morgan R. Bentely, Bentley & Bruning, PA, 783 S. Orange Ave., Ste.300, Sarasota FL, 34236

MICHAEL J. POLELLE
Your Name (please print)

Michael J Polelle
Your Signature

46