

No. 22-14031-JJ

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

### MICHAEL J. POLELLE,

*Plaintiff-Appellant*

*v.*

*CORD BYRD,* in his capacity as Secretary of State of Florida, and RON TURNER, in his capacity as Supervisor of Elections for Sarasota County, Florida,

*Defendant-Appellees*

Appeal from the United States District Court for the Middle District of Florida

No. 8:22-cv-1301-SDM-AAS

### APPELLANT'S REPLY BRIEF

Michael J. Polelle, Pro Se

1102 Ben Franklin Dr, Unit 511

Sarasota, Florida 34236

(941) 388-1840   mpolel2@uic.edu

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

### CERTIFICATE OF INTERESTED PERSONS AND
### CORPORATE DISCLOSURE STATEMENT (CIP)

_____ *vs.* _____ Appeal No. _____

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party. *(Please type or print legibly)*:

Bentley Goodrich Kison

Byrd, Cord, Florida Secretary of State

Davis, Ashley E.

Florida Secretasry of State's Office

Gaillard, Ashley E.

Merryday, Hon. Steven, U.S. District Judge

Polelle, Michael J.

Sarasota County of Electioins Office

Turner, Ron, Sarasota County Supervisor of Elections

Voters registered in Florida with "No Party Affiliation"

Wallace, David A.

Submitted by:
Signature: Michael Polelle
Name: Michael J. Polelle          Prisoner # (if applicable): N/A
Address: 1102 Ben Franklin Drive, Unit 511, Sarasota, Florida  34236
Telephone #: (941) 388-1840

Rev.: 2/23

# TABLE OF CONTENTS

**Certificate of Interested Persons and Corporate Disclosure Statement . . . C-1**

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Table of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Defendant Turner's misplaced reliance on the *Doremus* case instead of the Eleventh Circuit's *Pelphrey* case highlights why Polelle has municipal-taxpayer standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. The *Doremus* case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. *Smith* and *Pelphrey* cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Defendants' responses to Polelle's traditional standing argument outlined in the *Pelphrey* case miss the mark . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. Defendant Turner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B. Defendant Byrd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1. Injury-in-fact . . . . . . . . . . . . . . . . . . . . . . . . 5

        2. Traceability and redressability . . . . . . . . . . . 7

III. Because Polelle has his own standing through municipal-taxpayer standing, traditional standing, or both, he is allowed under the overbreadth doctrine to raise the First Amendment rights of political parties not before this Court. . . . . . . . . . 8

    A. No waiver occurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B. Why the overbreadth doctrine applies . . . . . . . . . . . . . . . . . . 10

1. The two factual elements of the overbreadth doctrine . . . 10

2. Factual element one . . . . . . . . . . . . . . . . . . . . . . . . .    11

3. Factual element two . . . . . . . . . . . . . . . . . . . . . . . .    12

IV. By conditioning Polelle's right to vote on the requirement of a false declaration of party allegiance, Florida's closed-primary system in itself violates his First Amendment right not to associate with or support political parties. . . . . . . . . . . . 13

V. As part of a unified electoral system, Florida's closed primaries violate both the First Amendment and Equal Protection Clause by diluting and diminishing the vote of politically unaffiliated voters in subsequent general elections because, unlike registered party adherents, they have zero voting influence in determining candidates for those general elections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI. Defendants have not adduced any legitimate state interests which survive the exacting or strict scrutiny required by the Supreme Court inasmuch as Florida's closed primaries intrude on the core right of all citizens under the First Amendment and Equal Protection Clause to vote regardless of their orthodox or unorthodox political beliefs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Addendum (Polelle's Voting Record)** . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**Certificate of Compliance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Certificate of Service** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

**Cases:**

*Comptroller of the Treasury of Maryland v. Wynne*
575 U.S. 542 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Doremus v. Bd. of Educ. of Hawthorne*
342 U.S. 429 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

*Gale Force Roofing & Restoration*
548 F.Supp.3d 1143 (N.D. Fla. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Green v. Miss United States of America, LLC*
52 F.4th 772 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hardwick v. Bowers*
760 F.2d 1202 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Janus v. AFSCME, Council 31*
__U.S.__, 138 S. Ct. 2448 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Kilborn v. Amiridis*
No.22C475, 2023WL2058061 at *5 (N.D. Ill. Feb. 15, 2023) . . . . . . . . . . . 18

*Montana Green Party v Jacobsen*
17 F.4th 919 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Nader v. Schaffer*
417 F.Supp. 837 (D. Conn. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*\*Pelphrey v. Cobb Cnty. Ga.*
*547 F.3d 1263 (11ᵗʰ Cir. 2008).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2-3*

*Rothenberg v. Sec. Mgmt. Co.*
667 F.3d 958 (11ᵗʰ Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*\*Singleton v. J. L. Wulff*
428 U.S. 106 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*\*Smith v. Jefferson Cnty. Of Sch. Comm'rs*
641 F.3d 197 (6ᵗʰ Cir. 2011) (rehearing en banc) . . . . . . . . . . . . . . . . . . . . . 1-4

*Starbuck v. R.J. Reynolds Tobacco Co.*
349 F. Supp. 3d 1223 (M.D. Fla. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*\*Tashjian v. Republican Party of Conn.*
479 U.S. 208 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11-12

*\*Washington State Grange v. Washington State Republican Party*
552 U.S. 442 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*\*Washington State Republican Party v. Washington State Grange*
676 F.3d 784 (9ᵗʰ Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

iv

*Witt v. Metro. Life Ins. Co.*
772 F.3d 1269 (11th Cir.2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ziskis v. Symington*
47 F.3d 1004 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Constitution:**

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend. XIV § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Rule & Statutes:**

Fed. R. Evid. 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,12

Fla. Stat. § 101.021 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fla. Stat. § 119.07 (1) (a) (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Miscellaneous:**

Fla. Dep't of State, Div. of Elections, Political Parties . . . . . . . . . . . . . . . . 12-13

https://dos.myflorida.com/elections/candidates-committees/political-parties/


Fla. Dep't of State, Div. of Elections, Voter Information as a public record . . 14

https://dos.myflorida.com/elections/for-voters/voter-registration/voter-information-as-a-public-record/


George Washington's Farewell Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

https://www.senate.gov/artandhistory/history/resources/pdf/Washingtons_Farewell_Address.pdf


National Conference of State Legislatures . . . . . . . . . . . . . . . . . . . . . . . . . 22

http://ncsl.org/elections-and-campaigns/state-primary-election-types


*Bob Peris & Silva Avcil, Fulcrum, "Open primaries legislation breaks through in New Mexico,"* http://thefulcrum.us/open-primaries-new-mexico *(last visited April 7 2023)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# ARGUMENT

# INTRODUCTION

…[T]he common and continual mischiefs of the spirit of party are sufficient to make it the interest and duty of a wise people to discourage and restrain it. It serves always to distract the public council and enfeeble the public administration. It agitates the community with its ill founded jealousies and false alarms, kindles the animosity of one part against another, foments riot and insurrection.

**FAREWELL ADDRESS, PRESIDENT GEORGE WASHINGTON**

HTTPS://WWW.SENATE.GOV/ARTANDHISTORY/HISTORY/RESOURCES/PDF/WAS HINGTONS_FAREWELL_ADDRESS.PDF AT 14.

## I. DEFENDANT TURNER'S MISPLACED RELIANCE ON THE DOREMUS CASE INSTEAD OF THE ELEVENTH-CIRCUIT'S PELPHREY CASE HIGHLIGHTS WHY POLELLE HAS MUNICIPAL-TAXPAYER STANDING.

### A. THE DOREMUS CASE

Defendant Turner argues against municipal taxpayer standing based on his keystone case of *Doremus v. Bd of Educ. Of Borough of Hawthorne*, 342 U.S. 429 (1959) cited *passim* in his brief. Without his incorrect interpretation of *Doremus* as applying to municipal-taxpayer standing, the argument that the requirements for municipal -taxpayer standing are the same as state-taxpayer standing falls apart.

*Doremus* is not applicable to municipal-taxpayer standing. *Smith v. Jefferson Cnty. of Sch. Comm'rs*, 641 F.3d 197 (6th Cir. 2011)(*rehearing en banc* )held: "The defendants' argument under *Doremus* to suggest otherwise is

1

misplaced because that case concerned *state*-taxpayer standing and does not govern the case at bar." 641 F.3d at 211. *Smith* drew a bright-line distinction between the municipal-taxpayer standing it upheld as opposed to state-taxpayer standing. Moreover, fundamental reasons exist why *Doremus* is not usable to deny municipal-taxpayer standing. No evidence or even specific allegations exist in the sparse report of that case to show any governmental money at all was used, or the source of any funds, let alone municipal funds, to finance the reading of five Bible verses at the start of class. *Doremus,* 347 U.S. at 433.

Often overlooked, but explicit in the opinion, is that *Doremus* seems to have been a trumped-up "controversy" to induce the Supreme Court to rule on an abstract principle of First Amendment law. It so appeared to the Supreme Court. The State had waived the issue of standing at a pretrial conference in a likely bid to foist jurisdiction on the Supreme Court to induce a ruling on the merits of the case *Doremus*, 347 U.S. at 433. To extrapolate a denial of taxpayer standing in cases like the one before this Court, when more basic explanations exist for the decision, gives the thin reed of *Doremus* more legal weight than it can bear.

## B. SMITH AND PELPHREY CASES

In *Smith v. Jefferson County, 641 F.3d 197(6th Cir.2011) (rehearing en banc)* the Sixth Circuit, after a comprehensive examination of the issue, held

2

that two teachers had standing as municipal taxpayers to bring a § 1983 action against the school board for outsourcing their jobs in alternative education to a private organization with religious overtones in violation of the Establishment Clause. "Unlike federal or state taxpayers, municipal taxpayers may fulfill the injury requirement by pleading an alleged misuse of municipal funds. (citation omitted)." The Eleventh Circuit's own most relevant precedent of *Pelphrey v. Cobb Cnty, Ga.,* 547 F.3d 1263, 1280 (11th Cir. 2008) is foursquare in line with the *Smith* opinion by making a clear demarcation between municipal-taxpayer standing and the standing for state and federal taxpayers.

Defendant Turner suggests that funds expended to operate a closed-primary system is not a misuse of those funds under *Pelphrey.* (Deft. Brief, 17-18)). To the contrary, this Court in *Pelphrey* determined the district court correct in concluding that the county planning commission "categorically excluded certain faiths" from prayer invocations at governmental meetings. 547 F.3d at 1282.

The case at bar is exactly the same except for the constitutionally inconsequential difference that Polelle and other politically unaffiliated voters like him were "categorically excluded" from voting in a political primary because of their political beliefs rather than being excluded because of religious beliefs.

3

If Polelle had been excluded from voting because of his race or ethnicity, surely no one doubts that would be considered a misuse of county funds. The misuse is not only through an unconstitutional system of systemic exclusion but also by the payment of election officials, law enforcers, and other personnel with county funds to enforce those exclusions.

Defendant Turner hypothesizes that if Florida's closed-primary system were declared unconstitutional, the financial loss or gain by Sarasota County should somehow affect whether Polelle has municipal standing to challenge closed primaries (Deft. Byrd's brief, 13-14). This is not so, for as the Sixth Circuit in *Smith* concluded: "There is no precedent for a requirement that municipal taxpayers show that an unconstitutional act shrinks the public treasury in order to establish standing. Indeed, any such rule would run directly counter to case law from the Supreme Court, from this court, and from our sister circuits." 641 F.3d at 211. To similar effect, Justice Sutton noted in a concurring opinion: "But municipal taxpayer standing has never hinged on the amount by which an expense would affect the municipal treasury." 641 F.3d at 221.

## II.  DEFENDANTS' RESPONSES TO POLELLE'S TRADITIONAL STANDING ARGUMENT OUTLINED IN THE PELPHREY CASE MISS THE MARK.

### A. DEFENDANT TURNER

4

Defendant Turner confounds the preliminary question of traditional

standing with the merits of the case. But the merits are reached only if and when

standing exists. Defendant Turner argues in the standing portion of his brief that

"Just like any eligible Florida voter, Polelle is allowed to vote in a party's primary

if he registers with that party." (Deft Turner's Brief, 18) and "His [Polelle's]

options are to join a party and participate in selecting its candidate, or not." Deft.

Turner's brief, 20).  But this puts the cart of constitutional decision before the

horse of standing by effectively saying no standing exists because in Defendant

Turner's view Polelle should lose on the paramount constitutional issue in the case:

whether the right of an American citizen to vote requires allegiance to a political

party absent a heightened or strict-scrutiny interest justifying that requirement.

## B. DEFENDANT BYRD

### 1. Injury-in fact

The injury-in-fact requirement should be "most loosely" applied to

this case because it involves the First Amendment. *Gale Force Roofing &*

*Restoration LLC v. Brown,* 548 F. Supp. 3d 1143, 1154 (N.D. Fl. 2021) (citing 11th

circuit cases and also holding injury-in-fact fairly traceable to Secretary of State).

Defendant Byrd considers Polelle as only motived by an insufficient

"desire" to vote in political primaries (Deft. Byrd's brief, 8). The word "desire" in

itself does nothing to help a court divine the issue of injury-in-fact because obviously both those allowed to vote and those prevented from doing so have a "desire" to vote.

The Addendum appended to this Reply Brief and obtained by Polelle as a public record from the Supervisor of Elections Office, Sarasota County, in December 2022, indicates that Polelle has more than an ineffectual and abstract "desire" to vote.

This "Voting History Report" shows a consistent record of voting in those non-political primaries where Polelle is allowed to vote as one politically unaffiliated. Federal courts are empowered to take judicial notice of public records within their jurisdiction. *Rothenberg v. Sec. Mgmt. Co.,* 667 F.3d 958, 961 n.8. (11th Cir. 1982) ("Normally, an appellate court will not consider facts that were not presented to the district court (citation omitted).We are, however, free to take judicial notice of subsequent developments in cases that are a matter of public records and are relevant to the appeal (citation omitted)." See also Fed. R. Evid. 201(b).

Polelle has more than a passing "desire" to vote in primaries. The public record provided by Defendant Turner establishes that his past practice of voting in elections, primary as well as general, provides a reasonable inference he will most

6

probably vote in future political primaries, if this Court grants the relief requested. At the pleading stage Polelle's Complaint alleges a sufficient injury-in-fact.

Standing cannot mean that Polelle must be arrested for demanding to vote in a primary while remaining registered with no-party affiliation. To require such would defeat the salutary purpose of  declaratory relief as a judicial mechanism to avoid disorderly conduct in order to establish a legal claim.

### 2. Traceability and Redressability

Defendant Byrd argues in his brief that any injury is not traceable to or redressable by the Secretary of State because "Here, the Secretary is not an enforcement authority of the Closed Primary Statute . . . ." (Deft. Byrd's brief, 11).  Defendant Byrd fails to understand how Polelle's reference to the  Office of Election Crimes and Security  created in 2022 within the Florida Secretary's Department of State by legislative enactment affects the application of  traditional - standing doctrine to the Secretary of State. (Deft. Byrd's brief, 11-12, n. 5.).

If Polelle were to dissemble his true conviction of nonaffiliation with political parties and falsely change his registration to membership in a political party, he risks running afoul of Florida laws which criminally punish fraudulent registrations and illegal voting as well as swearing or affirming falsely by oath or affirmation in submitting voter information.  Florida even makes it a third-class

7

felony for any person, who knows he is unqualified to vote in any election (Appellant's Appendix, Memorandum of Law, Doc.14, R. 115 with legal citations).

The significance of the new Office of Election Crimes signed into law by Governor DeSantis on April 25, 2022 adds an additional and potent enforcement mechanism wielded by the Secretary of State which was not available for consideration in earlier cases.

## III. BECAUSE POLELLE HAS HIS OWN STANDING THROUGH MUNICIPAL- TAXPAYER STANDING, TRADITIONAL STANDING, OR BOTH, HE IS ALLOWED UNDER THE OVERBREADTH DOCTRINE TO RAISE THE FIRST AMENDMENT RIGHTS OF POLITICAL PARTIES NOT BEFORE THIS COURT.

### A. NO WAIVER OCCURRED

Both Defendants submit that the right of Polelle to argue the overbreadth doctrine cited in his opening brief was waived in the district court. This Court stated in *Witt v. Metro. Life Ins. Co., 772 F.3d 1269. 1279 (11th Cir. 2014):*

Waiver requires "(1) the existence[,] at the time of the waiver[, of] a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit (citation omitted)." Where a party alleges an implied waiver, "the acts, conduct, or circumstances relied upon to show waiver must make out a clear case (internal *citation omitted).*

In his response to the motion to dismiss Polelle specifically contended that under Florida law a political party, in a clear violation of *Tashjian v.*

8

*Republican Party of Conn.,*479 U.S. 208 (1986), is not allowed to open up its primary to politically unaffiliated voters. (Appellant's opening brief, 20). This shows that he did not intentionally relinquish his right to raise the overbreadth argument but effectively asserted it in so many words. Nor do these words make out a "clear case" of implied waiver. They instead show the opposite.

The District Court was aware of the point. It found the action warranted dismissal for lack of standing because no political party had joined the action or otherwise objected to the closed-primary statute. (Appellant's opening brief, 20). Defendant Turner claims the District Court's statement was taken "out of context." (Deft. Turner's brief, 23). But the only context was the constitutional rights of political parties not before the District Court. It is far less likely to suppose the District Court erroneously meant that Polelle had to join a political party as a mandatory co-plaintiff or have a political party file an amicus brief as a matter of law.

In *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223 (M.D. Fla. 2018) even the Middle District of Florida stated that Florida's "long-standing public policy" of adjudicating disputed on the merits where possible likely extended to the waiver doctrine. The district court noted that recent cases from both the Florida Supreme Court and the Eleventh Circuit

9

suggested the standard for finding waiver in Florida is "demanding." 349 F. Supp. 3d at 1230.

## B. WHY THE OVERBREADTH DOCTRINE APPLIES

To clarify at the outset, Polelle disputes Defendant Turner's assertion that he asserts the overbreadth doctrine as "an independent basis for standing" to challenge Florida's closed-primary system. (Deft. Turner's brief, 22). Rather, Polelle asserts he has first laid the predicate of his own standing either under the municipal-taxpayer standing rule, or the traditional standing rule, or both as discussed in Polelle's opening brief and in this Reply Brief.

### 1. The Two Factual Elements of the Overbreadth Exception

The Supreme Court in *Singleton v. J.L. Wulff*, 428 U.S. 106, 114-17 (1976) employed the overbreadth rule for third-party jurisdiction in First Amendment cases where two "factual elements" are met: (1) the relationship between the litigant and the party not before the court whose right the litigant seeks to assert is such that this right is "inextricably bound up with the activity the litigant wishes to pursue" and the litigant is "fully, or very nearly," as effective in defending the right as the third party would be. (2) Some "genuine obstacle" prevents the third party from asserting the right in court. 428 U.S. at 114-17 (citations omitted and verbiage condensed).

10

## 2. Factual Element One

The first element is clearly met in this case. Polelle and political parties in Florida who want to open up their primaries to voters registered as politically unaffiliated have an inextricably united claim that Florida's closed primary system violates their First Amendment rights of speech and association.

*Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 225 (1986) unequivocally held that even a closed-primary state violated the First Amendment rights of the Republican Party by preventing it from opening up its primaries to politically unaffiliated voters (extended discussion in Appellant's opening brief, 20-21). Just as unequivocally the Florida closed-primary system categorically restricts primary voting to the political party designated in the elector's registration "and no other." Fla. Stat §101.021(2022).

It is true that Polelle argues Florida violates both his right to not associate with political parties by barring him from voting in political primaries because of his non-party political convictions and also violates the right of Florida political parties who might be willing to associate with voters like Polelle. But his First Amendment right not to associate is inextricably part of the same First Amendment right of political parties to associate. The rights of political association and non-association are simply opposite sides of the same coin.

11

Lastly, Polelle would be at least "as effective or nearly as effective" as any representative of a political party who may appear in court to urge a violation by Florida of the *Tashjian* holding. Polelle's Complaint alleges he is "an emeritus professor of law."(Appellant's Appendix Doc.1- R.5: "The Parties," ¶.4). This allegation indicates his familiarity with First Amendment law would most likely be at least "as effective, or nearly as effective," as that of any representative who might appear before this Court on behalf of a political party. The reality is that it cannot be assumed any of the minor political parties in Florida would be able to appear through an attorney and might have to appear pro se, if at all.

### 3. Factual Element Two

The Florida Department of State lists the two major political parties, Democratic and Republican, on its website and eleven minor political parties. Fla. Dep't of State, Div. of Elections, "Political Parties" (last visited: April 3, 2023), https://dos.myflorida.com/elections/for-voters/voter-registration/voter-information-as-a-public-record/. *Montana Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021) ("We take judicial notice of maps and official election results from the Montana Department of State website (citations omitted)." Fed. R. Evid. 201(b).

Polelle readily concedes that the duopolistic dominance of the two major parties in contemporary American politics guarantees they will have no

12

financial or legal "genuine obstacles" to defend themselves in court without Polelle.

But the eleven registered minor parties are another matter. Some do not have the massive campaign contributions or readily available access to legal representation that the major parties do.  Although Polelle may not offer information outside the record, the Florida Department of State website, cited above, seems to indicate that The Coalition with A Purpose Party, for example, obtained zero contributions to fund its activities in the latest election cycle. The lack of resources to obtain legal counsel is a "genuine obstacle." Application of the overbreadth doctrine would guarantee constitutional protection of minority-party interests in Florida.

## IV.  BY CONDITIONING POLELLE'S RIGHT TO VOTE ON THE REQUIREMENT OF  A FALSE DECLARATION OF PARTY ALLEGIANCE IN A PUBLIC RECORD, FLORIDA'S CLOSED-PRIMARY SYSTEM  IN ITSELF VIOLATES HIS FIRST AMENDMENT RIGHT  NOT TO  ASSOCIATE WITH OR SUPPORT POLITICAL PARTIES.

Absent a vital interest, government may not deny First Amendment rights by unlawfully conditioning those rights in such a way so as to do indirectly what it could not do directly: effectively preventing the exercise of the First Amendment right (Appellant's Brief, discussion of *Rutan* Supreme Court case, 28).

Florida's closed-primary system requires a crucial condition before a voter is allowed to vote in a political primary: The voter must declare allegiance to a

political party. This condition effectively prevents principled voters who are politically unaffiliated from voting in political primaries. Although Defendants correctly but irrelevantly argue the truism that Polelle can vote if he just re-registers as a member of a political party that simply sidesteps the underlying issue of the case: Can a citizen be compelled to join a political party in order to participate on an equal basis with fellow citizens in electing candidates to office?

Not only must voters dedicated to political nonaffiliation swallow their true political convictions in order to vote by choosing a political party. They must suffer harassment by misled solicitations from party operatives at election time and the further indignity of having their duplicitous switch recorded by the Supervisor of Elections as a public record for all to see and obtain. Fla. Dep't of State, Div. of Elections, "Voter Information as a public record" (last visited: April 3, 2023) ("Once filed, with few exceptions, all voter registration information is a public record including your name, address, date of birth, *party affiliation* [emphasis supplied], phone number and email address."). https://dos.myflorida.com/elections/for-voters/voter-registration/voter-information-as-a-public-record/. See also the broad public-record statute Fla. Stat. § 119.07(1) (a) (2022).

This electoral arrangement brings to mind the early Christians' dilemma of having to decide whether to burn just a pinch of incense before an image of the

14

emperor, as required by the authorities, or not do so, as required by their

conscience and Christian faith.

### V. AS PART OF A UNIFIED ELECTORAL SYSTEM, FLORIDA'S CLOSED PRIMARIES VIOLATE BOTH THE FIRST AMENDMENT AND EQUAL PROTECTION CLAUSE BY DILUTING AND DIMINISHING THE VOTE OF POLITICALLY UNAFFILIATED VOTERS IN SUBSEQUENT GENERAL ELECTIONS BECAUSE, UNLIKE REGISTERED PARTY ADHERENTS, THEY HAVE ZERO VOTING INFLUENCE IN DETERMINING CANDIDATES FOR THOSE GENERAL ELECTIONS.

A primary voter has a right to an effective vote in the general elections. See

*Montana Green Party v. Jacobsen,* 17 F,4th 919, 927-28 (9th Cir.2021) ( at least one

voter with standing to successfully urge violation of equal protection regarding

nominating petitions as an integral part of an elective system under the "one

person, one vote" principle).

Defendant Turner attempts to distinguish the seminal United States Supreme

Court cases cited by Polelle which established primaries as part of a unified system

together with general elections. Defendant Turner does this by noticing factual

distinctions without a constitutional difference. (Deft. Turner's brief, 29: "For

example, he [Polelle].failed to show he is discriminated against in any way, such as

racially…."). Defendant Turner apparently concedes that if Polelle's vote were

suppressed in a primary on racial or ethnic grounds, Polelle would have a right to

sue for a violation of this First Amendment and Equal Protection rights.

15

Defendant Turner denies, however, that the same First Amendment and Equal Protection guarantees under the Fourteenth Amendment apply to Polelle because his discrimination is based only on political beliefs. But it does not follow that other forms of discriminatory suppression based on the same constitutional rights are unavailable. To base voter suppression on political beliefs is equally repugnant under our Constitution. The Fourteenth Amendment does not distinguish between the fundamental right of freedom from racial and ethnic discrimination and the fundamental right of freedom of speech and association, Voter suppression is voter suppression no matter what unconstitutional form it takes.

Defendants, understandably, do not attempt to justify the arbitrary and politically manipulative Universal Primary addition to the Florida closed-primary system. The invidious arbitrariness of the Universal Primary in Florida closed-primaries is readily apparent. In the real world of hyperpartisan campaigns, that addition fails even the rationality test. Voter inclusion or exclusion in a primary turns randomly on a "write-in" Don Quixote candidate qualifying for the general election.

## V. DEFENDANTS HAVE NOT ADDUCED ANY LEGITIMATE STATE INTERESTS SURVIVING THE EXACTING OR STRICT SCRUTINY REQUIRED BY THE SUPREME COURT INASMUCH AS FLORIDA'S CLOSED PRIMARIES INTRUDE ON THE CORE RIGHT OF

**ALL CITIZENS UNDER THE FIRST AMENDMENT AND EQUAL
PROTECTION CLAUSE TO VOTE REGARDLESS OF THEIR
ORTHODOX OR UNORTHODOX POLITICAL BELIEFS.**

Defendant Byrd cites the almost fifty-year-old case of *Nader v. Schaffer*, 417

F. Supp. 837 (D.Conn.1976), *summarily aff'd, 429 U.S. 989 (1976)* (standing not

an issue) and *Ziskis v. Symington,* 47 F.3d 1004 (9th Cir.1995) (standing not an

issue), citing *Nader,* to support the Florida closed-primary system. Neither of these

cases raised arguments made by Polelle, such as the doctrine of unconstitutional

conditions, the unique irrationality of the Florida Universal Primary, and the First

Amendment rights of political parties not before this Court.

In any event, *Nader* is no longer persuasive. *Comptroller of the Treasury of

Maryland v., Wynne, 575 U.S. 542,560 (2015) (*summary affirmance has

"considerably less precedential value than an opinion on the merits (internal

citation omitted)." Too much contrary legal development has occurred since *Nader*

to continue its persuasiveness. A change in the development of subsequent law

may fatally erode the precedential value of an earlier summary affirmance by the

Supreme Court.  See also *Hardwick v. Bowers.* 760 F.2d 1202, 1209 (11th

Cir.1985) ("Doctrinal developments need not take the form of an outright reversal

of the earlier case.")

*Janus v. AFSCME, Council 31,* __U.S.__, 138 S. Ct. 2448 (2018), which

Polelle raised but which neither Defendant addresses, is a major doctrinal

17

development undermining *Nader*. (Appellant's opening brief, 23-25). Without deciding whether "strict scrutiny" applied, the Supreme Court applied the less rigorous standard of "exacting scrutiny" to an Illinois statute mandating the payment of agency fees by a nonmember public employee, Mark Janus, to the union representing employees under a collective bargaining agreement. 138 S. Ct. at 2465.

The application of doctrinal developments formulated in *Janus* cannot be hermetically confined to collective bargaining situations involving public labor unions. The core logic of *Janus's* compelled-speech has spread beyond that context. See e.g., *Green v. Miss United States of America, LLC, 52 F.4th 772, 783(9th Cir. 2022)* (pageant operator not compelled to hold out transgender applicant as "natural born" female in violation of its "natural born female" message to public: citing *Janus*) and *Kilborn v. Amiridis*, No.22C475, 2023 WL 2058061 at *5 (N.D. Ill. Feb. 15, 2023) (law professor compelled to express commitment to sensitivity diversity-training against his beliefs in order to continue teaching stated claim: citing *Janus*)

An intermediate level of scrutiny was sufficient for the Supreme Court in *Janus* to strike down on First Amendment grounds the compelled subsidization of private speech and support of an organization with which the nonunion employee did not wish to associate. Polelle's compelled subsidization of closed primaries

18

through his local taxes is more egregious in the sense that a nonunion employee is entitled to all the benefits AFSCME negotiated through a collective bargaining agreement for its union members.

Polelle, on the other hand, reaps no benefits from compelled subsidization of political-party primaries. Instead he, and others like him, reap only ostracism from those government-supported and government-funded primaries supported in part by their tax dollars and have their political nonaffiliation opened up to public scrutiny.

The strongest state interest for closed primaries has been in protecting the associational rights of political parties to choose their own nominees for the general election without participation by nonmembers. Closed-primaries have traditionally protected against hypothetical "crossover voting" where nonmembers could conceivably vote in a party primary and distort the integrity of the party's selection of its nominee.

Defendant Turner assumes that Polelle requests this Court to compel political parties "to accept his choice of their nominee as a non-party member."(Deft. Turner's brief, p.29). This is not the case. As Polelle has explained in his opening brief, "crossover voting" is not an inevitable consequence when closed primaries are dismantled. (Appellant's opening brief, Argument VI,

19

40-44). In any case, Polelle has never suggested political parties cannot nominate their own candidates without outside interference. He simply does not want Florida and political parties to suppress his constitutional right to vote.

Also beside the point is Defendant Turner's observation: "If he [Polelle] had an associational interest, it would be weighed against the governmental interests in using the primary format, which the Supreme Court has long recognized as crucial to the democratic process (citation omitted)." On the contrary, Polelle is all for primaries, believes in them, and wants to expand them. That does not mean Florida is restricted to an unconstitutional form of primary that reduces him and some four million Florida voters to second-class citizenship in the electoral process because of their political convictions.

Defendants have not disputed the force of *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 453(2008), another subsequent development to *Nader* and *Ziskis,* which reversed lower- court opinions and allowed non-party primary voters to vote in what the Court called a "modified blanket" primary, Initiative 872 (I-872), without infringing the associational right of parties to pick their own nominees. (Appellant's opening brief, 41-43). No compelling or exacting reasons exist why a similar system could not replace closed primaries in Florida without causing voter confusion.

In fact, the subsequent case of *Washington State Republican Party v. Washington State Grange*, 676 F.3d 784 (9th Cir. 2012), *cert. denied, 568 U.S. 814 (2012) sub nom. Washington State Democratic Central Committee v. Washington State Grange*, 568 U.S. 814 (2012) explained fully how Washington's Initiative 872 was implemented so as not to violate the associational rights of political parties or cause voter confusion. Each primary candidate designates his or her party preference or lack of preference on the primary ballot and on related information. Political parties cannot prevent this designation. The top-two vote-getters advance to the general election regardless of party affiliation. In holding that the new primary system conformed to the Supreme Court's opinion, the Ninth Circuit opinion stated:

> The ballots, and related informational materials, inform voters that, although each candidate for partisan office may specify a political party that he or she prefers, a candidate's preference does not imply that the candidate is nominated or endorsed by the party, or that the party approves of or associates with that candidate. 676 F.3d at

Next, Defendant Turner suggests: "If anything, it [opening Florida's primaries to voters registered as politically unaffiliated] could conceivably increase the costs to municipal taxpayers by increasing the number of potential voters in party primary elections." (Deft. Turner's brief, 14). Putting aside the observation that increasing the turnout of qualified voters in elections is usually considered

21

beneficial to the cause of American democracy, Polelle submits the hypothetical thoughts about additional costs do not survive judicial scrutiny. In *Tashjian v. Republican Party of Conn.*, 479 U.S.208 (1986), the Supreme Court dismissed such an argument in holding that the Republican Party of Connecticut had a constitutional right to open up its primaries to politically unaffiliated voters. "… [T]he possibility of future increases in the cost of administering the election system is not a sufficient basis for infringing appellees' First Amendment rights." 479 U.S. at 218.

The lack of any significant state interests that could withstand an exacting or strict-scrutiny examination is indicated by the fact that the number of states using closed political primaries has rapidly dwindled to only seven. There were eight in 2022. National Conference of State Legislatures, http://ncsl.org/elections-and-campaigns/state-primary-election-types (last visited April 7, 2023). In 2023 that number was reduced to seven. Bob Peris & Silva Avcil, Fulcrum, "Open primaries legislation breaks through in New Mexico," http://thefulcrum.us/open-primaries-new-mexico (last visited April 7 2023)

The State of Florida has no valid interest in giving voice in closed primaries to the more extreme views of party partisans but shutting down the First

Amendment voices of more politically nuanced voters who choose not to be true believers in politics.

In short, a governmental system which would ban George Washington from voting in a primary is constitutionally flawed on its face.

## CONCLUSION

For the foregoing reasons, as well as those set out in the opening brief of Polelle, Plaintiff-Appellant, the judgment of the District Court should be reversed.

Respectfully submitted,

/s/ Michael J. Polelle

Michael J. Polelle, Pro Se

1102 Ben Franklin Drive

Unit 511

Sarasota, Florida 34236

Tel: (941) 388-1840

Email: mpolel2@uic.edu

Ron Turner

| Date | 12/12/202: | Supervisor of Elections | Sarasota County, FL |
|---|---|---|---|
| Time | 03:37 PM | **Voting History Report** | |

**Voter ID 119077274    POLELLE, MICHAEL J**

| Election | AddressLine2 | Election Date | Voted |
|---|---|---|---|
| 186 | 2022 General Election | Nov/08/2022 | Voted Absentee |
| 185 | 2022 Primary Election | Aug/23/2022 | Voted Absentee |
| 184 | 2022 Special Election | Mar/08/2022 | Voted Absentee |
| 182 | LBK REFER / CITY OF VENICE | Nov/02/2021 | Not Eligible |
| 181 | CITY OF NP SPEC | Mar/09/2021 | |
| 180 | GENERAL | Nov/03/2020 | Voted Absentee |
| 179 | PRIMARY | Aug/18/2020 | Voted Absentee |
| 178 | PRES PREFERENCE PRIMARY | Mar/17/2020 | |
| 177 | CITY OF VENICE GENERAL | Nov/05/2019 | |
| 176 | LBK_HOLIDAY PARK | Mar/12/2019 | |
| 175 | GENERAL | Nov/06/2018 | Voted Absentee |
| 174 | PRIMARY | Aug/28/2018 | Voted Absentee |
| 173 | SCHOOL BD/LBK/SPEC DIST | Mar/20/2018 | Voted Absentee |
| 172 | SPEC HD 72 | Feb/13/2018 | |
| 171 | SPEC PRI HD 72 | Dec/05/2017 | |
| 170 | CITY OF VENICE GENERAL | Nov/07/2017 | |
| 169 | CITY SAR 2ND/NP SPEC | May/09/2017 | Voted Absentee |
| 168 | CITY SAR/NP SPEC/LBK | Mar/14/2017 | Voted Absentee |
| 167 | GENERAL | Nov/08/2016 | Voted Absentee |
| 166 | PRIMARY | Aug/30/2016 | Voted Absentee |
| 165 | PPP | Mar/15/2016 | |
| 164 | LBK REFER/CITY OF VENICE | Nov/03/2015 | |
| 163 | LBK REFERENDUM | May/13/2015 | |
| 162 | CITY OF SARASOTA SECOND | May/12/2015 | Voted Absentee |
| 161 | CITY SAR/LBK | Mar/10/2015 | Voted Absentee |
| 160 | GENERAL | Nov/04/2014 | Voted |
| 159 | PRIMARY | Aug/26/2014 | Voted Absentee |
| 158 | SPEC COUNTYWIDE LBK GEN | Mar/25/2014 | Voted Absentee |
| 157 | CITY OF VENICE GENERAL | Nov/05/2013 | |
| 156 | CITY OF SARASOTA SECOND | May/14/2013 | Voted |
| 155 | CITY OF SARASOTA LBK | Mar/12/2013 | |
| 154 | GENERAL | Nov/06/2012 | Voted Absentee |
| 153 | PRIMARY | Aug/14/2012 | |
| 152 | LBK GEN | Mar/20/2012 | |
| 151 | PRES PREF PRIMARY | Jan/31/2012 | |
| 150 | CITY OF VENICE GENERAL | Nov/08/2011 | |
| 149 | CITY SARASOTA SECOND | May/10/2011 | |
| 148 | LBK GENERAL | Mar/15/2011 | |
| 147 | CITY OF SARASOTA | Mar/08/2011 | |
| 146 | 2010 GENERAL | Nov/02/2010 | |
| 145 | 2010 PRIMARY | Aug/24/2010 | |
| 144 | SCSB LBK TRI-PAR HP | Mar/16/2010 | |
| 143 | LBK PRELIMINARY | Jan/26/2010 | |
| 142 | VENICE GENERAL | Nov/03/2009 | |
| 141 | SAR SECOND (IF NECESSARY) | Apr/14/2009 | |

24.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

*Check the appropriate box in section 1, and check the box in section 2.*

**1.    Type-Volume**

☑    This document complies with the word limit of FRAP        32(a)(7)(B)(ii)
     because, excluding the parts of the document exempted by FRAP 32(f) and
                                          , this document contains
            4,816              words.

   **or**

☐    This brief complies with the line limit of FRAP     [insert Rule citation]      because,
     excluding the parts of the brief exempted by FRAP 32(f) and
               [insert applicable Rule citation, if any]          , this brief uses a monospaced
     typeface and  contains       [state the number of]         lines of text.


**2.    Typeface and Type-Style**

☑    This document complies with the typeface requirements of FRAP 32(a)(5) and the
     type-style requirements of FRAP 32(a)(6).


(s)_Michael J. Polelle_____

Attorney for _Pro Se_____

Dated: _April 17, 2023_____

25

Rev.: 12/16

### U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

### CERTIFICATE OF SERVICE

*(Use this form only if service is being made other than through the Court's electronic-filing system.)*

**Michael J. Polelle** *vs.* **Cord Byrd et al.** Appeal No. **22-14031-JJ**

FRAP 25(b) through (d) require that at or before the time of filing a paper, a party must serve a copy on the other parties to the appeal or review. Unless the document is being served through the Court's electronic-filing system, the person making service must certify that the other parties have been served, indicating the date and manner of service, the names of the persons served, and their addresses. **You may use this form to fulfill this requirement.** *Please type or print legibly.*

I hereby certify that on (date) APRIL 25, 2023 a true and correct copy of the

foregoing (title of filing) **Appellant's Reply Brief** has been (check one):

- ■ sent by mail, postage prepaid

- ☐ deposited in the prison's internal mailing system with first-class postage prepaid

- ☐ sent by electronic means with the consent of the person being served

- ☐ other (specify manner of service) _____

and properly addressed to the persons whose names and addresses are listed below:

1. Ashley E. Davis, Deputy General Counsel, Florida Dept. of State, 500 S. Bronough, Suite 100, Tallahassee FL. 32399

2. Ashley E. Gaillard, Bentley Goodich Kison, P.A., 783 South Orange Avenuer, Third Floor, Sarasota, FL 34236

3, David A. Wallace, Bentley Goodrich Kisson, P.A., 783 South Orange Avenue, Third Floor, Sarasota FL 34236

MICHAEL J. POLELLE
Your Name (please print)

Your Signature

Rev.: 12/20

26