No. 22-14031 $-JJ$

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---



MICHAEL J. POLELLE,

*Plaintiff-Appellant*

*v.*

*CORD BYRD*, in his capacity as Secretary of State of Florida, and RON TURNER,

in his capacity as Supervisor of Elections for Sarasota County, Florida,

*Defendant-Appellees*

Appeal from the United States District Court for the Middle District of Florida

No. 8:22-cv-1301-SDM-AAS

---

## PETITION FOR PANEL REHEARING

---

Michael J. Polelle, Pro Se

1102 Ben Franklin Dr, Unit 511

Sarasota, Florida 34236

(941) 388-1840   mpolel2@uic.edu

# TABLE OF CONTENTS

Argument I: The Panel Overlooked Ruling On Polelle's Major Argument That Once He Has Standing, He Is Allowed Under The Overbreadth Doctrine To Uphold The First Amendment Rights Of Political Parties Not Before The Court..........1

Argument II: The Panel Majority Misapprehended The Anderson-Burdick Analysis Because That Analysis Does Not Apply Where A Core First Amendment Prohibition Against Compelled Speech And Association Is Involved And A More Exacting Scrutiny Is Required..............................................................................2

Argument III: The Summary Supreme Court Affirmance In Nader Is Not Binding And Even If It Were The Developments Doctrine Of This Circuit Renders It No Longer Binding .......................................6

Argument IV: Even If The Anderson-Burdick Analysis Were The Correct Analysis To Apply, The Panel Majority Has Misapplied The Analysis By Extensively Inserting The Nader Decision Into The Analysis.............................7

Conclusion:.......................................................................15

i

Certificate of Interested Persons and Corporate
Disclosure Statement...................................................................16

Certificate of Compliance ........................................................17

Certificate of Service .................................................................18

Addendum A (1946 Opinion of Florida Attorney General)................... 19

Addemdum B (Florida Voter Registration Application)...................... 20

Addendum C  ({Panel Opinion) ...................................................21

## ARGUMENT

## I. THE PANEL OVERLOOKED RULING ON POLELLE'S MAJOR ARGUMENT MADE THAT ONCE HE HAS STANDING, HE IS ALLOWED UNDER THE OVERBREADTH DOCTRINE TO UPHOLD THE FIRST AMENDMENT RIGHTS OF POLITICAL PARTIES NOT BEFORE THE COURT

The panel majority properly ruled that Polelle has standing as regards the Sarasota County Supervisor of Elections. Because he has standing in his own right, Polelle contended in his Opening Brief (at 20-22) that he has the further standing to raise the First Amendment rights of political parties not before the Court because the Florida closed-primary system, is in clear violation of *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986), by depriving parties of the right to invite politically unaffiliated voters to vote in their primaries. He also made the same claim in his Reply Brief (at 10), specifically citing the two-factor test for such claims laid out in *Singleton v. J.I. Wulff*, 428 U.S. 106, 114-17 (1976).

This omission takes on significance because Judge Robert Luck, on July 26, 2023 (Docket Item 35), granted leave to the Libertarian Party of Florida to file an out-of-time motion but in the very same order denied its motion for leave to file a brief as amicus curiae in support of Polelle's claim without requiring an answer from Defendants. *But see* FRAP 29(a)(6)("...specifying the time within which an

1

opposing party may answer.") . The out-of-time motion by the Coalition with a Purpose Party to file an amicus brief in support of Polelle was simply denied.

Whatever level of scrutiny is appropriate to Polelle's claims, the degree to which the First Amendment rights of political parties are also abridged by the Florida closed-primary system is important to the resolution of Polelle's claim. This is so because such information would have further informed the panel of the strength or weakness of Florida's alleged interest in preserving the closed-primary system for the benefit of political parties. This is especially true where the rights of minor parties are involved, such as the Libertarian Party of Florida and the Coalition with a Purpose Party. "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson v. Celebrezze*, 460 U.S. 780,793 (1983)

Polelle urges this panel to vacate the preliminary rulings by Judge Robert Luck and then grant the Motions of the Libertarian Party of Florida and the Coalition with a Purpose Party to file briefs in support of Polelle's claims under 11th Cir. R. 27-1(g)(*Motions*).

## II. THE PANEL MAJORITY MISAPPREHENDED THE ANDERSON-BURDICK ANALYSIS BECAUSE THAT ANALYSIS DOES NOT APPLY WHERE A CORE FIRST AMENDMENT PROHIBITION AGAINST

2

## COMPELLED POLITICAL SPEECH AND ASSOCIATION IS INVOLVED AND A MORE EXACTING SCRUTINY IS REQUIRED.

In *Anderson v. Celebrezze,* 460 U.S. 780 (1983), Justice Sevens set out the legal framework, characterized as a "sliding scale" by the panel (Op. at 57), used to strike down an early filing deadline for candidacy and nominating petitions. He specifically noted that an unconstitutional burden"…especially difficult for the State to justify…" fell on "an identifiable segment of Ohio's independent voters." 460 U.S. at 792-93.*Anderson* did not consider the act of voting itself but only the secondary aspect of when voting deadlines must be met. And yet even in that secondary context the Ohio statute was struck down.

*Burdick v. Takushi, 504 U.S. 428,436 (1992)* (Stevens, J. dissenting), upheld a neutral regulation banning write-in candidates for all voters and candidates equally. But Hawaii, unlike the closed system Polelle faces, had a very open primary system with minimal requirements, such as only needing 15-25 names on a petition to place a candidate on a ballot. This made the lack of a write-in ballot an insignificant burden on voters.

Justice Steven, writing for the Court, in *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 344 (1995), removed any doubt in which cases *the Anderson-Burdick* analysis applied and in which it did not. Ohio prohibited anonymous campaign literature. The Court struck down the prohibition and drew a

3

bright line: The *Anderson-Burdick* analysis did not apply to "pure speech" cases, such as the case before the Court. The prohibition unconstitutionally regulated the content of speech, even though it was applied equally to all viewpoints expressed in the anonymous pamphlets. The unconstitutional pressure put on Polelle to make a "Hobson's choice" between his right to vote and his political beliefs is within the ambit of core speech and association values rather than the myriad secondary aspects of voting regulations and laws.

The original *Anderson-Celebrezze* analysis has degenerated over the years .The Montana Supreme Court in *Montana Democratic Party v. Jacobsen,* 545 P.3d 1074 (Mont.2024)  refused to adopt the *Anderson-Burdick* " balancing test" to interpret its state constitution. The reason  was that originally the test was like "intermediate scrutiny" but that "after four decades of federal precedent," the test is now used to give undue deference to state legislatures." 545 P.3d. at 1084. The test was called "amorphous" and insufficient to prevent heavy burdens from being placed on voters. *Id* at 1089.  Instead, the Montana Supreme Court adopted a "middle-tier analysis" in this voting-rights case to strike down a state law. *Id.* at 65.

Polelle contends that a controlling precedent,  not explicitly discussed by the panel majority,  was submitted to the panel by FRAP 28(j) letter on July 3, 2023 (Docket Item 31) : *303 Creative LLC v. Elenis,* 600 U.S. 570 (2023). The Supreme Court held the plaintiff had standing because she had a credible fear that if she

4

expanded her graphic design business to include wedding websites, Colorado

would compel her to celebrate same-sex weddings against her sincerely held

religious convictions., The Court struck down the regulation threatening penalties

if she did not celebrate such weddings. She was faced with a "Hobson's choice" of

either not including wedding websites in her business or doing so and running the

risk of penalties unless she abandoned her religious scruples. "In this case,

Colorado seeks to force an individual to speak in ways that align with its views but

defy her conscience on a matter of major significance." *Id.* at 602-03.

The panel did expressly discuss the other compelled -speech case of *Janus

v. AFSCME,, Council 31*, 585 U.S. 878 (2018). Janus likewise had the option of

finding another job if he didn't want to pay an agency fee to a union for collective-

bargaining expenses. Nonetheless, the Court struck down the Illinois requirement

that he subsidize the union with payment of  agency fees because the requirement

failed an exacting standard of review. The panel majority attempts to distinguish

*Janus* on the basis that Polelle did not suffer a "monetary burden" anymore than

did the plaintiffs in *Nader.* (Maj. Op. at 67-68). What this attempted distinction

overlooks is that ever since his Complaint Polelle has urged throughout this case

that his payment of real estate taxes to subsidize closed primaries in which he

cannot vote without violating his political principles is precisely such a "monetary

burden."

5

### III. THE SUMMARY SUPREME COURT AFFIRMANCE IN NADER IS NOT BINDING AND EVEN IF IT WERE THE DEVELOPMENTS DOCTRINE OF THIS CIRCUIT RENDER IT NO LONGER BINDING.

In *Mandel v. Bradley*, 432 U.S. 173 (1977) (per curiam), decided a year after the Supreme Court decision in *Nader*, the same Court vacated and remanded a three-judge district court decision striking down Maryland's early filing as an unconstitutional burden on an independent candidate. The three-judge panel had improperly viewed prior affirmance by the Supreme Court in another case [*Salera*]as "controlling precedent." 432 at 175. The prior summary affirmance was an affirmance of the judgment only and not of the lower court's rationale . 432 at 176."Because of its preoccupation with Salera [prior summary- affirmance case] the District Court failed to undertake an independent examination of the merits." 432 at 177.  "We do not endorse the reasoning of the district court when we order summary affirmance of the judgment." *Bush v. Vera*, 517 U.S. 952,996 (1996) (Kennedy J., concurring).

The panel also  diverges from the  way the 11th Circuit has generally viewed the weight of Supreme Court summary-affirmance precedent under its "developments doctrine." *Hardwick v. Bowers,* 760 F.2d 1202, 1209 (11th Cir. 1985), a case cited by Polelle  (Reply Brief at 17 ) but not discussed by the panel. There the Eleventh Circuit did not consider itself bound by a Supreme Court

summary affirmance of a three-judge district court upholding the Georgia sodomy law. 760 F.2d at 1207.

Finally, the facts and circumstances of *Nader* and Polelle's case are significantly different. The panel majority asserted Polelle brought "the exact same claims as the plaintiffs in Nader did." (Maj Op. 58). But in fact, unlike Polelle, the *Nader* plaintiffs claimed additional violations of the right to vote under Article I of the Constitution for Senators and Representatives and the Seventeenth Amendment. 417 F.Supp. at 840 and did not raise a First Amendment overbreadth argument. But most importantly, the Nader three-judge district court noted the diminished harm to plaintiffs because of the Connecticut political landscape: ("…Connecticut is not a 'one-party" state and thus no one party's primary election is completely determinative of the outcome." 417 F.Supp. at 843. The panel majority candidly contrasts this with Sarasota County primary elections dominated by one party and determinative of most Sarasota County's partisan elections since 1968 (Maj. Op. 69). This is a crucial difference.

**IV. EVEN IF THE ANDERSON-BURDICK ANALYSIS WERE THE CORRECT ANALYSIS TO APPPLY, THE PANEL MAJORITY HAS MISAPPLIED THE ANALYSIS BY EXTENSIVELY INSERTING THE NADER DECISION INTO THE ANALYSIS.**

7

## (A) NADER IS NOT EVEN PERSUASIVE PRECEDENT REGARDING ANDERSON-BURDICK

*Nader* cannot be an implicit and "canonical" (Op. at 33 n.14 &58)

application of the *Anderson-Burdick* framework because *Nader* was decided in

1976. *Nader v. Schaffer,* 417 F. Supp. 837 (D.C. Conn. 1976), *summarily aff'd,* 428

U.S. 989 (1976) (mem.). *Anderson v. Celebrezze,* 460 U.S. 780 (1983) and *Burdick*

*v. Takushi,* 504 U.S. 428 (1992) were decided, respectively, seven and seventeen

years later. Courts have hindsight but they are not prognosticators of future

precedent so remote in time.

Polelle further submits that this Court must independently analyze the case

on its own terms with an *Anderson-Burdick* analysis. The panel majority attempts

to deflect this chronological chasm by claiming that *Nader*, nonetheless, conducted

" effectively" the same balancing test before the Supreme Court later "refined" it.

(Maj.Op.at 60) If that were so, nothing indicates that in the *ipse dixit* Supreme

Court affirmance. It is merely speculation. On the contrary, the *Nader* district court

concluded that the Connecticut closed primary was "reasonably related to the

accomplishment of legitimate state goals." 417 F. Supp. At 849. This mere

"rationality" test is antithetical to the later balancing test of *Anderson-Burdick*.

*Anderson-Burdick* cannot be considered binding or even persuasive

"canonical" authority preemptively preventing this Court hands from coming to an

8

opposite conclusion on the facts of this different case. Under *Anderson* there is no "litmus paper test" for separating valid from invalid restrictions and a court must independently balance on the precise facts before it. *Green Party of Ga. V., Georgia*, 551 Fed.Appx.982,983 (11th Cir.2014)(numerous cases upholding 5% petition-signature requirement not taken to mean a 1% requirement was automatically constitutional).

The *Anderson-Burdick* analysis requires a court to consider and weigh: (1) "the character and magnitude of the injury" to First and Fourteenth Amendment rights (2) by identifying and evaluating the legitimacy and strength of "the precise interests put forward by the State as justifications" for a plaintiff's constitutional burden (3) and finally by not only determining "the legitimacy and strength of each of those interests" but also by considering " the extent to which those interests make it necessary to burden a plaintiff's rights." *Anderson* at 789/

## (B) CHARACTER AND MAGNITUDE OF ASSERTED INJURIES TO 1ST AND 14TH AMENDMENTS

### (1) *Voter Dilution and Outcome-Determinative Primaries*

The panel majority categorizes as Polelle's "strongest argument" that unlike *Nader*, Sarasota County has in most cases become a one-party jurisdiction dominated so thoroughly by one party for so long a time that the primary vote

determines the outcome of the general election. (Maj.Op.69), Polelle's vote is diluted because he and others like him have no say in determining who the candidates will be in a general election. No write-in candidate has ever prevailed in Florida. Even in the so-called Universal Primary exception, noted previously by Polelle (Complaint &Opening Brief, 37-40) and unnoted in the panel opinion, the disenfranchising and partisan shenanigans of a write-candidacy by a political operative in collusion with a political party can re-close a primary election in an arbitrary and capricious way.

"Our analysis reveals that extended periods of one-party dominance-currently on the uptick-is the rule, not the exception, in the American states, and are a phenomenon for further exploration," Parry, Dowdle, Long & Kloss, "The Rule, Not the Exception: One-Party Monopolies in the American States," 22 State Politics and Policy(A Quarterly at 226 (Abstract)(Cambridge Univ. Press 2022). One could hardly claim otherwise since the concurring opinion impressively cites actual empirical evidence to show how the rapidly rising number of registered independent voters in Florida, from all classes and races, is depriving ever more citizens of their right to vote on equal terms with fellow citizens(Concurring Op. at1-3).

The panel majority's only response is that the burdens were "substantially higher, if not categorical in the White Primary cases." (Maj. Op. at 70). This

10

observation strays from the point. Nothing in the *Anderson-Burdick* analysis requires that a plaintiff must have a burden at least equal to that in the White Primary cases. The voting harm inflicted by racial animus is repugnant. But so is a violation based on a voter's political convictions. The Constitution does not mandate a rivalrous escalation of constitutional injury to establish voting-rights violations.

Even if we were to treat the White Primary Cases as a benchmark for sufficient harm, surely Black and Hispanic voters registered as politically unaffiliated are now deprived of their right to vote just as surely as were the Black plaintiffs in the White Primary cases due to race. On March 27, 1946, The Florida Attorney General, stated that in his opinion "316 negroes" registered for a primary election "who did not know or state their party affiliation" were not entitled to vote in the primary because of a predecessor statutory provision nearly identical to the current closed-primary statute found at Fla. Stat.§ 101.021.(ADDENDUM A). Were they excluded because of racial animus or because of their political beliefs? In either case the exclusionary result was the same.

### (2) The "Hobson's Choice" of Unconstitutional Conditions

Paradoxically, the panel majority correctly found Polelle's "Hobson's choice", either lie about your sincerely held political beliefs on a voter application

11

and vote, or tell the truth and not be allowed to vote, relevant to the establishment of standing . However, the panel did not mention this injury at all when discussing the injury to Polelle on the merits. Nor did the panel address in its opinion Polelle's argument that Florida could not impose an unconstitutional condition on his right to vote (Polelle's Opening Brief, 27-28 (citing Supreme Court precedent) and his Reply Brief, 13-15).

Polelle suggests that omission of the unconstitutional-conditions doctrine from the *Anderson-Burdick* analysis is erroneous. Fla. Stat. (§) 97.1031 provides that a person registering to vote must subscribe to the following oath: "...[A]ll information provided in this application is true." The Florida voter application form states right above the signature line: "I understand that it is a 3rd degree felony under state and federal laws to falsely swear or affirm or otherwise submit false information." (ADDENDUM B).

Florida does not treat false information in elections as a harmless fib, "white lie," or prevarication. In *Arcia v. Florida Sec'y of State,* 772 F.3d 1335 (11th Cir. 2014) this Circuit allowed plaintiffs to sue for the injury caused by the purging of alleged non-citizens from voter rolls and the likelihood that it might happen again. This case was brought to the panel's attention by a FRAP 28(j) letter on August 24, 2024. In *Jones v. Schiller*, 345 So.2d 406,414 (Fla. Dist. Ct. App. 2022) the court noted that an appropriate remedy against a primary opponent being

untruthful as to party affiliation would be to refer "bad actors" for prosecution under various Florida criminal statutes.

## (C) THE LEGITIMACY AND STRENGTH OF PRECISE STATE INTERESTS MAKING IT NECESSARY TO BURDEN PLAINTIFFS' RIGHTS

The district court in *Nader* provided three imprecise generalizations adopted by the panel majority as valid state interests when weighed in the *Anderson-Burdick* balancing test. These outdated generalizations were, even at the time, untethered to empirical or other evidence. Less so now in 2025 do these unsubstantiated generalizations justify preventing a citizen from voting in a closed primary because of their political beliefs.

Following the nebulous reasoning of the *Nader* district court, the panel majority claims, first, that states have the right to protect a political party and its members from intrusion by those with "adverse" political principles. (Maj. Op. 63-64). But the interests of registered independents are not necessarily "adverse" as those of an opposing political party. *Nader's* paternalistic attitude was later rejected in *Tashjian v. Republican Party of Connecticut,* 471 U.S. 208 (1985) (Republican Party had First Amendment right to open its primary to independents despite closed-primary law).

13

The second *Nader* state interest, perhaps the most nebulous, relied on by the panel majority was helpfully reduced by the panel majority to the simple concept of protecting a party's "brand." (Maj.Op. 64). But Defendants have not argued that Florida has that interest, let alone provided any evidence how letting Polelle vote in several possible alternatives to a closed-primary would damage that "brand." Political parties have diverse views about their own "branding" without Florida's imposed and constitutionally suspect view, whatever that view may be. ". . .[T] major parties in this country have been characterized by a fluidity and overlap of philosophy of membership." Democratic Party v. Wisconsin, ex rel. LaFollette, 450 U.S. 107, 131 (1981) (internal quotation marks eliminated) (Powell, J. dissenting)

The third *Nader* interest adopted by the panel majority is the "housekeeping function" of political parties in knowing who are registered voters so that party can solicit their votes on its behalf. (Maj. Op. 64-65). But the accessibility of voter registration lists does not require a closed primary. Admittedly, the voter lists with party identification or lack thereof make it easier to verify who is qualified to vote in a closed primary. But if Florida abolished its closed primaries, it would still have its registered voter lists open to the public and political parties for use in soliciting votes. Defendants did not even raise this *non sequitur* justification.. Primaries, uniquely peculiar to modern American politics, are not even essential for a party to nominate its candidates.

14

Polelle maintains the only clear interest served by Florida's closed-primary system is the preservation of party power, in effect the preservation of the two-party system. But this is precisely the state interest that the Supreme Court rejected in *Anderson v. Celebrezze*, 406 U.S.780, 802 ("Thus in *Williams v. Rhodes* we concluded that First Amendment values outweighed the State's interest in protecting the two major political parties.").

## CONCLUSION

Wherefore, petitioner respectfully requests his panel to grant a rehearing and redress the omissions and legal misapprehensions in the panel's opinion.

s------------------------------

Michael J. Polelle, Pro Se

1102 Ben Franklin Drive, Unit 511

Sarasota, Florida 34236

(941) 388-1840

Mpolel2@uic.edu

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT (CIP)

MICHAEL J. POLELLE vs. FLORIDA SECRETARY OF STATE et al.   Appeal No. 22-14031

11th Cir. R. 26.1-1(a) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party. *(Please type or print legibly)*:

Bentley Goodrich Kison

Byrd, Cord, Florida Secretary of State

Davis, Ashely E. , Esq.

Florida Secretary of State's Office

Gaillard, Ashley E., Esq.

Merryday, Hon., Steven, U.,S., District Judge

Michael J. Polelle, Esq.

Sarasota County Elections Office

Turner, Ron, Sarasota County Supervisor of Elections

Florida Voters registered with "No Party Affiliation"

Wallace, David A., Esq.

Submitted by:

Signature:

Name: Michael J. Polelle        Prisoner # (if applicable): _____

Address: 1102 Ben Franklin Drive   Unit 511   Sarasota, Florida  34236

Telephone #: (941) 388-1840

16,

Rev.: 2/23

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

*Check the appropriate box in section 1, and check the box in section 2.*

**1.    Type-Volume**

☒    This document complies with the word limit of FRAP 40 (b) (1) [insert Rule citation] because, excluding the parts of the document exempted by FRAP 32(f) and _____ [insert applicable Rule citation, if any] , this document contains 3,228 [state the number of] words.

**or**

☐    This brief complies with the line limit of FRAP [insert Rule citation] because, excluding the parts of the brief exempted by FRAP 32(f) and _____ [insert applicable Rule citation, if any] , this brief uses a monospaced typeface and contains [state the number of] lines of text.

**2.    Typeface and Type-Style**

☒    This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

(s)_____

Attorney for _____Pro Se_____

Dated: ___March 22, 2025___

17.

Rev.: 12/16

## U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF SERVICE

*(Use this form only if service is being made other than through the Court's electronic-filing system.)*

Michael J. Polelle <sub>vs.</sub> Cord Byrd et al.    Appeal No. 22-14031

FRAP 25(b) through (d) require that at or before the time of filing a paper, a party must serve a copy on the other parties to the appeal or review. Unless the document is being served through the Court's electronic-filing system, the person making service must certify that the other parties have been served, indicating the date and manner of service, the names of the persons served, and their addresses. **You may use this form to fulfill this requirement.**
*Please type or print legibly.*

I hereby certify that on (date) March 24, 2025 , a true and correct copy of the

foregoing (title of filing) Petition for Panel Rehearing has been (check one):

☒ sent by mail, postage prepaid

☐ deposited in the prison's internal mailing system with first-class postage prepaid

☐ sent by electronic means with the consent of the person being served

☐ other (specify manner of service) _____

and properly addressed to the persons whose names and addresses are listed below:

1. Ashley E. Davis, General Counsel, Florida Dept. of State, 500 S. Bronough, Suite 100, Tallahassee FL. 32399

2. Ashley E. Gaillard, Esq., Bentley Goodrich Kison, P.A., 783 Orange Ave., Third Floor, Sarasota, FL. 34236

MICHAEL J. POLELLE
Your Name (please print)

Michael J Polelle
Your Signature

Rev.: 12/20

18.

(1)   This question is answered in the affirmative; that is to say, that under the provisions of Section 102.11, Florida Statutes, 1941, the supervisor of registration of Levy county is authorized to transfer to the general election registration books the names of those electors duly registered as provided in Chapter 102, Florida Statutes, 1941.

(2)   In preparing the general election registration books for the coming general election, the supervisor of registration should, in the preparation of books for two districts created from a single district, transfer to such books the names of those qualified electors who were duly registered in the old district, according to the respective places of residence of said electors in such two new districts.

March 27, 1946.—046-140.

### REGISTRATION—ELIGIBILITY—AFFILIATION

QUESTION: In a certain Florida precinct 316 negroes are registered in the primary registration books, such books not evidencing the party affiliations of such registrants. May such registrants vote in the May, 1946, primary?

*To Honorable J. B. Mashburn, Supervisor of Registration, Bay County, Panama City, Florida:*

It is assumed that the registration books referred to in your letter are those for use in the primary election. You will note that the above question is conditioned upon such assumption.

You state you understand these registrants did not know or would not state their party affiliations.

Under Section 102.21, Florida Statutes, 1941, as part of the information required to be entered on the registration books, is the party affiliation of the registrant.

Under Section 102.40, Florida Statutes, 1941, it is provided that any qualified elector who is also a member of a political party, as defined under our primary election law, "shall be entitled to vote at such primary election and shall receive the official primary election ballot of the political party designated in his registration, and no other." Where voting machines are used at a primary election as authorized in and provided by Chapter 100, Florida Statutes, 1941, the procedure with respect to ballots is, of course, different from that set forth in said Section 102.40 where such machines are not used. However, whether voting machines are used or not, since it is apparent that only a person who is the member of a party having candidates participating in the primary is authorized to vote at such primary, it would seem that the registration books should evidence his party affiliation.

In view of the foregoing, in my opinion the above question is properly answered as follows:

Since it appears that the party affiliations of the three hundred sixteen negroes do not appear to be entered in the registration books in the precinct involved in the above question, such registrants are not entitled to vote in the 1946 primary election.

May 22, 1946.—046-217.

### STATE CANDIDATES—EXPENSES

QUESTION: In the second primary election of 1946 to be held in your county only two names will appear on your ticket and these are state candidates for a member of the supreme court and the railroad commission. Because only state candidates are to be nominated in this primary, are the expenses of such primary election to be borne by the State of Florida or your county?

**Información:** Sírvase llamar a la oficina del Supervisor de Elecciones de su condado si le interesa obtener este formulario en español.

## How to Register
- Complete and submit this form by mail or in person to:
  - Supervisor of Elections' office (mailing addresses are on back of form),
  - Any office that issues driver licenses,
  - Any voter registration agency (public assistance office, center for independent living, office serving persons with disabilities, public library, or armed forces recruitment office), or
  - The Division of Elections
- Register online: RegistertoVoteFlorida.gov (or QR code).

**Note:** If a third-party voter registration organization (3PVRO) collects your application, the 3PVRO must give you a receipt. The 3PVRO might not deliver your application within the 10 days or by the registration deadline. You can choose instead to mail or deliver your application to your Supervisor of Elections or register online.

## Voter Registration Requirements
- U.S. citizen and resident of Florida and county
- At least 18 years old (or 16 for pre-registration)
- Not adjudicated mentally incapacitated, or if so, voting rights restored.
- Not be convicted of a felony, or if so, voting rights restored.
- **Do not complete this form if you do not meet all of these requirements.**

## When to Register
- Deadline to register is 29 days before an election.
- Deadline to change party is 29 days before a primary election.

## Registration Status
- If application is accepted, your Supervisor will mail a voter information card.
- If your application is incomplete or denied, your Supervisor will contact you.
- Contact your Supervisor if you have any additional questions.

## Identification (ID) Requirements to Register or Update Record
- A current and valid Florida driver license (FL DL#), or Florida ID card number (FL ID#), or last four digits of your Social Security number (SSN).
- Special requirements apply if registering by mail for the first time, never previously voted in Florida, and never issued a FL DL or ID card or SSN. You will be required to provide identification prior to voting.

## Florida has Closed Primaries/Political Party Affiliation
- You must be registered with a political party to vote in that party's primary elections. However, in primary elections, all voters can vote on nonpartisan issues and for candidates in that partisan primary race if the candidates face no opposition in the general election.
- If registering for first time and you do not choose a party, you will be registered with no party affiliation (NPA). If you are already registered and do not choose a party, your party choice on record will remain the same.

## Public Record
- Most voter information, including phone number and email address is public. Your signature may be viewed but not copied.
- The following is not public: FL DL#, FL ID#, SSN, where you registered to vote, and whether you declined to register or update your voter registration record at a voter registration agency or office that issues FL DL or FL ID cards.

## Resources
- Supervisor phone numbers are on back of form.
- Division of Elections: https://dos.fl.gov/elections/
- Voter Assistance Hotline: 1.866.308.6739
- Voter Information Lookup visit: https://registration.elections.myflorida.com/CheckVoterStatus

**Rows 1 – 8 and 15 must be completed for an application to be processed. Print plainly and clearly using a black or blue pen.**

| | |
|---|---|
| ☐ New registration | ☐ Update or change (e.g., address, name, party affiliation, signature) |

☐ Request to replace voter information card

**1** Are you a citizen of the United States of America? ☐ Yes ☐ No

**2** ☐ I affirm that I am not a convicted felon, or if I am, my right to vote has been restored. (For information on felon voting rights, visit Division of Elections' webpage - https://dos.fl.gov/felon)

**3** ☐ I affirm that I have not been adjudicated mentally incapacitated with respect to voting or, if I have, my competency has been restored.

**4** Date of birth (mm-dd-yyyy) | Florida Driver License or Identification Card Number (FL DL/ID) | Last 4 of SSN (if no FL DL/ID) | ☐ I have never been issued a FL DL/ID or SSN.

**5** Last name | First name | Middle name | Suffix (Sr Jr I II)

**6** Residential address where you live in FL (no P.O. box or business address) | Unit | City | County | Zip

**7** Mailing address (if different from above or mail not deliverable at residence) | Unit | City | State or country | Zip

**8** Address where last registered | Unit | City | State | Zip

**9** Former name (if named has changed) | Gender ☐ F ☐ M | State/country of birth

**10** Phone no. (optional) ( ) | ☐ Email me sample ballot if available in my county. Email address:

**11** Party affiliation (choose one) (See Florida has Closed Primaries/Political Party Affiliation above)
☐ Florida Democratic Party ☐ Republican Party of Florida ☐ No party affiliation (NPA) ☐ Minor party (print party):

**12** Race/ethnicity (choose one)
☐ American Indian/Alaskan Native ☐ Asian/Pacific Islander ☐ Black, not of Hispanic Origin ☐ Hispanic ☐ White, not of Hispanic Origin ☐ Multi-Racial ☐ Other:

**13** Military/overseas status (choose one, if applicable)
☐ I am an active-duty Uniformed Services or Merchant Marine member or ☐ their spouse or dependent ☐ I reside outside U.S. but am a U.S. citizen

**14** ☐ I will need help voting. ☐ I would like to be a poll worker or election worker | Official use only

**15** I understand that it is a 3rd degree felony under state and federal laws to falsely swear or affirm or otherwise submit false information.
**Oath:** I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information provided in this application is true.

FVRS No.

| Signature X | Date | 3PVRO No. | Agent Initials | Date Collected |
|---|---|---|---|---|

20.

[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

––––––––––––––––––––

No. 22-14031

––––––––––––––––––––

MICHAEL J. POLELLE,

Plaintiff-Appellant,

*versus*

FLORIDA SECRETARY OF STATE,
SARASOTA COUNTY SUPERVISOR OF ELECTIONS,

Defendants-Appellees.

––––––––––––––––––––

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cv-01301-SDM-AAS

––––––––––––––––––––

21.

USCA11 Case: 22-14031    Document: 60    Date Filed: 03/26/2025    Page: 25 of 136

2                    Opinion of the Court                    22-14031

Before ROSENBAUM, ABUDU, and TJOFLAT, Circuit Judges.

ROSENBAUM, Circuit Judge:

Michael J. Polelle is a voter in Sarasota County, Florida, who has not registered with a political party. As a result, Florida's closed system of primary elections prevents him from participating in any political party's primary.

At the same time, though, the Republican primary has determined the outcome of most Sarasota County elections since the 1960s. So Polelle filed suit claiming Florida's law puts him to an unconstitutional "Hobson's choice," requiring that he either forfeit his right to a meaningful vote or forfeit his right not to associate with political groups and messages. The district court dismissed Polelle's lawsuit because it concluded he has not suffered an injury that gives him standing to sue in the federal courts and, alternatively, because he failed to state a claim for relief on the merits.

After careful consideration, and with the benefit of oral argument, we agree with the district court's decision to dismiss Polelle's case. But we do so after reaching the merits. Polelle has adequately alleged that he suffered an injury in fact, traceable to Defendant-Appellee Sarasota County Supervisor of Elections Ron Turner and redressable by the federal courts. As Polelle points out, he has both the right to a meaningful vote and the right not to associate with certain political groups and messages. And Florida's closed primary burdens those rights.

Still, that Polelle has suffered an injury sufficient to engage the federal courts' jurisdiction does not itself entitle him to relief.

And under the relevant *Anderson-Burdick*[1] framework for evaluating First and Fourteenth Amendment claims like Polelle's, Florida's legitimate interests in preserving political parties as viable and identifiable interest groups and enhancing candidates' electioneering and party-building efforts outweigh the minimal burdens on Polelle's First and Fourteenth Amendment rights. Florida's system of closed primary elections may put Polelle to a "Hobson's choice," but it does not do so unconstitutionally.

## I.    BACKGROUND

The facts of this case are straightforward. Michael J. Polelle is a current resident of and registered voter in Sarasota County, Florida. When he registered to vote, Florida law required him to declare whether he affiliates with a political party and, if so, which one. *See* Fla. Stat. § 97.052(2)(j). Polelle declared "No Party Affiliation." Although Florida law permits him to change his party registration no later than 29 days before the relevant primary election, *id.* § 97.055, he has not and will not do so. As a result, Polelle cannot vote in future Florida primaries for partisan offices.[2]

---

[1] *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

[2] Florida distinguishes between political offices that are partisan and non-partisan. For example, elections for judicial offices are non-partisan. *See* Fla. Stat. § 105.061. A voter's party affiliation (or lack of one) does not impact their ability to participate in non-partisan primary elections. *See id.* (describing elector qualifications for non-partisan elections); *id.* § 105.041 (describing the form of the ballot for non-partisan primaries).

4                          Opinion of the Court                 22-14031

That's because Florida's primaries are closed: "[i]n a primary election[,] a qualified elector is entitled to vote the official primary election ballot of the political party designated in the elector's registration, and no other." *Id.* § 101.021. In fact, "[i]t is unlawful for any elector to vote in a primary for any candidate running for nomination from a party other than that in which such elector is registered." *Id.*

This rule has one exception. In 1998, Floridians amended their constitution to except universal primary contests from the usual system of closed primaries. In a universal primary contest, "all candidates for an office have the same party affiliation and the winner will have no opposition in the general election." FLA. CONST. art. VI, § 5(b). When that situation occurs, under Florida's constitutional amendment, "all qualified electors, regardless of party affiliation, may vote in the primary elections" for that affected office. *Id.*

But this provision applies only if a primary election is *formally* dispositive of the outcome of a general election. So if, for instance, the general election permits write-in candidates, then Florida's Constitution does not require a universal primary. *Brinkmann v. Francois*, 184 So. 3d 504, 514 (Fla. 2016). That means Polelle, and more than 3.5 million other Floridians who

registered "No Party Affiliation,"[3] generally may not vote in any political party's primary.

And that's so even when, as Polelle alleges is the case here, the primary is *functionally* dispositive of the outcome of the general election. "Republican primaries," for instance, "have determined the outcome of most Sarasota County's partisan elections since 1968." In fact, "the last non-Republican candidate elected to the Sarasota County Commission was in 1966, almost 58 years ago."[4]

So Polelle filed suit *pro se* under 42 U.S.C. § 1983 against Defendants-Appellees Cord Byrd, Florida Secretary of State, and Ron Turner, Supervisor of Elections for Sarasota County, Florida (collectively, "Defendants," "the State," or "Florida"). He alleged three claims for relief: (1) a violation of his First Amendment freedoms from compelled speech or association; (2) a violation of his fundamental right to vote, as secured by the First and Fourteenth Amendments; and (3) a violation of his rights to the equal protection of the laws, as secured by the Fourteenth Amendment.

---

[3] *Voter Registration - By Party Affiliation*, FLORIDA DIVISION OF ELECTIONS (Aug. 14, 2024), https://dos.fl.gov/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-by-party-affiliation/ [https://perma.cc/M7C6-J2LU].

[4] Carrie Seidman, *In Sarasota County, Voters May Find It's Better To Switch Than Stick*, SARASOTA HERALD-TRIB. (May 10, 2024), https://www.heraldtribune.com/story/opinion/columns/2024/05/10/sarasota-county-voters-are-embracing-the-need-to-switch-parties/73629882007/ [https://perma.cc/YV62-R7KW].

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 6 of 112

6                    Opinion of the Court              22-14031

To address these alleged violations, Polelle sought two forms of relief: a declaration that Florida's closed-primary statute, Fla. Stat. § 101.012, and its universal-primary exception, FLA. CONST. art. VI, § 5(b), violate the First and Fourteenth Amendments both facially and as applied to him; and an injunction prohibiting Defendants from enforcing those provisions or any others that prevent Polelle from voting in future primary elections while he maintains his "Not Party Affiliated" status.

Defendants Secretary Byrd and Supervisor Turner filed separate motions to dismiss Polelle's complaint. They argued that Polelle lacked standing to challenge Florida's primary elections system and, in the alternative, that he failed to state a claim for relief. Both arguments stemmed from the position that a putative voter does not have a constitutional interest in voting in the primary election of a political party to which that person does not belong.

The district court granted Defendants' motions. It accepted the argument that Polelle had only a "desire" to vote in a party primary, not a legally protected interest sufficient to afford him standing to sue in the federal courts. And, the district court held, even if Polelle had standing, Polelle failed to state a claim. The court concluded that Florida's interest in preventing unaffiliated voters' potential to undermine a political party's candidate-selection process outweighed Polelle's desire to vote in a partisan primary election, especially given the minimal burdens that Florida law imposes on voters who wish to join or switch political parties.

Polelle timely appealed.

## II.    STANDARDS OF REVIEW

We review *de novo* the threshold jurisdictional question of whether plaintiffs enjoy standing to sue in the federal courts. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 923 (11th Cir. 2020) (en banc). And because standing involves our jurisdiction, we must raise *sua sponte* any issues related to standing that we spot. *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007).

As to the merits, we review *de novo* an order granting a motion to dismiss with prejudice. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1037 (11th Cir. 2008). In conducting our review, "we must accept the complaint's allegations as true, construing them in the light most favorable to the plaintiff." *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1253 (11th Cir. 2022). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 8(a)(2). In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    DISCUSSION

Our discussion proceeds in two parts. First, we address Defendants' jurisdictional arguments that Polelle lacks standing to sue in the federal courts. We conclude he has standing to sue Supervisor Turner. But Polelle has failed to show his injuries are traceable

8                    Opinion of the Court              22-14031

to Secretary Byrd, so Polelle lacks standing to sue him. Second, we consider the merits of Polelle's complaint. We conclude that he has failed to state a claim for relief. So the district court correctly dismissed Polelle's suit.

### A. Polelle has standing to sue for violations of his First and Fourteenth Amendment rights.

Article III of the Constitution limits federal courts to deciding "Cases" and "Controversies." U.S. CONST. art. III, § 2. That limitation, which we call "standing," "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). It stems from "concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Polelle must make three showings to enjoy standing to sue in a federal court: (i) that he "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (ii) that Secretary Byrd or Supervisor Turner (or both) "likely caused" his injury; and (iii) that a favorable judicial decision can likely redress his injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). If Polelle does not satisfy his burden on all three requirements, "there is no case or controversy for the federal court to resolve." *Id.* (quoting *Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 333 (7th Cir. 2019)). And in that case, we lack jurisdiction.

Here, all three requirements are at issue. Both Defendants assert that Polelle has not experienced an injury in fact. And Secretary Byrd contends that, even if Polelle has suffered an injury in fact, Polelle failed to plead that Secretary Byrd caused Polelle's injury and, therefore, that an injunction or declaration against Secretary Byrd would redress Polelle's injury. We address each argument in turn.

1. Polelle alleges an injury in fact sufficient to confer standing to sue in the federal courts.

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

In light of voting's importance, Polelle argues that he suffers an injury when Florida excludes him, a political-party non-affiliate, from participating in partisan primary elections that effectively determine the political choice for certain public offices. Polelle further asserts this exclusion burdens a constellation of related constitutional rights—his right to a meaningful vote, his right not to associate with political groups and messages, and his right to the equal protection of the laws.[5]

---

[5] Polelle also contends that he has standing to sue Supervisor Turner as a municipal taxpayer because Sarasota County allocates a portion of his ad valorem tax proceeds to operate the partisan primary elections in which he cannot participate. Because we conclude that Polelle has traditional standing to sue

10                    Opinion of the Court                   22-14031

Defendants do not dispute that Polelle's alleged injuries sat-
isfy many of the defining characteristics of an injury in fact. They
don't contest that his alleged injuries are "concrete," "particular-
ized," and "actual" or "imminent." Nor could they.

Polelle's alleged injuries are certainly particularized. That is,
they are "individual and personal in nature," *Reynolds v. Sims*, 377
U.S. 533, 561 (1964), as opposed to generalized grievances that an-
ybody could pursue, *Gladstone Realtors v. Village of Bellwood*, 441 U.S.
91, 99–100 (1979). Our precedent in *Jacobson v. Florida Secretary of
State* exemplifies this distinction. There, we held that voters "have
no judicially enforceable interest in the *outcome* of an election." 974
F.3d 1236, 1246 (11th Cir. 2020) (citing *Raines v. Byrd*, 521 U.S. 811,
819, 824, 830 (1997)). A voter suffers no "particularized" injury
when their preferred candidate or ballot measure fails. *See Raines*,
521 U.S. at 819, 829 (concluding legislators suffer "no injury to
themselves as individuals" when a President vetoes a line-item in a
bill for which they voted). If a voter did, after any election, as much
as nearly half the population could claim injury without any show-
ing that they have a "'personal stake' in the alleged dispute." *Id.* at

---

Supervisor Turner, we do not address his taxpayer-standing arguments. And
although we conclude Polelle does not have traditional standing to sue Secre-
tary Byrd, we do not assess whether Polelle has standing to sue Secretary Byrd
as a taxpayer. Polelle claimed standing as a *municipal* taxpayer only, not as a
*state* taxpayer aggrieved with Secretary Byrd's execution of a statewide office.
*See Pelphrey v. Cobb County*, 547 F.3d 1263, 1280 (11th Cir. 2008) (recognizing
"the distinction between standing of municipal taxpayers and standing of fed-
eral or state taxpayers").

819; see *Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) ("[I]rregularities in the tabulation of election results do not affect Wood differently from any other person," including "the four million or so Georgians who voted in person this November.").

By contrast, we and the Supreme Court have long recognized that voters assert a "particular injury" when they allege *their* "inability to vote in a particular election," *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 312 n.14 (1986), or when some government action undermines the effectiveness of *their* vote, see *Gill v. Whitford*, 585 U.S. 48, 65–68 (2018). And Polelle alleges those deprivations here: that Florida's closed-primary statute limits *his* "ability to vote" in certain primary elections and ensures that *his* "vote [is not] given the same weight as any other." *Jacobson*, 974 F.3d at 1246. So Polelle's complaint adequately identifies "disadvantage[s] to [himself] as [an] individual[]." *Gill*, 585 U.S. at 65–66 (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

Polelle's injuries are also imminent. Polelle squarely alleges that "[u]nless this Court intervenes, Defendants will continue to . . . prohibit [him] from voting in" future Florida primary elections and deny him the right to an effective vote. These allegations are sufficient to show his injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Without declaratory or "injunctive relief," nothing will stop those "harm[s] from occurring." *TransUnion*, 594 U.S. at 435; *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *cf. Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 772 (7th Cir. 2022) ("A routine past harm, such as denial of access

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 12 of 112

to a ballot, presents a textbook example an 'actual' injury suffered.").

And Polelle's asserted injuries are undoubtedly "concrete." The "concreteness" requirement ensures the alleged injury is "'real,' and not 'abstract,'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), so "that the plaintiff has a real stake in the litigation," *Drazen v. Pinto*, 74 F.4th 1336, 1339 (11th Cir. 2023) (en banc). Tangible harms, such as "physical injury and financial loss," easily satisfy this requirement. *Id.* But intangible harms may also be concrete. *Id.*

When we evaluate whether an asserted intangible injury can satisfy Article III's concreteness requirement, we consider "whether that harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Drazen*, 74 F.4th at 1343 (cleaned up). And in making that comparison, we consider only whether the asserted harm is "similar in kind" to the traditional harm; the injuries need not be of the same "degree" or severity. *Id.* at 1344.

Constitutional injuries are prototypical concrete injuries. *TransUnion*, 594 U.S. at 425. After all, "where there is a legal right, there is also a legal remedy by suit or action at law." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (citation omitted). So the First and Fourteenth Amendments' possible protection of Polelle's asserted rights renders his injuries concrete.

But voting-rights claims are also concrete independent of their constitutional make-up; they are the "kind" of injury for which Americans have always sued to seek redress. "For most of

USCA11 Case: 22-14031   Document: 60   Date Filed: 03/26/2025   Page: 36 of 136
USCA11 Case: 22-14031   Document: 54-1   Date Filed: 03/11/2025   Page: 13 of 112

22-14031            Opinion of the Court            13

the nation's history"—indeed, well before Americans ratified the
Fourteenth Amendment, which now constitutionally secures
Americans' voting rights—voters sought common-law remedies
when an "election official," either "mistakenly or intentionally," de-
nied "a voter's ballot or registration."[6]  Note, *Voting Wrongs and*

---

[6] As we explain in the text, the harm stemming from an election official's in-
terference with a person's vote at common law is similar in kind (if not the
same as) the harm arising from the government's degradation of a person's
vote in modern elections. Still, we note one distinction between voting-rights
claims at common law and those Polelle now brings: a *mens rea* element.  In
some circumstances, plaintiffs had to prove that a defendant "by a consciously
wrongful act intentionally deprive[d]" them "of a right to vote in a public elec-
tion." RESTATEMENT (FIRST) OF TORTS § 865 (Am. L. Inst. 1939).  Even so, that
scienter element does not affect the concreteness of Polelle's injury because it
is not "essential to the harm" in the relevant common-law comparator, *Dra-
zen*, 74 F.4th at 1343 (quoting *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48
F.4th 1236, 1249 (11th Cir. 2022) (en banc))—a deprivation of his voting rights.
Instead, *mens rea* presents a question of a defendant's "culpability" and "blame-
worth[iness]." *Morissette v. United States*, 342 U.S. 246, 252 (1952).  True, in
some circumstances, a defendant's mental state may relate to the *degree* of in-
jury or causation; some courts have concluded intentional conduct is more
likely to cause a more severe injury than would result in the case of an accident
or negligence. *Cf. Raybon v. United States*, 867 F.3d 625, 632 (6th Cir. 2017)
(explaining the extent of an injury can prove the intent to cause the requisite
quantum of harm).  But a defendant's mental state does not change the *kind*
of injury a defendant inflicts upon a plaintiff.  And it's the *kind* of injury, as
opposed to the *degree* of injury, that's at the core of our concreteness analysis.
*Drazen*, 74 F.4th at 1343; *see Hunstein*, 48 F.4th at 1256 (Pryor, C.J., concurring)
("We apply *TransUnion*'s simple rule that an element must be present if that
element is necessary for the presence of the *harm* that was traditionally action-
able." (emphasis in original) (citation omitted)).  After all, if an election official
denies a voter's ballot or dilutes or nullifies the effectiveness that ballot, the

14                    Opinion of the Court              22-14031

*Remedial Gaps*, 137 HARV. L. REV. 1182, 1182 (2024). In fact, "[t]hat
private damage may be caused by" the infringement of a person's
right to vote "and may be recovered for in suit at law hardly has
been doubted for over [three] hundred years." *Nixon v. Herndon*,
273 U.S. 536, 540 (1927).

And we have long recognized that states may abridge a per-
son's right to vote by means other than simply denying that per-
son's ballot in a general election. Voters, for instance, have a con-
crete interest in "maintaining the effectiveness of their votes" that
forms of "dilution" may impair. *Baker*, 369 U.S. at 208 (quoting
*Coleman v. Miller*, 307 U.S. 433, 438 (1939)); *see Jacobson*, 974 F.3d at
1246 ("Voters . . . have an interest in their ability to vote and in their
vote being given the same weight as any other."). And those inter-
ests are no less important because they occur in a primary election:
"If the defendants' conduct was a wrong to the plaintiff[,] the same
reasons that allow a recovery for denying the plaintiff a vote at a
final election allow it for denying a vote at the primary election that
may determine the final result." *Nixon*, 273 U.S. at 540; *see also
United States v. Classic*, 313 U.S. 299, 310, 314 (1941) (concluding
"[i]nterference with the right to vote" may occur in a primary that
is the "only stage of the election procedure when" a voter's "choice
is of significance"). So Polelle has adequately pled an imminent,
particular, and concrete injury.

_____

voter suffers harm whether the election official acted intentionally, uninten-
tionally, in good-faith, or in bad-faith.

22-14031                Opinion of the Court                    15

Still, Defendants argue that Polelle lacks standing because he has not alleged a deprivation of a "legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996–97 (11th Cir. 2020) ("Each subsidiary element of injury—a legally protected interest, concreteness, particularization, and imminence—must be satisfied."). They claim Polelle has no "constitutional right" to or "interest" in "selecting the candidate of a group to which one does not belong, if indeed [that] can even fairly be characterized as an interest." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 573 n.5 (2000). Rather, they assert, "only the party proper, and not individual members of the party, may challenge a state's regulation of a political party's primary." *Osburn v. Cox*, 369 F.3d 1283, 1287 (11th Cir. 2004).

We disagree. Defendants' contention conflates the merits with standing and mischaracterizes the injuries that Polelle asserts.

The Supreme Court has been clear that "standing in no way depends on the merits of the plaintiff's" claim. *Warth*, 422 U.S. at 500; *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (explaining "one must not confuse weakness on the merits with absence of Article III standing" (cleaned up)). And we have similarly cautioned that "in reviewing the standing question," we "must be careful not to decide the questions on the merits for or against the plaintiff." *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)) (cleaned up). So we generally assess plaintiffs' standing "assum[ing] that on the merits the plaintiffs

would be successful in their claims." *Id.* (quoting *City of Waukesha*, 320 F.3d at 235).

For that reason, a plaintiff alleges "the invasion of a legally protected interest" when a "plaintiff has a right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89–90 (1998)). As a result, asserting the deprivation of a constitutional interest normally satisfies standing's injury-in-fact requirement.

To be sure, we have noted that "our standing analysis" may require "us to take a 'peek' at the merits" of a party's constitutional claim. *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1382 (11th Cir. 2019). But we entertain that "limited inquiry into the merits of the plaintiff's claim to determine [only] whether the injury the plaintiff asserts *might stem* from a violation of [a] constitutional guarantee." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 n.35 (11th Cir. 1991) (emphasis added). In other words, an infirmity in the merits transforms into a jurisdictional defect only where "such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946) (discussing subject-matter jurisdiction); *see CHKRS, LLC*, 984 F.3d at 489 (extending *Bell* to standing).

Our precedent shows this principle in action. In *Club Madonna*, for instance, we held that the plaintiff club lacked standing to assert First Amendment claims to recover the costs of complying

with the City's ordinance regulating nude establishments. *Club Madonna*, 924 F.3d at 1375–76. We explained the club lacked standing because it could not "clear the low bar of demonstrating that the challenged provisions are *at least arguably vague* as applied to it." *Id.* at 1383 (emphasis added).

Similarly, we held in *Bowen v. First Family Financial Services* that the plaintiffs lacked standing to challenge a lender's practice of requiring customers to sign an arbitration agreement. 233 F.3d 1331, 1333 (11th Cir. 2000). We reached that conclusion because, as in *Club Madonna*, the plaintiffs in *Bowen* could not show that the lender would take "some action that *at least arguably* violate[d]" any law. *Id.* at 1340 (emphasis added). The bottom line is that plaintiffs allege a legally protected interest when they meet the "low bar" of pointing to some arguable or colorable federal or constitutional interest.[7]

---

[7] The speculative nature of an alleged injury may also require us to peek at the merits. *See, e.g., J.W. ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248 (11th Cir. 2018) (concluding students lacked standing to challenge police use of an incapacitating chemical spray because each student had an estimated .4% chance of being subject to the spray and a .0003% chance of being subject to an unconstitutionally excessive use of the chemical spray); *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1238 (11th Cir. 2019) (holding plaintiff failed to show an imminent injury because the chance the TSA would screen him unconstitutionally was "entirely too speculative"). But no one argues Polelle's alleged injury is speculative, and we find no basis to reach that conclusion, either. In any case, because the "legally protected interest" requirement overlaps so heavily with the merits of a plaintiff's constitutional claim, we must be careful to dismiss suits for lack of a "legally protected interest" only when a

18                     Opinion of the Court                22-14031

Polelle clears that hurdle here. His claims are certainly col-
orable. For starters, voters undoubtedly "have an interest in their
ability to vote and in their vote being given the same weight as any
other." *Jacobson*, 974 F.3d at 1246; *cf. id.* (concluding Jacobson
lacked standing because she "failed to identify any difficulty in vot-
ing for her preferred candidate or otherwise participating in the po-
litical process").

And the First Amendment, as incorporated through the
Fourteenth Amendment, secures Polelle's freedom "from state dis-
crimination based on the content of his speech." *Duke v. Massey*, 87
F.3d 1226, 1232 (11th Cir. 1996); *see W. Va. State Bd. of Educ. v. Bar-
nette*, 319 U.S. 624, 642 (1943) ("[N]o official, high or petty, can pre-
scribe what shall be orthodox in politics . . . or other matters of
opinion or force citizens to confess by word or act their faith
therein."). That includes Polelle's freedom from exclusion from
primary elections based on his political non-affiliation. *See Duke*, 87
F.3d at 1232 & n.6 (addressing Duke's exclusion from a Republican
primary ballot because of his claimed "Nazi ties").

Plus, under the Equal Protection Clause, a voter's injury in
fact "*is* the denial of equal treatment" through some state-created
"barrier" that does not apply to all voters or "that makes it more
difficult for members of one group" to participate in the electoral
process. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th

———————————

plaintiff cannot assert any possible constitutional interest. Otherwise, we risk
dismissing "every losing claim . . . for want of standing." *Initiative & Referen-
dum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc).

Cir. 2009) (emphasis added) (quoting *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)).

So the First and Fourteenth Amendments ultimately protect, and Florida's law ultimately burdens, in some form, each of the interests Polelle asserts in his complaint. A requirement that forces Polelle to either register with a political party (which the First Amendment allows Polelle to refuse) or forfeit his ability to cast a meaningful ballot (an opportunity the Fourteenth Amendment guarantees) places him at a conceivable disadvantage compared to other voters who affiliate with political parties. And it does so potentially in violation of the Equal Protection Clause. That is all our standing precedent requires of Polelle at this stage.

Supreme Court precedent confirms our characterization of Polelle's injuries. In *Nader v. Schaffer*, voters brought the exact same First and Fourteenth Amendment claims that Polelle now brings. 417 F. Supp. 837, 842 (D. Conn.), *aff'd mem.*, 429 U.S. 989 (1976). The three-judge panel there resolved the complaints on the merits, rather than standing. *See id.* at 850 (concluding Connecticut's closed primaries were "constitutionally permissible"). And the Supreme Court affirmed the panel's decision. We discuss *Nader's* rationale in greater detail when we assess the merits of Polelle's claims. But for now, it's worth emphasizing that our holding that Polelle has alleged legally protected interests sufficient to confer standing to sue in the federal courts comports with Supreme Court precedent.

So as for Defendants' contention that Polelle claims a right to or associational interest in selecting candidates for the

Republican Party of Florida, or any other political party, that is wrong. As we've explained, Polelle filed suit to vindicate his own right to "vote in elections with the same effectiveness as party voters" without "forfeit[ing] his other fundamental right not to associate or identify himself with political parties." In other words, Polelle claims injury because he can't vote at the critical juncture of the election for certain public offices, not because the State prevents him from voting for a Republican candidate specifically.

The relief Polelle requests also shows this to be the case. Although Polelle has acknowledged that he would vote in a party primary if granted the opportunity, he has also disclaimed a request for an injunction requiring Defendants to issue him a ballot for and accept his vote in future party primaries should that relief infringe political parties' associational interests. Rather, he asks that the district court declare the current system of closed partisan primaries facially unconstitutional and prevent its enforcement, permitting the State and its officials to choose among potentially constitutional alternatives.

These facts also make *Osburn* and *Jones*—cases on which Defendants rely—unhelpful to Defendants, at least on the issue of standing.

In *Osburn*, Georgia voters tried to close an "open" primary that enabled citizens to vote in any political party's primary

regardless of their political affiliation.[8] 369 F.3d at 1286. We held
that those voters lacked standing to assert First Amendment claims
because the political party was the one with the "right to both ex-
pand and limit the persons that the party wishes to include in its
primary elections." *Id.* at 1287. The associational right to exclude
voters from a primary belonged not to the party's "individual
members" but to the "party proper." *Id.* at 1287. In other words,
the plaintiffs lacked standing to bring the First Amendment claims
because those asserted interests were not "individual and personal
in nature," *Reynolds*, 377 U.S. at 561—the voters attempted to assert
rights held by an organization that they did not represent.

     In contrast to our conclusion that the voters lacked standing
to assert First Amendment claims, we reached the merits of the
voters' claims that Georgia's open primary system violated the
Fourteenth Amendment, Fifteenth Amendment, and Section 2 of
the Voting Rights Act ("VRA"). *Osburn*, 369 F.3d at 1288. We did
so because those claims plainly concerned "disadvantage[s] to" the
voters "as individuals." *Baker*, 369 U.S. at 206. To state claims for
relief, we explained, the voters had to show that, under the open
primary system, "*they* lack[ed] the equal opportunity to participate
in the political process," *Osburn*, 369 F.3d at 1288 (emphasis added)
(Fourteenth Amendment), and that "*they* '[had] less opportunity

---

[8] One distinguishing feature of an open primary is that "the voter is limited to
one party's ballot." *Jones*, 530 U.S. at 577 n.8. So for example, a voter who
chooses to vote in the Republican primary—whether affiliated with that party
or not—must vote in the Republican primary for each office.

22                Opinion of the Court              22-14031

than other members of the electorate to participate in the political process and to elect representatives of *their* choice,'" *id.* (emphasis added) (quoting 52 U.S.C. § 10301(b)).

Polelle asserts a claim here that's analogous to the *Osburn* plaintiffs' Fourteenth Amendment, Fifteenth Amendment, and VRA claims: that the closed primary limits the effectiveness of *his vote*. So *Osburn* supports, if not compels, the conclusion that Polelle has suffered and will imminently suffer an injury in fact.

*Jones* does not help Defendants, either. There, California enacted a "blanket" primary. 530 U.S. at 570. Under that system, every voter could vote in the primary, and every voter's primary ballot listed every candidate, regardless of the voter's affiliation. *Id.* The top vote-getter affiliated with each party became that party's nominee in the general election. *Id.* After four political parties asserted that the regime violated their First Amendment rights, the Court held the blanket primary unconstitutional because it intruded into the height of each political party's associational interest, "the process of selecting its nominee." *Id.* at 571, 575, 586. This ruling does not bear on whether Polelle has standing here for three reasons.

First, *Jones* did not address the question of whether *voters* have standing to challenge a state's system of primary elections. The relevant parties were California and the local political organizations, not putative voters. In fact, the Court clarified that voters' right to a meaningful vote, among other things, was not "really at issue." *Id.* at 573 n.5. As the Court confirmed, "[s]electing a

22-14031              Opinion of the Court                    23

candidate"—the First Amendment right that the political parties asserted—"is quite different from voting for the candidate of one's choice" or "cast[ing] a meaningful vote"—the claim Polelle raises. *Id.* So the Court did not consider the question of whether voters have standing to argue that a closed primary infringes their rights to an effective vote, to be free of political coercion, or to the equal protection of the laws.

Second, and relatedly, the Court concluded that voters' rights were not really at issue because California did not choose a tailored means of securing them; rather, the State needlessly infringed the political parties' right to choose their nominee. *Id.* at 585–86; *see also N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 207 (2008) ("[I]t is hard to understand how the competitiveness of the general election has anything to do with respondents' associational rights in the party's selection process."). California's error was that it failed to disaggregate voters' interests in a meaningful vote from the political parties' right to select their candidate. Instead, the State contended that "the only way to ensure [voters] have an 'effective' vote is to" enact a blanket primary. *Jones*, 530 U.S. at 583.

But that contention was incorrect. As the Court made clear, California's blanket primary was "not a narrowly tailored means of furthering" the State's compelling interest in ensuring fair elections for voters in "safe" districts. *Id.* at 585–86. Had California wished to pursue its asserted interests, the Court reasoned, California "could [have] protect[ed] them all by resorting to a *nonpartisan*

24                    Opinion of the Court                 22-14031

blanket primary," *id.* at 585, or, potentially, an open primary, *see id.*
at 577 n.8.

And as it turns out, those are the forms of primary elections
that Polelle argues Florida could enact should he succeed on the
merits. So the "constitutionally crucial" distinction between the
issue in *Jones* and the claims that Polelle now asserts is that Polelle
seeks to obtain redress for his own concrete injuries—his right to a
meaningful vote, among other things—and that requested redress
is "not inherently incompatible" with political parties' "First
Amendment rights." *Id.* at 586 (explaining "the State of California"
made those rights incompatible by "forcing political parties to as-
sociate with those who do not share their beliefs").

Third, even if we were to assume that Defendants properly
characterized Polelle's complaint as asserting a right to or associa-
tional interest in selecting the candidates of a political party to
which Polelle does not belong (they do not), we cannot say such an
assertion is so "wholly insubstantial and frivolous" that he lacks
standing.

To start, a nonmember's desire to participate in a political
party's primary may not inherently burden the political party's
right to select its candidate. *Jones* suggested this when it expressly
reserved the question of whether open primaries are facially un-
constitutional. *See id.* at 577 n.8. The Court recognized that the
open primary "may be constitutionally distinct" from "the blanket
primary" because the use of only "one party's ballot" could "be
described as an act of affiliation with" that party sufficient to limit

the constitutional burden on parties concerned about outsiders selecting their candidate. 530 U.S. at 577 n.8 (quoting *Democratic Party of U.S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 130 n.2 (1981) (Powell, J., dissenting)).

We similarly don't pass on the constitutionality of a mandatory open primary. We don't need to because *Jones* expressly left open the possibility that Polelle may participate as a nonmember in a political party's primary without substantially burdening the party's associational interests, at least if he does so through a single-party ballot (like the one Florida already uses). *See, e.g., Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1125 (9th Cir. 2016) (upholding Hawaii's open primary in part because "the extent of the burden that" it "imposes on the Democratic Party's associational rights is a factual question on which the Party bears the burden of proof"); *Miller v. Cunningham*, 512 F.3d 98, 106 (4th Cir. 2007) (Wilkinson, J., dissenting from the denial for rehearing en banc) (criticizing the panel opinion for its narrow ruling that did not broadly declare Virginia's open primary constitutional). And that means, even under Defendants' interpretation of Polelle's complaint, his legal position is not so "wholly insubstantial and frivolous" that we lack jurisdiction.

And even if Polelle's asserted interests substantially conflicted with political parties' First Amendment rights (they do not), *Jones*'s narrowest reading is not that Polelle lacks a constitutional interest but that his interests just don't overcome a party's right to select its candidate. Indeed, the Court rejected as uncompelling

26                    Opinion of the Court              22-14031

California's asserted interest in supporting safe-district voters' right
to an effective vote because "a nonmember's desire to participate
in the party's affairs is overborne by the countervailing and legiti-
mate right of the party to determine its own membership qualifi-
cations." *Id.* at 583 (quoting *Tashjian v. Republican Party of Conn.,*
479 U.S. 208, 215 n.6 (1986)). The Court added that "[t]he voter's
desire to participate does not become more weighty simply be-
cause the State supports it." *Id.* at 583–84. Because *Jones* focused
on the relative "weight[]" of the State and political parties' inter-
ests, *id.* at 584, its conclusions went to the merits, not standing.

       Plus, even if we assumed that Defendants properly charac-
terized Polelle's complaint and correctly read *Jones* as bearing on
Polelle's standing (they do not), Defendants' arguments still fail. In
*Clingman*—which issued five years after *Jones* and one year after *Os-
burn*—the Supreme Court rejected on the merits—and not for lack
of standing—voters' and a political party's attempt to open Okla-
homa's semi-closed primary.[9] 544 U.S. at 598. A majority of the
Court concluded that the voters had constitutionally protected in-
terests in voting in the primary elections of parties to which they
did not belong. *See id.* at 599 (O'Connor, J., concurring in part and
concurring in the judgment) ("[R]espondents' claim implicates im-
portant associational interests."); *id.* at 608 (Stevens, J., dissenting)

_____

[9] In a semi-closed or semi-open primary, "a political party may invite only its
own party members and voters registered as Independents to vote in the
party's primary." *Clingman,* 544 U.S at 584. Voters registered with political
parties may not vote in another political party's primary.

("[T]he voters in this case certainly have an interest in associating with the LPO."). So again, even Defendants' reading of *Jones* doesn't make Polelle's claims so "wholly insubstantial and frivolous" that Polelle failed to plead a legally protected interest.

The Partial Dissent disagrees with our assessment of Polelle's claim and Defendants' arguments. Based on the preceding analysis, it characterizes Polelle's claim as nothing more than a complaint that his vote is insufficient to ensure the election of his preferred candidate. Part. Diss. Op. at 10–11. And if the Partial Dissent were correct and Polelle's only proffered injury were simply that his preferred candidate lost, he would not have standing to sue. *See Jacobson*, 974 F.3d at 1246.

But as we've already explained, Polelle premises his claims on opportunity, not outcome. Indeed, as even the Partial Dissent recounts, Polelle alleges that he lacks the same "*opportunity* to affect the outcome of a general election" as do his peers who can participate in the outcome-determinative primary election.[10] Part. Diss. Op. at 10 (emphasis added).

---

[10] The Partial Dissent suggests our distinction between outcome and opportunity is mere wordplay. Part. Diss. Op. at 11. Not so. To be sure, outcome and opportunity are related: any "abridgment of the opportunity" to "participate in the political process inevitably impairs [one's] ability to influence the outcome of an election." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991). But a voter's concern about an election's outcome does not taint the injury that limitations on that voter's ability to participate in the political process inflict. Plaintiffs lack standing when they identify "an unfavorable electoral outcome,

That Polelle can cast a ballot in the general election does not eliminate his injury. Just as voters in a packed or cracked district allege a constitutional injury despite their ability to cast a ballot in a packed or cracked election,[11] *see Gill*, 585 U.S. at 67, voters excluded from an outcome-determinative primary election allege a deprivation of their "constitutional right of choice" despite their ability to "write into their ballots" or "cast at the general election, the name of a candidate rejected at the primary," *Classic*, 313 U.S. at 313, 319.

The point is that an electoral scheme injures voters when it causes them to "'waste' their votes in elections where their chosen candidates . . . are destined to lose," *Gill*, 585 U.S. at 66, for instance, by ensuring an election's winner is necessarily determined at a prior election stage in which some voters cannot participate, *see Terry v.*

---

*wholly apart* from any allegation of vote dilution or nullification" or denial. *Jacobson*, 974 F.3d at 1247 (emphasis added). And that is not the case here. Polelle claims to suffer an injury because he cannot participate in a primary that decides the election. That kind of limitation on Polelle's opportunity to participate in the political process is a particularized, actual, and concrete injury. *See Stachura*, 477 U.S. at 312 n.14 ("[T]he Court recognized that the plaintiff had suffered a particular injury—his inability to vote in a particular election . . . ."); *see also Jacobson*, 974 F.3d at 1246; *Classic*, 313 U.S. at 313, 319.

[11] "Cracking" and "packing" are terms that come up sometimes in gerrymandering cases. "Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins." *Gill*, 585 U.S. at 55 (citation omitted). The goal of cracking and packing is to reduce or eliminate the impact of the cracked and packed voters' votes.

*Adams*, 345 U.S. 461, 469 (1953) (opinion of Black, J.) (explaining Black voters' rights had been abridged because they could partici-pate only in elections that were "no more than the perfunctory rat-ifiers of the choice that has already been made"); *White v. Regester*, 412 U.S. 755, 766–67 (1973) (concluding a combination of Texas's primary regulations—a majority-vote prerequisite and a ballot-place rule—afforded Black voters in Dallas County "less oppor-tunity . . . to participate in the political process" by reducing a mul-timember election to a "head-to-head contest for each position" that their preferred candidate would not win).

    And that's the case for Polelle here. Even if he can write in his preferred candidate in the general election, he claims he has lost the opportunity to cast a meaningful ballot because the closed pri-mary in which he claims he cannot participate effectively deter-mines the outcome of the general election. *See Classic*, 313 U.S. at 319 (refusing to ignore "that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon the rejection . . . of the choice made at the primary"); *Morse v. Republican Party of Va.*, 517 U.S. 186, 205 (1996) (opinion of Stevens, J.) (explaining limitations on "the opportunity for voters to participate in the" party's primary "undercuts their in-fluence on the field of candidates whose names will appear on the ballot, and thus weakens the 'effectiveness' of their votes cast in the general election itself"); *cf. also Lubin v. Panish*, 415 U.S. 709, 719 n.5 (1974) (doubting that a write-in option equalizes electoral oppor-tunity); *Anderson v. Celebrezze*, 460 U.S. 780, 800 n.26 (1983) (same).

The Court has long recognized that states interfere with "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively" by enacting a regulation that "in effect tends to give" certain groups "a complete monopoly" over the political arena. *Williams v. Rhodes*, 393 U.S. 23, 30, 32 (1968). So to point out, as Polelle does, that "the ultimate choice of the mass of voters is predetermined when the nominations have been made," *Newberry v. United States*, 256 U.S. 232, 286 (1921) (Pitney, J., concurring in part), is not to complain about an electoral loss—rather, it is to argue the State may not have set an equal playing field to begin with.[12]    *See Classic*, 313 U.S. at 313, 319; *Morse*, 517 U.S. at 205

---

[12] A hypothetical shows the error in the Partial Dissent's position that Polelle lacks an adequate injury in fact. Imagine that Congress enacted a statute barring in congressional elections the use of any primary process that is outcome-determinative of the general election and that excludes voters based on partisan affiliation. *See* U.S. CONST. art. I, § 4, cl. 1. Then imagine that Congress granted voters a statutory right to enforce that rule of decision. Under the Partial Dissent's logic, even then, voters would not have standing to sue. *See TransUnion*, 594 U.S. at 426 (explaining Congress cannot create an Article III concrete injury). We don't see how anyone could accurately say a plaintiff suing under that hypothetical statute claims only "an injury in law," *id.* at 427, or asserts harm only because their preferred candidate lost an election. That plaintiff would sue to redress concrete harms—vote denial and electoral exclusion—just as Polelle does. A contrary conclusion is also at odds with *Osburn*, where we considered on the merits the plaintiffs' claims that an open primary system reduced minority voters' ability to participate in the political process. 369 F.3d at 1288–89. And as for the Partial Dissent's response that this hypothetical "mistakes a statutory violation for a constitutional injury," Part. Diss. Op. at 20 n.6, the Partial Dissent misses our point. We agree there can be no standing for a statutory violation if an alleged injury isn't concrete,

(opinion of Stevens, J.); *Clingman*, 544 U.S. at 603 (O'Connor, J., concurring in part and concurring in the judgment) (explaining that as electoral "restrictions become more severe," perhaps with "discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition").

The Partial Dissent resists this conclusion. It suggests "glaring" differences exist between the cases we cite and Polelle's. Part. Diss. Op. at 12. In particular, the Partial Dissent tries to distinguish cases that involved racially discriminatory voting practices. *See id.*; *see also id.* at 14–15 (suggesting *Osburn* is inapposite because it concerned the Fourteenth and Fifteenth Amendments and the VRA).

But the principles there remain applicable here. For voters to show that their "right . . . to vote" is "denied or abridged . . . on account of race," they must show that their "right . . . to vote" is "denied or abridged." U.S. CONST. amend. XV, § 1. Equally so, under the Fourteenth Amendment, plaintiffs generally "prove purposeful discrimination" by establishing that they "have less opportunity to participate in the political processes and to elect candidates of their choice." *Rogers v. Lodge*, 458 U.S. 613, 624 (1982);

---

particularized, and actual or imminent in the first place. But we raise the hypothetical to help illustrate that a concrete injury exists. Our hypothetical statute would remove the barriers that prevent Polelle from engaging in the political process as other voters who are party members currently do. By envisioning how Polelle may participate in the preliminary stages of the political process under the hypothetical statute, it helps us understand how the current system injures him: by excluding him the outcome-determinative election.

*accord Osburn*, 369 F.3d at 1288. So the abridgment that Polelle alleges—exclusion from an outcome-determinative election—"deprive[s]" him "of voting rights." *Terry*, 345 U.S. at 470 (opinion of Black, J.).

That Florida abridges Polelle's voting rights—by limiting his ability to participate in an outcome-determinative election—for reasons other than his "color," *id.*, does not affect his *standing* to sue. Rather, it goes to the extent of the burden on Polelle's voting rights and the state's justification for that burden—paradigmatic merits considerations.[13] *See Burdick*, 504 U.S. at 434 (explaining

---

[13] The Partial Dissent charges that we reach our conclusion through "sleight of hand" and that, by compiling quotations, we create a freestanding right to vote. *See* Part. Diss. Op. at 13. That's incorrect. We quote the Fifteenth Amendment and *Rogers* to show the distinction between two, different considerations in a voting-rights claim: the burden on a person's voting rights (how a person's right to vote is abridged or denied) and the basis on which that burden is applied unequally (on what account the abridgment or denial occurs). *See Anderson*, 460 U.S. at 788 & n.9 (permitting "reasonable, nondiscriminatory restrictions," such as those "that serve legitimate state goals which are unrelated to First Amendment values"); *Burdick*, 504 U.S. at 434 (distinguishing between severe restrictions and reasonable, nondiscriminatory ones). Our point is that we can separate holdings about vote abridgment and apply them to cases where the alleged abridgment is on account of something other than race—here, political affiliation. As far as we can tell, there is no precedent suggesting plaintiffs lack standing when they press valid theories of vote abridgment simply because the alleged deprivation is because of political affiliation. To the contrary, the Supreme Court has held that voters have standing to press such claims, like those of partisan vote dilution. *See Rucho v. Common Cause*, 588 U.S. 684, 693, 703 (2019) (explaining the Court "addressed" standing "in *Gill*"). True, in *Rucho*, the Court concluded that partisan gerrymandering

22-14031                Opinion of the Court                    33

courts must weigh the character and magnitude of the asserted First and Fourteenth Amendment interests against the states' justification for the burden imposed by the election regulation).

As for standing, we've been clear that "a small injury, 'an identifiable trifle,' is sufficient." *Billups*, 554 F.3d at 1351 (citation omitted). And a party-registration requirement certainly presents the constitutional trifle sufficient to confer standing.[14]  *See Nader*,

---

claims are non-justiciable. But it did so only because no clear and manageable standards guide the judiciary's inquiry in resolving them. *See id.* at 703, 709–710, 721. Here, though, "discernible and manageable standards," *id.* at 708, exist for assessing the exclusionary impact of an election regime, *see, e.g., Nader*, 417 F. Supp. at 843–45; *Clingman*, 544 U.S. at 589–92. In fact, Justice O'Connor, who consistently thought partisan-gerrymandering claims non-justiciable, see *Rucho*, 588 U.S. at 703 (quoting *Davis v. Bandemer*, 478 U.S. 109, 144 (1986) (O'Connor, J., concurring in the judgment)); *Vieth v. Jubelirer*, 541 U.S. 267, 270, 305–06 (2004) (plurality opinion), considered the "[p]rimary voting" interests that Polelle asserts "vitally important," "entitled to some level of constitutional protection," and justiciable, *Clingman*, 544 U.S. at 602 (O'Connor, J., concurring in part and concurring in the judgment).

[14] The Partial Dissent's rationalizations for ignoring *Nader* are unpersuasive. *Nader* is not of "flimsy precedential value." Part. Diss. Op. at 18. As we explain later, *see infra* Part III.B, *Nader* is canonical and a case the Supreme Court frequently cites in this area of the law. *See, e.g., Tashjian*, 479 U.S. at 215 n.6; *Jones*, 530 U.S. at 583. Indeed, the Supreme Court has referred to *Nader*'s holdings as its own. *Clingman*, 544 U.S. at 593–94. Plus, the Partial Dissent's suggestion that *Nader* would have concluded the plaintiffs lacked standing had the case been decided today, Part. Diss. Op. at 19, is entirely speculative. Seminal standing cases—which echoed the same separation-of-powers concerns *Nader* did, the Partial Dissent now does, and we also share—preceded the panel's decision and the Court's summary affirmance in *Nader*. *See, e.g., Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–21 (1974); *Warth*, 422 U.S.

34                        Opinion of the Court                22-14031

417 F. Supp. at 843–44, 847, 848–49 (discussing the minimal burden
on plaintiffs' asserted constitutional interest and the state's valid
reason for imposing them); *Tashjian*, 479 U.S. at 216 n.7 (recogniz-
ing that a "requirement of public affiliation with [a] Party in order
to vote in [a] primary" may pose a burden on voters and parties);
*Clingman*, 544 U.S. at 589–92 (discussing the semi-closed primary's
burden on voters and comparing it to *Tashjian*'s articulation of how
"Connecticut's closed primary limited citizens' freedom of politi-
cal association").

    But even putting aside Polelle's effective-opportunity theory,
the Partial Dissent offers no response to the other injuries Polelle
asserts. It ignores that the First Amendment places some re-
strictions on excluding voters from primary elections based on
their political beliefs. *See Duke*, 87 F.3d at 1232 & n.6. And the Par-
tial Dissent doesn't acknowledge that, under the Equal Protection
Clause, Florida's closed primary injures Polelle solely by imposing
a "barrier," *Billups*, 554 F.3d at 1351, to voting in partisan-election
primaries that is more burdensome to Polelle, a political non-

---

at 498–99. And *Nader*'s discussion of the plaintiffs' alleged constitutional inter-
ests, *see* 417 F. Supp. at 843–44, 847, 848–49, answers the key question at this
stage in our standing inquiry: that legally cognizable interests are at stake, even
if they are burdened only minimally. *Cf. Ziskis v. Symington*, 47 F.3d 1004, 1006
(9th Cir. 1995) (rejecting a challenge to Arizona's closed primary and relying
on *Nader*'s characterizing of the relevant constitutional burdens and state in-
terests); *Balsam v. Sec'y of N.J.*, 607 F. App'x 177, 182 (3d Cir. 2015) (explaining
*Nader* "struck a balance of competing First Amendment associational rights
and Fourteenth Amendment rights"). To this final point, the Partial Dissent
offers no response.

affiliate who does not want to register with a party and has not
done so, than it is to other voters who want to register with a party
and already have, *see id.* (holding a voter-identification law injured
voters who did not already have valid identification by requiring
them to obtain one or to present one at the ballot box). Indeed, at
a minimum, Polelle alleges Defendants will deny him a ballot in
state-operated primary elections—the "textbook," *Hero*, 42 F.4th at
772, limitation on his "ability to vote," *Jacobson*, 974 F.3d at 1246;
*Stachura*, 477 U.S. at 312 n.14; *Morse*, 517 U.S. at 207 (Stevens, J.),
that courts have long recognized at common law as a potential tort,
*see Voting Wrongs*, *supra*, at 1182; *Nixon*, 273 U.S. at 540.

The Partial Dissent only touches on this final point, and it
conclusorily remarks that "the right to vote means the right to par-
ticipate on equal footing in the general election," not "the primary
process of a political party he refuses to join." Part. Diss. Op. at 11;
*see also id.* at 17 (arguing *Jacobson* concerned a general election, not
a primary election). We'll set aside for the moment the incorrect
statement that the right to vote concerns only the right to partici-
pate in a general election. *See Nixon*, 273 U.S. at 540; *Gray v. Sanders*,
372 U.S. 368, 375 (1963). And we'll also ignore for the moment that
voters' inability to participate in a primary almost by definition hin-
ders their ability to participate equally in a general election. *See
Morse*, 517 U.S. at 205 (opinion of Stevens, J.); *Gray*, 372 U.S. at 380.
But even then, for the reasons we've already explained, we remain
unconvinced that a voter's political non-affiliation is enough of a
reason to conclude they lack standing to challenge an allegedly ex-
clusionary electoral scheme.     Principally, *Nader*, *Osburn*, and

*Clingman* addressed on the merits similar, if not identical claims, to those Polelle brings. And the Partial Dissent does not sufficiently explain why we should part ways with Supreme Court precedent or our past decisions.

The closest the Partial Dissent gets to offering such an explanation is its assertion that primary and general elections serve different purposes: the Partial Dissent claims general elections select officeholders, while primary elections choose parties' nominees. Part. Diss. Op. at 17. But that misstates, or at least incompletely states, the purpose of a primary. Primaries serve to "winnow the number of candidates to a final list . . . for the general election." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 454 (2008) (citation omitted). And primaries don't need to be partisan to do so. *See id.* To be sure, states may wish to hold public party primaries to ensure that parties select their nominees in a democratic manner and to enable party members "to set their faces against 'party bosses.'" *Lopez Torres*, 552 U.S. at 205. That is another interest a state may have in using partisan, rather than nonpartisan, primaries. *See Nader*, 417 F. Supp. at 843 (discussing the smoke-filled rooms that plagued party politics).

But such an interest doesn't negate a voter's injury when they are excluded from participating in the primary process. Nor does it eliminate the practical impact that primaries have on the general election. Voters have an interest in participating in the political process to help determine who may appear on the general election ballot. *See Gray*, 372 U.S. at 380 (explaining constitutional

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 37 of 112

guarantees extend to "any preliminary election that in fact determines the true weight a vote will have"). Still, "[t]he fact that a State's regulatory authority may ultimately trump voters' . . . interests in a particular context is no reason to dismiss the validity of those interests" in the first place. *Clingman*, 544 U.S. at 602 (O'Connor, J., concurring in part and concurring in the judgment).

Yet the Partial Dissent again misses this distinction between standing and the merits. It interprets our conclusion that Polelle has asserted an injury in fact as an alleged holding that "any restriction affecting a voter's interest in his ability to vote is constitutionally suspect." Part. Diss. Op. at 17 (cleaned up). Most respectfully, that's just wrong. We've stressed repeatedly that "standing in no way depends on the merits of the plaintiff's" claims. *Warth*, 422 U.S. at 500. And our ultimate merits determination—which soundly rejects Polelle's claims—belies the Partial Dissent's insistence that we're crafting a broad rule that makes "constitutionally suspect" routine election regulations. The Partial Dissent's instinct that Florida "must play an active role in structuring elections" is a correct one. *Burdick*, 504 U.S. at 433. But it's not an instinct that standing doctrine vindicates. *See id.* at 433–34 (explaining the states' constitutional role in structuring elections leads to a "more flexible standard" to apply to the merits).

In the end, Polelle has alleged the imminent deprivation of particular, concrete, and arguably protected interests. At this stage, that's all he must do. It's not "necessary to decide whether [Polelle's] allegations of impairment of [his] vote[] . . . will,

38                    Opinion of the Court                    22-14031

ultimately, entitle [him] to any relief, in order to hold that [he] ha[s]
standing to seek it." *Baker*, 369 U.S. at 208. "If such impairment
does produce a legally cognizable injury," we know that Polelle will
"sustain[] it." *Id.*

Because we conclude Polelle has sufficiently alleged an in-
jury in fact, we next assess Secretary Byrd's argument that Polelle's
injury is not traceable to him.

> 2. Polelle's exclusion from Florida primary elections is
> traceable to Supervisor Turner and redressable by an in-
> junction against him.

To satisfy standing's causation requirement, a plaintiff's in-
jury must be "fairly traceable to the challenged action of the de-
fendant, and not the result of the independent action of some third
party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). As
for standing's redressability requirement, to satisfy that, a plaintiff
must show that "the effect of the court's judgment on the defend-
ant" will likely redress "the plaintiff's injury, whether directly or in-
directly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir.
2019) (en banc) (cleaned up). These "two requirements—traceabil-
ity and redressability—often travel together." *Support Working An-
imals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (cit-
ing 13A Charles Alan Wright & Arthur R. Miller, Federal
Practice and Procedure § 3531.5 (3d ed. 2021)). And "where, as
here, a plaintiff has sued to enjoin a government official from en-
forcing a law, he must show, at the very least, that the official has
the authority to enforce the particular provision that he has

challenged, such that an injunction prohibiting enforcement would be effectual." *Id.*

Polelle alleges that he has been improperly excluded from the only stage of the election process for certain offices where his vote is of significance: Florida's partisan primary elections. So to have standing to sue, Polelle must show that his exclusion is fairly traceable to statutes that either the Secretary or the Supervisor enforces and that a judgment against either Defendant will likely redress Polelle's exclusion. Polelle does so as to Supervisor Turner. But as to Secretary Byrd, Polelle fails to carry his burden of identifying cognizable traceability and redressability theories. Still, because Polelle has standing to sue "at least one defendant," we proceed to the merits of his claims later in this opinion. *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014).

> *i.  Polelle's injuries are traceable to Supervisor Turner and redressable by an injunction against him.*

Supervisor Turner does not dispute that Polelle's exclusion is traceable to him. Nor does he contest that an injunction or declaratory judgment against him would afford Polelle relief.

That is unsurprising. Supervisors and the Election Board of poll workers they appoint conduct Florida's elections. Fla. Stat. § 102.012. The Board possesses "full authority to maintain order at the polls and enforce obedience to its lawful commands during an election and the canvass of the votes." *Id.* § 102.031(1). That includes verifying the identify of putative voters, *id.* §§ 98.461(2), 101.043, 102.012(1)(a), allowing voters to "enter the booth or

compartment to cast his or her vote," *id.* § 101.51(1), and accepting voters' requests for and sending out vote-by-mail ballots, *id.* §§ 101.62(1), 101.62(3). So if we granted relief that enabled Polelle to participate in partisan primary elections, the district court could enter an injunction requiring the Supervisor to issue and accept Polelle's partisan ballot.

Still, as Polelle recognizes, we may not be able to order the Supervisor to include Polelle in a partisan primary election if doing so would severely burden political parties' associational rights. *Cf. Osburn*, 369 F.3d at 1287. Again, at this stage, we don't consider whether such an order would impermissibly infringe political parties' First Amendment rights. *Jones* expressly reserved that question when it declined to rule on open primaries' constitutionality. 530 U.S. at 577 n.8. And we don't need to resolve that issue here because even if we were to conclude that such relief would violate political parties' associational rights, Polelle would still have standing to sue.[15]

---

[15] The Partial Dissent has a big hole in it. As we've explained, Polelle's claims are redressable in two ways: (1) we could order Supervisor Turner to issue Polelle a ballot, or (2) we could order Supervisor Turner to conduct an alternative primary scheme. The Partial Dissent disputes this second form of redressability (we explain above why we, respectfully, think it's wrong), but the Partial Dissent doesn't say we can't engage in the first form. To do that, the Partial Dissent would have to conclude that the first form of relief would violate a political party's First Amendment rights to issue such a ballot. But the Partial Dissent doesn't do that. For good reason. As we explained in the last Section, it doesn't necessarily follow from Supreme Court precedent that open

As we've explained, Polelle would vote in a party primary if he had the opportunity. But he requested more expansive relief to litigate in the alternative: *If* Florida's system of closed primary elections unconstitutionally excludes Polelle from the only stage in the election process where his vote matters, and *if* political parties are also entitled to exclude Polelle from their own primaries such that we cannot order Supervisor Turner to issue Polelle a partisan ballot—questions we do not decide in the standing inquiry—then Florida could conduct neither closed nor open partisan primaries. But in that hypothetical case, the State could still switch to some alternative election regime that could accommodate both constitutional interests, like non-partisan primaries. *Cf. Jones*, 530 U.S. at 585–86.

Polelle raised this alternative in the district court and on appeal both in his briefing and at oral argument. He argued that we could enjoin the use of closed-primary elections, forcing the

---

primaries are facially unconstitutional. *See, e.g., Jones*, 530 U.S. at 577 n.8; *Wash. State Grange*, 552 U.S. at 446, 449–50, 452; *Nago*, 833 F.3d at 1124–25. We ultimately avoid that constitutional question because established law allows us to conclude Polelle's injury is redressable by ordering Supervisor Turner to conduct an alternative primary scheme. But the Partial Dissent doesn't have that same luxury because it (incorrectly) rejects that conclusion. So it must address the extent of the burden issuing Polelle a partisan ballot would place on a political party's First Amendment rights before determining that Polelle's injury is not redressable in that way. But the Partial Dissent doesn't do this. It only suggests *Jones* points in that direction (which, as we've already stated, isn't exactly correct). In turn, we don't see how it can, well, dissent and say that redressing Polelle's injury falls beyond the powers of the judiciary.

"Florida legislature . . . to adopt other primary solutions . . . that avoid the constitutional issues raised by Plaintiff in his Complaint and yet respect the constitutional rights of political parties."

So his suit is one that effectively "challenge[s] an unconstitutional" election regime and "seek[s] an injunction forbidding the state from conducting an election under the challenged scheme." SAMUEL ISSACHAROFF, PAMELA S. KARLAN & RICHARD H. PILDES ET AL., THE LAW OF DEMOCRACY: LEGAL STRUCTURE OF THE POLITICAL PROCESS 982 (6th ed. 2022). Put simply, Polelle requests in the alternative that we "command[]" Supervisor Turner "to do nothing more than refrain from violating federal law" by not conducting partisan primaries as Florida law otherwise instructs him to do. *Jacobson*, 974 F.3d at 1257 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011)).

A judgment of the nature Polelle seeks would redress his injuries, or, at a minimum, it would "significantly increase the likelihood" that he would obtain such redress. *Lewis*, 944 F.3d at 1301. That's so because such a judgment would prevent Supervisor Turner from proceeding with the elections of public officials in the absence of a system of elections that affords Polelle a meaningful vote unconditioned on his affiliation with a political party. Elections in Sarasota County would continue, of course. They just wouldn't continue under the allegedly constitutionally defective scheme.

Supervisor Turner could implement other election regimes—such as non-partisan primaries—that would allow Polelle

to participate in Sarasota County's politics on equal footing with those affiliated with political parties. *See Jones*, 530 U.S. at 585–86, 585–86; *Wash. State Grange*, 552 U.S. at 444 (upholding Washington's non-partisan primary). Eliminating the party-affiliation requirement would redress Polelle's asserted First Amendment and equal-protection injuries. And by ordering Supervisor Turner to not conduct elections that exclude unaffiliated voters from the dispositive stages, Polelle would be able to cast a meaningful ballot in the decisive vote. *Cf. Wash. State Grange*, 552 U.S. at 446, 454. Plus, if Supervisor Turner does not "implement a primary election that complies with the constitutional mandate" of this Court, *O'Callaghan v. Alaska Dir. of Elections*, 6 P.3d 728, 730 (Alaska 2000), the district court may order Supervisor Turner directly to bring his elections into compliance with federal law.

That theory of traceability and redressability underwrites the type of election-related relief that we and the Supreme Court routinely grant.

Polelle's request for an injunction that bars Florida's use of a certain primary-election structure is no different than what the political parties sought, and the Court granted, in *Jones*. *Cal. Democratic Party v. Jones*, 984 F. Supp. 1288, 1292 (E.D. Cal. 1997) (explaining the political parties requested "an injunction against [the blanket primary's] implementation"), *aff'd*, 169 F.3d 646 (9th Cir. 1999), *rev'd*, 530 U.S. 567 (2000); *see also O'Callaghan*, 6 P.3d at 730 (upholding Alaska's "emergency regulations to implement a primary election that complies with the constitutional mandate of

44                    Opinion of the Court                    22-14031

Jones"). Just as the courts afforded relief to the plaintiffs in Jones by preventing California officials from using a primary system that violated the parties' associational rights, Polelle asks that we prevent Supervisor Turner from using a primary system that undermines his right to an effective vote by conditioning it on an act of affiliation with a party.

And more recently, in Allen v. Milligan, the Supreme Court affirmed the three-judge court's preliminary injunction that prevented Alabama from conducting any congressional elections using Alabama's proposed congressional map and that afforded the Alabama legislature two weeks to enact a remedial plan. 599 U.S. 1, 9 (2023) (affirming the district court's order); Caster v. Merrill, 2022 WL 264819, at *3 (N.D. Ala. Jan. 24, 2022) (describing the order).

Milligan represents a "faithful[] appli[cation]" of "existing law." 599 U.S. at 23. Although "intervention by the federal courts in state elections has always been a serious business," Oden v. Brittain, 396 U.S. 1210 (Black, J., opinion in chambers), "[i]t cannot be gainsaid that federal courts have the power to enjoin state elections," Chisom v. Roemer, 853 F.2d 1186, 1189 (5th Cir. 1988). Federal courts may enforce federal law and the Constitution by enjoining upcoming elections, ordering specific election practices, or, in particularly extreme cases, setting aside ballots or election results. See, e.g., Bell v. Southwell, 376 F.2d 659, 665 (5th Cir. 1967) ("[W]e are unfettered by the negative or affirmative character of the words used or the negative or affirmative form in which the coercive order

22-14031               Opinion of the Court                45

is cast."); *Hamer v. Campbell*, 358 F.2d 215, 224 (5th Cir.), *cert. denied*, 385 U.S. 851 (1966); *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973) (en banc); *Watson v. Comm'rs Ct. of Harrison Cnty.*, 616 F.2d 105, 107 (5th Cir. 1980); *Roe v. Alabama*, 68 F.3d 404, 407, 409 (11th Cir. 1995).[16]

But because "relief [of that nature] [is] to be guardedly exercised," *Southwell*, 376 F.2d at 662, our practice is to enter such extraordinary relief "only when a legislature fails" to comply with the "requisites" of federal law "in a timely fashion after having had an adequate opportunity to do so," *White v. Weiser*, 412 U.S. 783, 794–95 (1973) (quoting *Reynolds*, 377 U.S. at 586); *accord North Carolina v. Covington*, 585 U.S. 969, 978–79 (2018) (per curiam) (affirming part of the district court's order requiring the use of "court-drawn" state electoral districts). After all, if the district court could order state officers to implement a specific primary-election regime in accordance with the federal law and the Constitution, *see, e.g.*, *Hamer*, 358 F.2d at 224; *Southwell*, 376 F.2d at 665; *Covington*, 585 U.S. at 978, it could surely, in the spirit of federalism, provide Supervisor Turner the chance to craft a remedial plan, or offer the State the opportunity to revise offending statutes, in the first instance. *See* ISSACHAROFF, KARLAN & PILDES ET AL., *supra*, at 1003–04.

The Partial Dissent disagrees. It first discounts the relief we discuss because it believes Polelle didn't request it. The Partial

---

[16] All decisions the Fifth Circuit issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

46                    Opinion of the Court                22-14031

Dissent characterizes Polelle's arguments suggesting Florida could
adopt alternative election regimes as a mid-litigation switch, and it
treats that purported switch as an implicit concession from Polelle
that he sought in his complaint relief the court cannot grant. Part.
Diss. Op. at 22–23, 22 n.8.

       But we fail to see how a position Polelle has pressed since his
response to Defendants' motions to dismiss—the first time in the
litigation that he could make a legal argument—is a mid-litigation
switch. Nor do we understand Polelle's district-court arguments to
depart from the requests he made in his complaint: he sought for
us to enjoin Defendants from enforcing any Florida law "which
prohibits [him] from voting in future Florida election primaries
based solely on his choice to remain" independent, as well as to en-
ter "[a]ny other relief" we "deem[] just and proper."

       The potential remedies we discuss flow from Polelle's claim
that Florida's closed system of primary elections is unconstitu-
tional. It doesn't matter that Polelle didn't plead with particularity
a request that Florida enact a certain primary regime, like non-par-
tisan primaries. For one thing, because a final judgment "should
grant the relief to which each party is entitled, even if the party has
not demanded that relief in its pleadings," FED. R. CIV. P. 54(c), we
see no issue considering such an injunction in our redressability
analysis.[17] For another, the Partial Dissent would fault Polelle, a *pro*

_____

[17] The Partial Dissent takes issue with how we characterize the injunctions
Polelle requests and that we conclude we could enter. It asks, "[h]ow is an

22-14031             Opinion of the Court                    47

*se* litigant, for requesting relief that implicitly recognizes the feder-
alism principles to which we routinely adhere—namely, affording
states the opportunity to correct parts of their electoral scheme
that violate federal law before directly ordering state officials to im-
plement corrections.[18] *See Weiser*, 412 U.S. at 794–95; *Covington*, 585

---

injunction barring Supervisor Turner from conducting partisan primaries the
same as an injunction ordering him to create and run a new primary system?"
Part. Diss. Op. at 26 n.12. Although the Partial Dissent highlights a literal dis-
tinction between two possible injunctions, there is no functional difference
that is relevant to redressability in the election-law context. Our precedent is
clear that we should be "unfettered by the negative or affirmative character of
the words used or the negative or affirmative form in which the coercive order
is cast." *Southwell*, 376 F.2d at 665. "If affirmative relief is essential, the Court
has the power and should employ it." *Id.* Plus, in attempting to paint Polelle
as disclaiming the entry of any affirmative injunction, the Partial Dissent mis-
reads Polelle's arguments below. *See* Part. Diss. Op. at 26. It conflates blanket
primaries (which the Court held unconstitutional in *Jones* and which Polelle
does not suggest Florida adopt) with any other form of primary elections, like
non-partisan ones (which avoid any alleged constitutional injuries to Polelle
and to political parties and which Polelle has suggested are a legally viable al-
ternative to closed primaries). The Partial Dissent can't fairly read into one
sentence in Polelle's response to Defendants' motion to dismiss a disclaimer
of the just and proper relief he plainly sought in his complaint.

[18] The Partial Dissent seizes on Polelle's suggestion that Florida's legislature
may alter its primary election scheme if we conclude its closed primary is un-
constitutional. Part. Diss. Op. at 24–25. But it jumps the gun in claiming
Polelle's theory of redressability relies solely on the independent action of
Florida's legislature. For the reasons we explain above, Polelle does not need
to rely on the Florida legislature to redress his claims. So his anticipation that
the Florida legislature will respond to a judicial ruling is not determinative of
redressability. Polelle merely recognizes how election remedies normally

48                    Opinion of the Court                22-14031

U.S. at 978–79. We make no "judicial overreach," Part. Diss. Op. at
28, in concluding we may order the appropriate state officials to
conduct elections in compliance with federal law should a plaintiff
prove such a violation.

Yet the Partial Dissent rejects that proposition, too. As the
Partial Dissent sees it, requiring Supervisor Turner to implement
an alternative primary-election regime, like non-partisan elections,
that complies with the Constitution, would amount to "invent[ing]
an election regime from scratch." *Id.* at 27. We respectfully disa-
gree. For starters, we would enter such an injunction only if Su-
pervisor Turner failed to comply with an initial order that he cease
using the closed-primary election regime that allegedly violates
Polelle's rights. *See Weiser*, 412 U.S. at 794–95; *Covington*, 585 U.S. at
978–79.

More to the point, though, "the aim of equity is to adapt
judicial power to the needs of the situation." *Alabama v. United
States*, 304 F.2d 583, 591 (5th Cir.), *aff'd mem.*, 371 U.S. 37 (1962). So
"federal courts may use any available remedy to make good the
wrong done," *Hood*, 327 U.S. at 684, including the entry of "such
orders and decrees as are necessary and proper" to afford plaintiffs
"full protection from" unconstitutional "election practices," *Terry*,
345 U.S. at 470 (opinion of Black, J.) (discussing the "Jaybird-Dem-
ocratic-general election practices").

---

proceed: courts grant legislatures and state officials the first opportunity to
"remove the invalidity or unenforceability" in state law. Fla. Stat. § 97.029(3).

Still, we share the Partial Dissent's concern that "'[t]he func-
tional structure embodied in the Constitution, the nature of the
federal court system[,] and the limitations inherent in the concepts
both of limited federal jurisdiction and of the remedy afforded by
§ 1983' operate to restrict federal relief in the state election con-
text." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986) (quoting
*Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980)).  Numerous doc-
trines exist to advance the federalism principles underlying our sys-
tem of multiple sovereigns and the role the Constitution intends
states to play in organizing elections. *See, e.g.*; *id.* at 1314–15 (ex-
plaining "episodic," "garden variety" election disputes, like those
over "the validity of individual ballots," normally do not give rise
to constitutional claims); *Weiser*, 412 U.S. at 794–95 (allowing States
to first craft remedial plans); *Republican Nat'l Comm. v. Democratic
Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) (explaining "fed-
eral courts should ordinarily not alter the election rules on the eve
of an election" (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per cu-
riam))).

But this is a case where a plaintiff alleges that state laws'
"very design infringes on the rights of voters." *Curry*, 802 F.2d at
1314. So "federal courts closely scrutinize" the challenged regula-
tions. *Id.* And "state policy must give way when it operates to hin-
der vindication of federal constitutional guarantees." *See Missouri
v. Jenkins*, 495 U.S. 33, 57 (1990) (quoting *N.C. Bd. of Educ. v. Swann*,
402 U.S. 43, 45 (1971)).  Against these principles, we do not share
the Partial Dissent's view that the federal courts cannot redress
Polelle's injury.  If federal courts can halt state elections, *Reynolds*,

377 U.S. at 585, redraw state and congressional electoral maps, *id.*
at 586, require that states use single-member legislative districts,
*White*, 412 U.S. at 765, alter candidate filing deadlines, *Anderson*, 460
U.S. at 806, void election results and call a special election under
their supervision, *Southwell*, 376 F.2d at 665, or, more broadly, "dis-
establish local government institutions that interfere with [the
Fourteenth Amendment's] commands," *Jenkins*, 495 U.S. at 55 (cit-
ing *City of New York v. Morris*, 489 U.S. 688, 690 (1989)), we think it
is within the judicial power to enjoin the use of a primary-election
practice and its "conforming amendments to [a] [s]tate['s] [e]lec-
tion [c]ode," *Jones*, 984 F. Supp. at 1290.

Importantly, Supervisor Turner is the principal election of-
ficer in Sarasota County, and he does not dispute that he would be
the proper official to implement the relief Polelle has requested for
county-wide elections.[19] *Cf. Osburn*, 369 F.3d at 1288–89 (raising no

---

[19] The Partial Dissent offers a final point that Florida law does not empower
Supervisor Turner to reshape the state's primary system. Part. Diss. Op. at 27.
But that does not impact redressability. "[S]tate-imposed limitations" on state
officials' authority "must give way when [they] operate[] to hinder vindication
of federal constitutional guarantees." *Swann*, 402 U.S. at 45. So when "a par-
ticular remedy is required, the State cannot hinder the process by preventing
a local government from implementing that remedy." *Jenkins*, 495 U.S. at 57–
58. In fact, Florida law already acknowledges this principle. It recognizes that
courts may enter "an order or judgment that nullifies or suspends, or orders
or justifies official action that is in conflict with, a provision of the Florida Elec-
tion Code." Fla. Stat. § 97.029(3) (noting "the Legislature" may "amend[] the
general law to remove the invalidity or unenforceability"). And there is no
dispute that Supervisor Turner is the proper official to take action that rectifies

redressability issue related to voters' request to enjoin Georgia's open primary); *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (holding the plaintiffs lacked standing to sue the Supervisors in part because the Supervisors disclaimed the authority or desire to enforce the challenged provision).

For these reasons, we conclude a judgment against Supervisor Turner is likely to redress Polelle's core complaint—that he is excluded from the dispositive elections in Sarasota County—as well as his other asserted First Amendment and equal-protection violations.

If we conclude that Polelle is entitled to only a narrow injunction that requires Supervisor Turner to issue a partisan ballot to and accept one from Polelle, Polelle would be able to cast an effective vote on the same playing field as other voters. And should we conclude Polelle is entitled to an injunction to prevent the use of a closed primary, Supervisor Turner can then implement a primary system that includes Polelle in the important stages of the election cycle without imposing on his political beliefs.

---

the alleged unconstitutionality of Florida closed primary-election laws; he already operates county-wide primary elections. *See, e.g.*, Fla. Stat. § 105.031(1) (explaining "nonpartisan candidates for countywide or less than countywide office shall qualify with the supervisor of election"); *id.* § 102.012 (directing the Supervisor to "conduct elections"); *id.* § 102.071 (requiring the election board to tabulate and post voting results); *id.* § 100.051 (charging Supervisors to print on general-election ballots the names of those who won the relevant primaries).

52                    Opinion of the Court                    22-14031

> ii. *Polelle has failed to show that his injuries are traceable*
>     *to Secretary Byrd.*

Although Polelle has standing to sue Supervisor Turner, he has failed to show that he has standing to sue Secretary Byrd. Polelle proffers three traceability and redressability theories, but we can sustain none in this posture.

Polelle first argues that his injuries are traceable to Secretary Byrd because the Secretary is the chief elections officer who provides direction to Supervisors of Elections and may maintain suits against Supervisors to enforce their compliance with Florida law. But we squarely rejected that theory in *Jacobson*. We said, "Supervisors are independent officials under Florida law who are not subject to the Secretary's control." *Jacobson*, 974 F.3d at 1253. And "[t]hat the Secretary must resort to judicial process if the Supervisors fail to perform their duties underscores her lack of authority over them." *Id.* "Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement" Florida's partisan primaries "may not be imputed to the Secretary for purposes of establishing traceability." *Id.* at 1253–54.

Polelle's next two arguments may show hints of merit, but he does not develop them enough. His second argument attempts to distinguish *Jacobson*. Polelle asserts that, unlike the situation in *Jacobson*, he sued both the Florida Secretary of State and his Supervisor of Elections. Polelle is right that we explained the plaintiffs' core error in *Jacobson* was their failure to sue the Supervisors. 974 F.3d at 1258. But Polelle goes no further than that distinguishing

fact. He does not explain why the Secretary is the "cause of any alleged injuries," how "relief against" the Secretary can "redress those injuries," *id.*, or why the Secretary is a party against whom a judgment is necessary to provide him complete relief, *see* FED. R. CIV. P. 19(a)(1)(A). Without more and against our precedent in *Jacobson*, Polelle hasn't carried his burden of persuasion, let alone his burden of "alleging facts that 'plausibly' demonstrate" the traceability and redressability "elements." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021) (quoting *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 996 (11th Cir. 2020)).

As for Polelle's last argument, it suffers from a similar flaw. Polelle observes that Florida recently established an Office of Election Crimes and Security under the Secretary's purview. He also asserts that Florida law charges the Secretary with the responsibility to "[c]onduct preliminary investigations into any irregularities or fraud involving . . . voting" and to "report his or her findings to the statewide prosecutor or the state attorney for the judicial circuit . . . for prosecution." Fla. Stat. § 97.012(15). Given these circumstances and because Florida law makes it "unlawful" to vote in the primary election of a party to which that voter does not belong, *id.* § 101.021, Polelle effectively contends that the Secretary will report Polelle for prosecution if Polelle votes in a closed primary election.

Again, this argument also shows glimmers of potential. *See Dream Defs. v. Governor of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) (explaining plaintiffs suffer an injury when there is credible threat of

54                    Opinion of the Court                22-14031

prosecution under a statute that arguably affects a constitutional interest). But Polelle makes it far too late.

He did not raise this argument in the district court, makes just a passing reference to it in his opening brief, and only begins to develop it in his reply brief. As Secretary Byrd points out, that short, initial mention of the Secretary's investigatory authority was not enough for him to frame a proper response to Polelle's argument. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). And in any event, "legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal," even on the issue of standing. *Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treas.*, 773 F.3d 243, 246 (11th Cir. 2014) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). As a result, we can't consider it.

In short, Polelle has failed to meet his burden to show that he has standing to sue Secretary Byrd. We address Secretary Byrd's arguments that Polelle lacks standing to sue him, even though Polelle has standing to sue Supervisor Turner, because whether Polelle has standing to sue Secretary Byrd affects the disposition of Polelle's suit.

"Typically, where standing is lacking, a court must dismiss the plaintiff's claim without prejudice." *McGee v. Solic. Gen. of Richmond Cnty.*, 727 F.3d 1322, 1326 (11th Cir. 2013). In contrast,

USCA11 Case: 22-14031   Document: 54-1   Date Filed: 03/11/2025   Page: 55 of 112

dismissing a case on the merits may warrant a dismissal of claims with prejudice. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1133 (11th Cir. 2019). So on remand, the district court should dismiss Polelle's claims against Secretary Byrd without prejudice. *See id.* (remanding with instructions to dismiss with prejudice the claims adjudicated on the merits but dismiss without prejudice claims that failed for lack of standing).

*            *            *

To recap our discussion so far, Polelle has standing to sue Supervisor Turner but not Secretary Byrd. Polelle has alleged particular, imminent, and concrete injuries. Supervisor Turner allegedly deprives him of a vote in certain primary elections, and the common law would afford Polelle relief if that deprivation were improper. Not only that, but Polelle has also identified colorable constitutional interests that Florida's closed primary elections burden—his right to a meaningful vote, his right to be free from discrimination based on political beliefs, and his right to the equal protection of the laws. Plus, Supervisor Turner enforces the statutes that inflict those injuries, which means a federal-court injunction could remedy them. So Polelle has adequately alleged an injury in fact, traceable to Supervisor Turner and redressable by the federal courts. In brief, he has standing to sue at least one defendant. And on to the merits we go.

B. *Polelle fails to state a claim for relief because Florida's interest in holding closed primary elections outweighs the minimal burdens on Polelle's First and Fourteenth Amendment rights.*

Polelle's complaint sets forth three claims for relief: (1) a violation of his First Amendment freedoms from compelled speech or association; (2) a violation of his fundamental right to vote; and (3) a violation of his equal-protection rights. We employ the framework that the Supreme Court refined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992) (commonly referred to as the "*Anderson-Burdick*" framework), to assess the merits of these claims.[20] *See Crawford v. Marion*

---

[20] When, as here, voting-rights complainants allege violations of the Equal Protection Clause, we distinguish between allegations that "the state has unconstitutionally burdened the right to vote" and assertions that "discriminatory animus motivated the legislature to enact a voting law." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 n.9 (11th Cir. 2019). Claims that the state has unconstitutionally burdened the right to vote fall under the *Anderson-Burdick* framework, but assertions that discriminatory animus motivated the legislature to enact a voting law state "a traditional Equal Protection Clause claim." *Id.* Here, Polelle's third claim could, at least initially, be characterized as either. He claims Florida "invidiously discriminated against" voters who have not affiliated with a political party. But he also asserts that such alleged discrimination prevents "Not Politically Affiliated" voters "from having the same opportunity to affect the outcome of a general election" as affiliated voters do. Still, Polelle does not allege any facts showing that Florida acted with discriminatory animus. Instead, he argues Florida's system of primary elections does not treat purportedly "similarly situated" voters alike. So we evaluate his third claim under the *Anderson-Burdick* framework. *See id.* at 1319 ("[W]hen a state regulation is found to treat voters differently in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard applies.")

*Cnty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (plurality opinion) (explaining the development of the *Anderson-Burdick* test).

*Anderson-Burdick* "requires us to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications" for the burdens the state imposes, "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Lee*, 915 F.3d at 1318. We strictly scrutinize laws that severely burden a plaintiff's speech, association, or voting rights. *Id.* That means we require the government action to "be narrowly drawn to serve a compelling state interest." *Id.* At the other end of the scrutiny scale— when the state "imposes only a slight burden" on a plaintiff's rights—"relevant and legitimate interests of sufficient weight . . . must justify that burden." *Id.* at 1318–19 (citing *Billups*, 554 F.3d at 1352). Ultimately, our analysis follows a sliding scale, as opposed to strict tiers; the "more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Id.* at 1319 (citing *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014)).

To conduct the *Anderson-Burdick* analysis here, we would ordinarily assess the burden that state action imposes on the plaintiff's asserted constitutional interests, consider the state's asserted justifications for the burden, and then weigh the burden on the plaintiff's rights against the state's asserted justifications. *See, e.g., id.* at

(quoting *Obama for Am. v. Husted*, 697 F.3d 423, 429-30 (6th Cir. 2012)); *Burdick*, 504 U.S. at 434 (assessing whether the challenged law is "nondiscriminatory"); *Hero*, 42 F.4th at 776 (same).

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 58 of 112

58                     Opinion of the Court                   22-14031

1319–26; *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022). But as we highlighted earlier, binding Supreme Court precedent has already addressed the very claims Polelle now asserts.

In *Nader v. Schaffer*, a group of independent voters challenged Connecticut's closed primary elections. 417 F. Supp. 837 (D. Conn. 1976). They argued "that participation in a primary election is an exercise of the constitutionally protected right to vote and of the constitutionally protected right to associate with others in support of a candidate"; that as to the right to associate, "there is a constitutionally protected correlative right not to associate, and to be free from coerced associations"; and that Connecticut's closed primary "limits them to" the exercise of "one or the other." *Id.* at 842. A three-judge panel rejected those independent voters' claims. And the Supreme Court summarily affirmed. *Nader v. Schaffer*, 429 U.S. 989 (1976) (mem.).

Polelle argues that *Nader* is weak precedent because it is a summary affirmance. And to be sure, "the precedential effect of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions." *Anderson*, 460 U.S. at 784 n.5. But Polelle brings the exact same claims as the plaintiffs in *Nader* did. So the precedential value of the Supreme Court's summary affirmance in *Nader* extends pretty far here. In fact, because *Nader* addresses the "precise issues presented" in this case, it controls.

And in any event, Polelle understates *Nader*'s canonical status; it's precedent on which the Supreme Court has repeatedly

relied. *See, e.g., Tashjian*, 479 U.S. at 215 n.6 (citing *Nader* for the proposition that "the nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications"); *Jones*, 530 U.S. at 583 (same). In *Clingman*, for instance, the Court even referred to *Nader* as a decision of "this Court." 544 U.S. at 593–94. So we have no trouble concluding that *Nader* binds us and that we must follow its reasoning to the extent it applies to the facts of Polelle's case. *See United States v. Thomas*, 242 F.3d 1028, 1035 (11th Cir. 2001) ("[W]e are bound to follow [*Nader*] unless and until the Supreme Court itself overrules that decision."); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (explaining courts should follow "Supreme Court dicta" that is "well thought out, thoroughly reasoned, and carefully articulated analysis . . . describing the scope of one of its own decisions").

For that reason, our analysis picks up where *Nader* left off. We first recount *Nader*'s evaluation of the *Nader* plaintiffs' claims and then assess whether Polelle has identified any "changed circumstances," such as new law or facts, that "require a different result [from *Nader*] under the *Anderson-Burdick* test." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1282 (11th Cir. 2020); *see Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1343 n.1 (11th Cir. 2020) ("[T]he *Anderson* analysis must be undertaken even if the very same requirement had been previously upheld as constitutional, if there are at least some non-frivolous arguments that, since the decision upholding the requirement, circumstances have changed the context of the analysis."). Although some relevant differences exist

USCA11 Case: 22-14031   Document: 54-1   Date Filed: 03/11/2025   Page: 60 of 112

60                    Opinion of the Court                22-14031

between *Nader* and Polelle's case, we conclude that those differ-
ences aren't significant enough to alter the balance that the *Nader*
panel struck and that the Supreme Court adopted.

> 1. <u>*Nader* rejected voters' claims that a system of closed pri-
> mary elections unconstitutionally burdened their First
> and Fourteenth Amendment interests.</u>

We start by noting that the *Nader* panel rendered its decision
before the Supreme Court refined the *Anderson-Burdick* framework
that now hones our constitutional analysis. Even so, the opinion
conducted effectively the same balancing inquiry. So we recount
*Nader*'s opinion through that lens. First, we discuss *Nader*'s assess-
ment of the burdens Connecticut's closed primary imposed on the
voter plaintiffs' First and Fourteenth Amendment rights, noting
that the Court concluded that those burdens were minimal. Sec-
ond, we discuss the state interests that Connecticut asserted and
that the panel credited. And third, we revisit *Nader*'s conclusion
that the State's asserted interests were sufficiently weighty to justify
the minimal burdens the state imposed on the plaintiffs' constitu-
tional interest.

To begin, we discuss the burdens *Nader* considered. The
*Nader* panel first concluded that Connecticut's closed primary elec-
tions minimally burdened the plaintiff voters' First and Fourteenth
Amendment rights to cast a meaningful vote. It explained that the
plaintiffs' failure to "enroll in the Democratic or Republican Par-
ties" did "not prevent them from" supporting their preferred can-
didate through other avenues of expression, such as volunteering,

"contributing money," signing petitions, or participating with po-
litical parties as those parties' own rules allowed. *Nader*, 417 F.
Supp. at 842. As the three-judge court noted, "Connecticut's voting
laws clearly provide avenues for supporting candidates of one's per-
suasion without affiliating with an established 'major' political
party." *Id.; see Hero*, 42 F.4th at 776 ("Indiana law provides alterna-
tive means to access the general-election ballot.").

Plus, the *Nader* court observed, Connecticut was not a "one-
party" state such that any "party's primary election" was "com-
pletely determinative of the outcome." 417 F. Supp. at 843 (com-
paring its facts to those of *United States v. Classic*, 313 U.S. 299
(1941)). That fact was especially true for "local elections," where
"both minor party and independent candidates" could "reasonably
anticipate a measure of success." *Id.* So even if the plaintiffs chose
"not to associate, by not enrolling in a party, their right to vote in
the general election [was] unaffected." *Id.* at 847.

And relatedly, the *Nader* court explained that the burden on
the plaintiffs' right to an effective vote was minimal because the
closed-primary statute only slightly infringed the plaintiffs' First
Amendment rights not to associate with political groups and be-
liefs. "[E]nrollment in Connecticut impose[d] absolutely no affirm-
ative party obligations on the voter, in terms of time or money, and
it d[id] not even obligate [the plaintiffs] to vote for the party's posi-
tions or candidates or to vote at all." *Id.* at 843. Not only that, but
a "voter's name could be erased from the party's enrollment list on
a proper showing that he does not support the party's principles or

candidates." *Id.* at 843–44 (noting that, "in actual practice," those "statutes" were "not used").  So the panel concluded that "[s]uch limited public affiliation is simply not comparable to the coerced orthodoxy imposed by government officials in the cases cited by plaintiffs." *Id.* at 844.

In one of those cases—*West Virginia State Board of Education v. Barnette*—for instance, the Supreme Court held unconstitutional a school's requirement that students each day salute the American flag and recite the pledge of allegiance.  319 U.S. at 642; *see also Russo v. Cent. Sch. Dist. No. 1*, 469 F.2d 623, 625 (2d Cir. 1972) (teacher's refusal to salute the flag and recite the pledge).  The Court was concerned that the state essentially "force[d] citizens to confess by word or act their faith" in a political "orthodox[y]." *Barnette*, 319 U.S. at 642.  By contrast, in *Nader*, registering for a political party was primarily a ministerial act that did not require any confession of faith or affirmative support of the political party or its beliefs.  417 F. Supp. at 844.  And even if "some affiliation" was "coerced," the voter "at least" could "choose his party, whereas in the cases just listed there was no such choice." *Id.*

So the panel concluded that the burdens on the plaintiffs' right not to associate with political groups and to cast an effective ballot were not substantial.[21]    Connecticut required only "a

---

[21] *Nader* also rejected the plaintiffs' argument that "the public nature of enrollment violates their right to privacy of association by potentially subjecting them to harassment because of their affiliations with a party."  417 F. Supp. at

minimal demonstration by the voter that he has some 'commit-
ment' to the party in whose primary he wishes to participate." *Id.*
at 847. The registration requirement did not "constitute anything
in the nature of an absolute barrier to voting in a primary election."
*Id.* As a result, the *Nader* court rejected the plaintiffs' contention
that Connecticut could sustain its law only by showing that the law
was the "least drastic means available" to serve its "compelling state
interest." *Id.* at 844 (citation omitted). Instead, the panel explained
that "[t]here must be more than a minimal infringement on the
rights to vote and of association . . . before strict judicial review is
warranted." *Id.* at 849.

Then, the *Nader* court proceeded to what we now consider
the second step of the *Anderson-Burdick* framework: assessing the
State's asserted interests. *Nader* credited three interests supporting
closed primary elections.

First, it explained that the Constitution secures the rights of
political parties to select their candidates and that states may "af-
firmative[ly] protect[]" those "associational rights." *Id.* at 845. The

---

844. Polelle makes the same argument in his reply brief, asserting that he will
"suffer harassment by misled solicitations from party operatives at election
time." We don't consider this argument because (1) Polelle did not plead it,
*see Iqbal*, 556 U.S. at 677, and (2) he raised it for the first time in his reply brief,
*see Sapuppo*, 739 F.3d at 683. But in any event, like in *Nader*, Polelle's brief
"merely . . . raise[s] the spectre of harassment" and has not made "a detailed
factual showing of actual threats or incidents of harassment." 417 F. Supp. at
844. So we do not consider in our analysis any potential burden on Polelle's
First Amendment interests that Polelle's speculative threats of harassment at-
tempt to raise.

court reasoned that if the political party were "a completely private organization with no government regulation," it would have plenary control over "participation in its nominating process." *Id.* So "[i]n the regulated situation, the state has a legitimate interest in protecting party members' associational rights, by legislating to protect the party 'from intrusion by those with adverse political principles.'" *Id.* (quoting *Ray v. Blair*, 343 U.S. 214, 221 (1952)).

Second, and relatedly, the *Nader* panel discussed the state's "more general, but equally legitimate, interest in protecting the overall integrity of the historic electoral process," including "preserving parties as viable and identifiable interest groups" and "[e]nsuring that the results of primary elections, in a broad sense, accurately reflect the voting of party members." *Id.* To the extent the public relied on parties' brands to embody certain political positions, the *Nader* panel said, the state had an affirmative interest in maintaining those brands—and thus aiding the public in making informed voting choices—by "preventing fraudulent and deceptive conduct which mars the nominating process." *Id.*

Third, the *Nader* panel concluded that requiring that voters enroll in political parties served "an important housekeeping function" that strengthened electoral competition. *Id.* at 848. As the panel saw things, "[c]andidates need to know who is in the electorate, so that they (the candidates) can attempt to persuade those individuals to vote for them." *Id.* "[D]irect solicitation of party members by mail, telephone, or face-to-face contact, and by the candidates themselves or by their active supporters is part of any

primary election campaign." *Id.* Yet "without the public list of" individuals' registration, "such electioneering would become quite difficult." *Id.* In other words, the *Nader* panel determined, the state's requirement that individuals register for a particular party to participate in its primary enhanced candidates' ability to communicate with voters, identify their needs, and campaign on those issues.

Finally, the *Nader* court conducted the last *Anderson-Burdick* step by balancing the burdens on the plaintiffs' constitutional rights against the State's asserted interests. Because the burdens on the plaintiffs' rights were minimal and Connecticut's election regime was "reasonably related to the accomplishment of legitimate state goals," the Court reasoned that Connecticut's closed primary was constitutional. *Id.* at 849.

Influential in the panel's conclusion was the recognition that, across the country, the format of states' primary elections "had been the subject of controversy." *Id.* Other states, for instance, enacted open primaries. *Id.* But, as the panel observed, one state's contrary policy choice does not make another's "election laws unconstitutional" or "invidiously discriminatory." *Id.* at 850. Rather, the *Nader* panel explained, state legislatures "have broad discretion in formulating election policies." *Id.* (quoting *Tansley v. Grasso*, 315 F. Supp. 513, 519 (D. Conn. 1970) (three-judge court)). At bottom, the *Nader* court concluded that Connecticut's policy choice served "legitimate goals through constitutionally permissible means," so there was "no need or occasion for the judicial relief requested by the plaintiffs." *Id.*

66                    Opinion of the Court                22-14031

> **2.** Polelle cannot adequately distinguish his claims from
> those in *Nader*, so binding precedent requires us to con-
> clude that Florida's interest in closing its primary elec-
> tions outweighs the burdens on Polelle's First and Four-
> teenth Amendment interests under the *Anderson-Burdick*
> framework.

Polelle appears to make four arguments in support of his
contention that Florida's system of closed primary elections vio-
lates his First and Fourteenth Amendment rights. We find none
persuasive.

To start, two of Polelle's arguments suggest that we should
depart from *Anderson-Burdick* and strictly scrutinize Florida's sys-
tem of closed primary elections.

First, Polelle relies on *Hill v. Stone*, 421 U.S. 289 (1975), *Kramer
v. Union Free School District No. 15*, 395 U.S. 621 (1969), and other
precedent to argue that "restrictions on the franchise other than
residence, age, and citizenship must promote a compelling state in-
terest in order to survive a constitutional attack," *Hill*, 421 U.S. at
295. According to Polelle, party allegiance is not one of the limited
restrictive categories that is exempt from strict scrutiny.

The problem for Polelle is that *Nader* expressly rejected
Polelle's argument—and it did so while referencing *Hill* and *Kramer*.
Indeed, the *Nader* panel held that "a state might reasonably classify
voters or candidates according to party affiliations." 417 F. Supp. at
848 (quoting *Blair*, 343 U.S. at 226 n.14). In contrast to the strict
qualifications-based restrictions at issue in *Hill* (only those with

rendered, taxable property could vote) and *Kramer* (only those who owned or leased taxable real property or had children in public schools could vote), the *Nader* panel reasoned, party-affiliation requirements are "not . . . a political caste system." *Nader*, 417 F. Supp. at 848.

Rather, Polelle "refrains from entering a party primary" solely "because he regards himself an independent." *Id.* at 848 (quoting *Pirincin v. Bd. of Elections of Cuyahoga Cnty.*, 368 F. Supp. 64, 70 (N.D. Ohio) (three-judge court), *aff'd mem.*, 414 U.S. 990 (1973)). So neither *Hill* nor *Kramer* allows us to apply any stricter level of scrutiny to the burden Florida's closed system of primary elections imposes; we apply a flexible standard that calls for a "corresponding interest sufficiently weighty to justify" the burdens on voters' rights, *Crawford*, 553 U.S. at 190 (plurality opinion) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). And as *Nader* concluded, that burden is minimal.

. Second, Polelle argues in reply that *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018), and other recent, compelled-speech cases require us to apply a higher level of scrutiny to the burden that Florida's closed system of primary elections imposes on his First Amendment rights to disassociate from political messages with which he disagrees. But the issue is not, as Polelle suggests, that *Nader* declined to extend compelled-speech doctrine to the election-law context. Rather, it is that Connecticut's party-registration requirement did not burden voters as severely as did the state action in the

68                    Opinion of the Court               22-14031

compelled-speech cases that *Nader's* plaintiffs (and Polelle) cited. And Polelle does not offer a concrete reason we should balance the burdens differently.

For instance, the burden at issue in *Janus*—forced monetary subsidization, 585 U.S. at 884—was a burden the *Nader* court explicitly found to be absent from Connecticut's closed-primary requirements, *see* 417 F. Supp. at 843 (finding the closed-primary statute imposed "no affirmative party obligations on the voter, in terms of time or money"). Florida's registration laws similarly do not impose monetary burdens on party affiliates. Polelle thus offers no reason we should (or can) depart from the balancing framework *Nader* and *Anderson-Burdick* employ.

So we move on to Polelle's third and fourth arguments for why Florida's closed-primary system violates his First and Fourteenth Amendment rights. In both these arguments, Polelle points to factual distinctions between Florida's system of closed primaries and the system at issue in *Nader*, and he says those distinctions compel a different conclusion under the *Anderson-Burdick* framework. Polelle's third argument relates to the burden side of the balancing test; he suggests the burdens on his Fourteenth Amendment right to an effective vote are much greater here because Sarasota County is a one-party jurisdiction with no competition in the general election. Then, his fourth argument attempts to rebut some of Florida's asserted interests; he claims Florida need not support parties' First Amendment rights because Florida could switch to non-

USCA11 Case: 22-14031   Document: 54-1   Date Filed: 03/11/2025   Page: 69 of 112

22-14031          Opinion of the Court              69

partisan primaries that secure both his and the parties' constitutional interests. We address each argument in turn.

Polelle's third argument is his strongest. Polelle highlights that here, unlike in *Nader*, for many public offices, Sarasota County's primaries are "the only stage of the election procedure when" voters' "choice is of significance." *Classic*, 313 U.S. at 314; *see Terry*, 345 U.S. at 484 (Clark, J., concurring) (discussing exclusion from "the locus of effective political choice"). When *Nader* issued, Connecticut was not a "'one-party' state" where "one party's primary" was "completely determinative of the outcome." 417 F. Supp. at 483 (comparing its facts to those of *Classic*). Rather, "minor party and independent candidates" could "reasonably anticipate a measure of success in local elections." *Id.* Indeed, "independent voters" were of "demographic importance . . . in Connecticut politics." *Tashjian*, 479 U.S. at 212.

By contrast, the local elections in Sarasota County are dominated by a single political party. "Republican primaries," after all, "have determined the outcome of most of Sarasota County's partisan elections since 1968." *Supra* note 4. So the stakes of exclusion from Sarasota County's primaries are higher here than they were in *Nader*.

But even though the stakes of exclusion are higher here, the *actual barriers* to enter "the only stage of the election procedure when" a voter's "choice is of significance," *Classic*, 313 U.S. at 314—and therefore the actual burden on Polelle's First and Fourteenth Amendment interests—are the same as they were in *Nader*:

minimal. They are not like those in *Classic*, or the other White Primary Cases that Polelle cites, where the barriers to an effective vote were substantially higher, if not categorical.

In *Classic*, for instance, the United States indicted Classic and others for willfully altering and falsely counting and certifying ballots cast in a congressional primary election. 313 U.S. at 307. At a minimum, the false tally diluted the effectiveness of each voter's ballot. *Baker*, 369 U.S. at 208 (citing *Classic* as a case of "dilution by false tally"); *Classic*, 313 U.S. at 308 (recounting the allegation that the defendants altered around one hundred ballots). And at worst, in a close race, that dilution could change the outcome of an election so as to completely nullify the voters' choice. *See Jacobson*, 974 F.3d at 1246–47 (explaining vote nullification injures voters).

And in *Terry*, as with the other White Primary Cases, Black Americans simply could not participate in the election's critical juncture. *See* 345 U.S. at 462–66 (opinion of Black, J.). The Jaybirds, a private political organization, held its own nonpublic primary to predetermine the outcome of certain elections to purposely and categorically deny Black Americans their right to vote. *Id.* at 469–70.

*Classic*, *Terry*, and the other White Primary Cases do not involve facts analogous to those at issue here. Polelle does not face similar obstacles to participate in the primary elections where Sarasota County effectively chooses its representatives. Florida law does not restrict Polelle's ability to support his candidate of choice; he may do so through a wide variety of means, whether it be

volunteering his time or donating money. *See Nader,* 417 F. Supp. at 842. At the same time, Florida law places Polelle under no "affirmative . . . obligation" to contribute "time or money" to a party. *Id.* at 843. Nor must Polelle profess substantive support for "the party's positions or candidates" or make any other pledge of affiliation "comparable to . . . coerced orthodoxy." *Id.* at 843–44.

And as Polelle admits, he can vote in a party primary "so long as he has changed his non-affiliated registration to affiliation with a political party recognized by the State of Florida twenty-nine days prior to the primary in question." That "enrollment process" imposes only the "minimal . . . 'commitment'" of registering with a party and does not "constitute anything in the nature of an absolute barrier." *Nader,* 417 F. Supp. at 847. And just like in *Nader,* Polelle can disaffiliate at any time. *Id.* Florida does not lock him into an unwanted party affiliation after registration. *See Clingman,* 544 U.S. at 591 (citing *Kusper v. Pontikes,* 414 U.S. 51, 60–61 (1973)). In fact, Polelle may not even have to wait until after a primary election to disaffiliate from the party of the primary in which he wishes to participate. Florida law may allow him to do so after the registration books for the primary election close on the twenty-ninth day before the primary occurs.[22] So if Polelle truly wished, he

---

[22] "A person can register with a party or change his or her party affiliation any time, but to vote for a party candidate in a primary election, one must be registered with the party before the voter registration deadline, which is the 29th day before an election." Primary Elections, RON TURNER, SUPERVISOR OF ELECTIONS, https://www.sarasotavotes.gov/Election-Information/Primary-

72                    Opinion of the Court                22-14031

could conceivably register with a party for a short period to qualify for a relevant primary election but disaffiliate thereafter.

Because Polelle "can join a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election," Florida's closed primary "does not unduly hinder" his First and Fourteenth Amendment rights. *Clingman*, 544 U.S. at 590 (quoting *Jones*, 530 U.S. at 596 (Stevens, J., dissenting)) (cleaned up); *see also id.* at 604 (O'Connor, J., concurring in part and concurring in the judgment) (explaining "reasonable reregistration procedures" suggest an absence of "anticompetitive regulatory restrictions," "partisan self dealing[,] or a lockup of the political process that would warrant heightened judicial scrutiny").

Polelle's fourth proposed distinction seeks to convince us that the interests that Florida asserts at the second step of the *Anderson-Burdick* balancing framework are due less weight than Connecticut's same interests in *Nader*. He notes that the Supreme Court in *Washington State Grange v. Washington State Republican Party*, facially upheld Washington's non-partisan primaries. 552 U.S. 442 (2008). So he argues that Florida can't rely on its interest in supporting political parties' First Amendment rights to select its

---

Elections (last visited Feb. 17, 2025) [https://perma.cc/M6LV-LJZD]. "Once the registration books are closed for an election, *new registrations and party changes will be accepted but only for the purpose of future elections.*" *Id.* (emphasis added).

nominee; as *Jones* discussed, parties' rights are "are not inherently incompatible" with Polelle's. 530 U.S. at 586.

To be sure (and as we've explained), Polelle's claims are distinguishable from those in *Nader* and *Jones* because Polelle does not request relief that directly infringes parties' associational rights. But Polelle's argument removes from the *Anderson-Burdick* balance only Florida's asserted interests in supporting parties' own First Amendment rights. It does not undermine the other legitimate interests a state still has in bolstering partisan electoral competition by preserving political parties as viable and identifiable interest groups and enhancing candidates' electioneering and party-building efforts. And those, we hold, are still sufficiently weighty to justify the minimal burdens on his First and Fourteenth Amendment rights.

Florida may wish to promote political parties as viable and identifiable interest groups because it may permissibly conclude that "proper party functioning is critical to the central public good of democratic governance." SAMUEL ISSACHAROFF, DEMOCRACY UNMOORED 65 (Oxford Univ. Press 2023); *see Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 367 (1997) ("The Constitution permits the Minnesota Legislature to decide that political stability is best served through a healthy two-party system.").

To govern effectively, elected officials must find compromise among dozens, if not hundreds, of colleagues who represent a diverse group of constituents with varying interests. Coordinating a legislative agenda can be difficult, if not impossible, even at the

74                    Opinion of the Court                22-14031

local level. *See generally* Kenneth J. Arrow, *A Difficulty in the Concept of Social Welfare*, 58 J. POL. ECON. 328 (1950) (explaining, in a Nobel Prize-winning piece, that it is difficult, if not impossible, to aggregate elected officials' and voters' policy preferences into collective choices). So governments seek democratic structures that help reduce this collective-action difficulty and enable them to effect change that benefits the people they represent.

And Florida may constitutionally conclude that political parties provide such a democratic structure. The State may reasonably determine that political parties help identify voters' preferences and mediate between candidates' ideologies so that elected officials can cohere around a set of policy priorities. *See* ISSACHAROFF, DEMOCRACY UNMOORED, *supra*, at 65. Or it may believe that parties help officials conduct daily business; parties could eliminate, for instance, the need for one legislature to whip several dozens if not hundreds of votes themselves. *Id.* As the Supreme Court has repeatedly recognized, parties "were created by necessity . . . so as to coordinate efforts to secure needed legislation and oppose that deemed undesirable." *Blair*, 343 U.S. at 221; *see also Davis v. Bandemer*, 478 U.S. 109, 144–45 (1986) (O'Connor, J., concurring in the judgment) ("[A] strong and stable two-party system in this country has contributed enormously to sound and effective government."); *Branti v. Finkel*, 445 U.S. 507, 532 (1980) (Powell, J., dissenting) ("Broad-based political parties supply an essential coherence and flexibility to the American political scene.").

Florida could also reasonably conclude that coordinating governance through political parties empowers voters. *See Nader*, 417 F. Supp. at 845; *Clingman*, 544 U.S. at 594. As binding precedent explains, when "party labels" become "representative of certain ideologies," *Nader*, 417 F. Supp. at 845, voters may be better able to identify policies and government action with particular candidates or parties. So Florida could conclude that elected officials may then govern more effectively, knowing that voters may more easily recognize their failures to deliver on particular promises. *See* Nicholas O. Stephanopoulos, *Accountability Claims in Constitutional Law*, 112 Nw. U. L. Rev. 989, 1002 (2018) ("If [elected officials'] records are strong, voters cast their ballots for the incumbents; if they are weak, voters throw their support to the challengers.").

Not only that, but Florida may rationally find that closed primaries are "reasonable election regulations that," *Timmons*, 520 U.S. at 367, further these legitimate interests, *see Nader*, 417 F. Supp. at 845 (recognizing Connecticut's closed primary advances the State's interest in "preserving parties as viable and identifiable interest groups" and "protecting the overall integrity of the historic electoral process").

The State may reasonably believe that closed primaries promote political parties' continuing viability by requiring some level of engagement with them. As the Supreme Court has observed, it is possible for certain electoral systems to render parties "an unreliable index of [their] candidate's actual political philosophy," *Clingman*, 544 U.S. at 595; *see Wash. State Grange*, 552 U.S. at 454–49

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 76 of 112

(accepting that certain non-partisan ballot designs could misrepresent the extent of a candidate's affiliation with a political party, thereby confusing voters). A state could reasonably be concerned in that case that voters may struggle to identify their candidates of interest or hold elected officials accountable based on their adherence to party platforms with which they agree. *See* Stephanopoulos, *supra*, at 1003 (explaining voters may only vote retrospectively, and thus hold elected officials accountable, when they know whom "to credit or blame for the performances they have observed and appraised"). So Florida can rationally think that a traditional closed-primary election supports effective governance by eliminating this concern.

Florida could also permissibly conclude that closed primaries enhance its interest in effective governance by supporting parties' electioneering efforts. The Supreme Court has recognized that affiliation requirements may ensure "party affiliations" are "meaningful." *Clingman*, 544 U.S. at 595. As the Court explained in *Clingman*, "[w]hen voters are no longer required to disaffiliate"— or even affiliate at all—"before participating in other parties' primaries, voter registration rolls cease to be an accurate reflection of voters' political preferences." *Id.* That can be significant, the Court explained, because "parties' voter turnout efforts depend in large part on accurate voter registration rolls." *Id.* Parties and "[c]andidates need to know who is in the electorate, so that they (the candidates) can attempt to persuade those individuals to vote for them." *Nader*, 417 F. Supp. at 848.

Of course, "encouraging citizens to vote is an important state interest" in and of itself. *Clingman*, 554 U.S. at 596. But as *Nader* and *Clingman* acknowledge, closed primaries' housekeeping function also enables parties to identify their voters and those voters' interests and then promote candidates who will advance them in public office. So Florida can constitutionally conclude that its closed-primary regime may promote both effective governance and electoral accountability.

To be clear, we are not suggesting that closed primaries are the best electoral system. There are many legitimate interests that weigh in favor of semi-open, open, non-partisan, and other systems of primary elections. *See Jones*, 530 U.S. at 584 (explaining a state may have a legitimate interest in choosing an electoral system that promotes fairness, affords voters greater choice, increases voter participation, and protects privacy). States across the country have adopted a wide variety of primary regimes. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (explaining states may "serve as a laboratory; and try novel . . . experiments"). In fact, "[t]he relative merits of" different primary systems "have been the subject of substantial debate since the beginning of" the nineteenth century, and "no consensus has as yet emerged." *Tashjian*, 479 U.S. at 223 & n.11.

So all we conclude here is that Florida has legitimate interests in conducting closed primaries, as opposed to any other system of primary elections, and that those legitimate state interests are

USCA11 Case: 22-14031   Document: 54-1   Date Filed: 03/11/2025   Page: 78 of 112

"sufficiently weighty to justify the limitation[s]" on Polelle's First and Fourteenth Amendment rights. *Norman*, 502 U.S. at 288–89.

*     *     *

In sum, Florida's system of closed primary elections survives scrutiny under the *Anderson-Burdick* framework. We acknowledge that the stakes of Sarasota County's primary elections are weightier than of those in *Nader* and *Tashjian*. And we recognize that Florida, in this posture, may not rely on its interest in supporting parties' own First Amendment rights. Still, Florida's interests in supporting parties as identifiable groups and improving electioneering efforts outweigh the minimal burdens that Florida's closed-primary system imposes on Polelle's First and Fourteenth Amendment rights. Should Polelle desire to participate in the important stage of Sarasota County's primary elections, he need only file registration papers with a party. *Jones*, 530 U.S. at 584; *accord Clingman*, 544 U.S. at 590–91; *Nader*, 417 F. Supp. at 848. Florida requires no additional commitment from its voters.

That said, we do not question the vigor of Polelle's sincerely held political beliefs. Nor do we doubt the "indignity" he may suffer by having to "switch" his registrations in contravention of those beliefs. Indeed, Florida's law puts him to a "hard choice." *Jones*, 530 U.S. at 584. But it is not one that the Constitution forbids. Florida chose "the primary election scheme that it thinks will best promote democratic, electoral and governmental goals." *Nader*, 417 F. Supp. at 843. And if Polelle thinks Florida made the wrong decision, he may convince his representatives or his fellow

22-14031              Opinion of the Court              79

Floridians of the State's error. "But the Constitution" ultimately "leaves that choice to the democratic process, not to the courts." *Clingman*, 544 U.S. at 598.

## IV.    CONCLUSION

We vacate the district court's order granting Defendants' motions to dismiss. Because we conclude Polelle does not have standing to sue Secretary Byrd, we remand with instructions to grant Secretary Byrd's motion to dismiss without prejudice. And because we conclude Polelle failed to state a claim for relief, we remand with instructions to grant Supervisor Turner's motion to dismiss with prejudice.

**VACATED AND REMANDED.**

22-14031              ABUDU, J., Concurring                    1

ABUDU, Circuit Judge, joined by ROSENBAUM, Circuit Judge, Concurring:

The law today as it stands, which the majority opinion recognizes, is that, under these facts, independent voters do not have the right to vote in a closed partisan primary election. The precedential basis for this is *Nader v. Schaffer*, 429 U.S. 989 (1976) (mem.), in which the Supreme Court summarily affirmed a lower court decision which upheld the exclusion of independent voters from Connecticut's closed primary system. *See* 417 F. Supp. 837 (D. Conn. 1976). While *Nader*'s holding is still the applicable legal standard in these types of voter access cases, the electoral landscape is changing such that the First and Fourteenth Amendment implications of *Nader* warrant serious consideration.

Polelle has argued that Florida's closed primary elections preclude independent voters from affecting the outcome of the general election to the same extent as party voters. Consequently, the exclusion of Sarasota County's independent voters from primary elections, many of which may be outcome-determinative, persists and their ability to influence who the county's political leaders will be is non-existent. Even more significantly, the ability of independent voters to influence county policies and procedures that directly impact them is seriously diminished. Essentially, independent voters have a defined political identity, but they have no real political power.

Statistics show that, with growing disapproval of both major political parties, more Americans are identifying as independent

2              ABUDU, J., concurring              22-14031

voters – a mandatory declaration in Florida which requires people
to pick a party when registering to vote.[1]  In the last quarter cen-
tury, the population of independent voters in Florida has grown
from 1.5 million in 2000, to 3.7 million in 2024, representing about
40% of the growth in the State's registered voters over that period.[2]
Nationally, large numbers of Black and Hispanic/Latino voters
have left the two-party system.  The Hispanic/Latino voter popu-
lation experienced a drop in Democratic and Republican voters
from 1999 to 2023 from 44% to 26%, and 17% to 15%, respectively.[3]
Simultaneously, independent Hispanic/Latino voters grew from
39% to 55%.[4]  Likewise, the population of Black, non-Hispanic in-
dependent voters grew from 29% to 46% and experienced a drop
in Democratic voters from 65% to 46% during the same period.[5]
The flight from the two-party system is happening even as Black
and Hispanic/Latino populations comprise a greater share of the
electorate.  As of 2024, 13% of registered voters are Hispanic/La-
tino, up from 4% in 1996; and 11% of registered voters are Black,

---

[1] *Party Affiliation*, GALLUP, https://news.gallup.com/poll/15370/party-affilia-
tion.aspx (last visited Feb. 5, 2024).

[2] *Voter Registration By Party Affiliation*, Florida Division of Elections,
https://dos.fl.gov/elections/data-statistics/voter-registration-statis-
tics/voter-registration-reports/voter-registration-by-party-affiliation/
[https://perma.cc/NJH5-UDWL].

[3] Jeffrey Jones & Lydia Saad, *Democrats Lose Ground with Black and Hispanic
Adults*, GALLUP, https://news.gallup.com/poll/609776/democrats-lose-
ground-black-hispanic-adults.aspx (Feb. 7, 2024).

[4] *Id.*

[5] *Id.*

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 82 of 112

22-14031          ABUDU, J., Concurring                3

up from 9% in 1996.[6]  In 2024, 43% of American voters identified as independent, whereas 28% identified as Republican and 28% identified as Democrat.[7]

In concrete ways, the growing independent voter population is being deprived of the "constitutional right of choice," particularly where closed primary elections are outcome determinative. *United States v. Classic*, 313 U.S. 299, 319 (1941).  To put *Nader* in perspective, a challenge against a closed primary system in a voting district where an insignificant number of individuals want to participate ought to be less compelling than the increasingly likely scenario where the inclusion of independent voters actually would make a difference and, thus, where an incumbent political party may feel a pull towards erecting anti-competitive electoral regulations.[8]  Unfortunately, today's decision, invisibly wrapped in cases which have refused to recognize certain partisan election schemes as unconstitutional, could leave this growing segment of the electorate without a voice and without legal recourse.  *See, e.g.*, *Rucho v. Common Cause*, 588 U.S. 684 (2019) (rejecting, as non-justiciable, a challenge to North Carolina's redistricting scheme in which

---

[6] *The Changing Demographic Composition of Voters and Party Coalitions*, PEW RSCH. CENTER, https://www.pewresearch.org/politics/2024/04/09/the-changing-demographic-composition-of-voters-and-party-coalitions/ (Apr. 9, 2024).

[7] *Party Affiliation*, GALLUP, https://news.gallup.com/poll/15370/party-affiliation.aspx (last visited Feb. 5, 2024).

[8] "Insignificant," as used here, means not enough voters to change the outcome of an election.

USCA11 Case: 22-14031    Document: 60    Date Filed: 03/26/2025    Page: 806 of 1236

4                    ABUDU, J., concurring              22-14031

Republican-led legislature admitted to drawing maps "favorable to
Republican candidates," while acknowledging that "race and poli-
tics are highly correlated," *Common Cause v. Rucho*, 318 F. Supp. 3d
777, 803–04 (M.D.N.C. 2018)).

     The current legal landscape, at times finding political parti-
sanship claims non-justiciable, may be unfit for the modern politi-
cal terrain.[9] However, it does not need to be. The Supreme Court's
summary affirmance in *Nader* arguably embraced the concept that
a court's jurisdiction involves "correct[ing] governmental action
which otherwise conflicts with" the Constitution. *Nader*, 417 F.
Supp. at 850, *aff'd*, 429 U.S. 989 (1976). It should be evident that
restrictions to the ballot, even under the veil of political partisan-
ship, in some instances can conflict with the constitutional protec-
tions that otherwise surround the right to vote. *See Smith v. All-
wright*, 321 U.S. 649, 661–62 (1944) (recognizing that the right to
vote in a primary "without discrimination by the State . . . is a right
secured by the Constitution.").[10]

---

[9] *See Rucho*, 588 U.S. at 718 (explaining the lack of standards to govern judicial
review of partisan gerrymandering claims rendered the claim non-justiciable).
Partisanship-based claims may be justiciable, however, where there are man-
ageable standards, such as where individuals are invidiously excluded from
elections or where a statute creates one, *see id.* at 716 (suggesting "statutory
provisions" can "confin[e] and guid[e] the exercise of judicial discretion").

[10] *See Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("[A]ll qualified voters have a
constitutionally protected right to vote"); *see also Classic*, 313 U.S. at 315
("[T]he right of qualified voters within a state to cast their ballots and have
them counted . . . is a right secured by the Constitution.").

22-14031          ABUDU, J., Concurring                    5

Here, the practical implications of excluding Sarasota County's independent voters echo similarities to *Terry v. Adams*, 345 U.S. 461 (1953), in which the Court struck down an electoral scheme for primary elections which systematically excluded Black voters. The Court reasoned that "the Democratic primary and the general election . . . [became] no more than the perfunctory ratifiers of the choice that has already been made in [] elections from which [African-Americans] have been excluded." *Id.* at 469. While racial animus drove the unlawful tactics in *Terry*, closed primary schemes could become just another proxy for the exclusion of populations that might upend the political dominance of one party over other political voices. Thus, the concern about outsiders influencing partisan primary elections could become a more covert excuse for electoral exclusion. Without any available legal remedies, these "outlier" voters are politically silenced.

> The Supreme Court, in *United States v. Classic*, stated:
>
> we cannot close our eyes to the fact . . . that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon the rejection at the election of the choice made at the primary and may thus operate to deprive the voter of his constitutional right of choice.
>
> 313 U.S. at 319.

We, too, should not ignore this truth in Sarasota County.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

Professor emeritus of law Michael Polelle sued Florida Secretary of State Cord Byrd and Sarasota County Supervisor of Elections Ron Turner, challenging Florida's closed-primary system. Polelle alleged that, as a No Party Affiliation voter, the system "suppress[ed] . . . his primary vote in selecting political candidates" and thus violated his First and Fourteenth Amendment rights. But Polelle never explained how a court ruling would secure him the vote he sought. Instead, he asked the District Court to enjoin the system altogether.

Courts do not wield the Constitution as a blunt instrument to level the political playing field. We resolve only concrete "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. The District Court correctly held that Polelle lacked standing.

The Majority disagrees.[1] It does so by distorting two fundamental limits on judicial power. First, the Majority reframes Polelle's political dissatisfaction as a legally cognizable injury. It is not. Second, the Majority dilutes the redressability requirement of standing by proposing an injunction that Polelle never requested and that courts have no authority to issue. Under binding

---

[1] The Majority concludes that, "as to Secretary Byrd, Polelle fails to carry his burden of identifying cognizable traceability and redressability theories." Maj. Op. at 39. I agree. This dissent focuses on the Majority erring by not concluding the same for Supervisor Turner.

precedent, Polelle lacks standing. Because the Majority says otherwise, I respectfully dissent.

*          *          *

My dissent proceeds in four parts. First, I review the facts of this case. Second, I summarize the hornbook requirements of Article III standing. Third, I explain why the Majority's application of standing is not faithful to our precedent. Fourth, I conclude.

## I.    Facts

Michael Polelle, a Sarasota County resident and registered voter with "No Party Affiliation" (NPA), sued Florida Secretary of State Cord Byrd and Sarasota County Supervisor of Elections Ron Turner under 42 U.S.C. § 1983, challenging Florida's closed-primary system. He alleged that Florida's election laws violated his constitutional rights by preventing him from voting in partisan primaries. His complaint asserted three claims:

1. *"Violation of the First Amendment Freedom from Compelled Speech or Compelled Association."* Florida's primary system, Polelle argued, forces NPA voters to affiliate with a political party if they want to participate in primaries, violating their rights against compelled speech and association.

2. *"Violation of the Fundamental Right to Vote Provided by the Free Speech Clause of the First Amendment of the United States Constitution."* By barring NPA voters from voting in partisan primaries, Polelle argued, Florida unconstitutionally burdens NPA voters' right to vote, especially in jurisdictions where

22-14031        TJOFLAT, J., Dissenting in Part              3

one party's primary effectively decides the general election outcome.

3. *"Violation of the Fourteenth Amendment Equal Protection Clause."* According to Polelle, the state's primary system discriminates against NPA voters by denying them access to taxpayer-funded elections in which party-affiliated voters could participate.

In simpler terms, Polelle alleged that because he was not affiliated with a political party, he was shut out of Florida's partisan primary elections—even when those elections effectively determined the winners of the general election. He claimed this restriction forced him to either join a party against his will or forgo a meaningful vote.

As relief, Polelle sought:

1. A declaration that Florida's closed-primary law (Fla. Stat. § 101.021)[2] and its universal-primary exception (Fla. Const.

---

[2] Polelle requested a declaration and injunction concerning "§ 101.102 Fla. Stat. (2021)"—a statute that does not exist. I assume he meant § 101.021. That statute says,

> In a primary election a qualified elector is entitled to vote the official primary election ballot of the political party designated in the elector's registration, and no other. It is unlawful for any elector to vote in a primary for any candidate running for nomination from a party other than that in which such elector is registered.

Fla. Stat. § 101.021.

art. VI, § 5(b))[3] violate the First and Fourteenth Amendments, both facially and as applied to him;

2. A permanent injunction prohibiting Florida officials from enforcing those provisions or any other laws that prevent NPA voters from voting in partisan primaries; and

3. "Any other relief deemed just and proper."

The Defendants moved to dismiss Polelle's complaint, arguing that Polelle lacked standing and failed to state a claim. They contended that Polelle lacked standing because an individual voter has no constitutional right to participate in a political party's primary without affiliating with that party. And they asserted that Polelle's proposed remedy—forcing unaffiliated voters into a party's closed primary—would violate the First Amendment rights of political parties by compelling the parties to associate with non-members.

Polelle responded by doubling down on his claims and expanding his arguments. He asserted taxpayer standing—both as a federal taxpayer and as a Sarasota County taxpayer—contending that his tax dollars funded elections in which he was excluded from participating. In response to the Defendants' argument that his requested relief would violate the political parties' First Amendment

---

[3] That provision says, "If all candidates for an office have the same party affiliation and the winner will have no opposition in the general election, all qualified electors, regardless of party affiliation, may vote in the primary elections for that office." Fla. Const. art. VI, § 5(b).

rights, Polelle "clarified" that he was not advocating for a blanket primary or asking for a partisan ballot if that was impermissible. Instead, he suggested that the District Court could wipe the slate clean and the Florida legislature could adopt alternative primary structures that would allow NPA voters to participate without infringing on the political parties' associational rights.

The District Court sided with the defendants and dismissed Polelle's complaint. The Court held that Polelle lacked standing because he had only a "desire" to vote in a party primary, not a legally protected interest in doing so. And even if he had standing, the Court concluded that he failed to state a claim: Florida's primary system is a permissible exercise of state authority over elections, and nothing in the Constitution requires the state to allow non-party members to participate in party primaries.

## II.    A Primer on Standing

Under Article III of the U.S. Constitution, federal courts decide only "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. This limitation is "fundamental to the judiciary's proper role in our system of government." *Murthy v. Missouri*, 603 U.S. 43, 56, 144 S. Ct. 1972, 1985 (2024) (citations and internal quotation marks omitted). It means that "federal courts can address only questions 'historically viewed as capable of resolution through the judicial process.'" *Rucho v. Common Cause*, 588 U.S. 684, 695, 139 S. Ct. 2484, 2493–94 (2019) (quoting *Flast v. Cohen*, 392 U.S. 83, 95, 88 S. Ct. 1942, 1950 (1968)).

6                    TJOFLAT, J., Dissenting in Part            22-14031

To ensure that a case or controversy exists, a plaintiff "must establish that [he] ha[s] standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 2317 (1997). Standing requires "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 44, 144 S. Ct. at 1986 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013)). "The party invoking federal jurisdiction"—in this case, Polelle—"bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992). Relevant here are the first and third requirements: injury in fact and redressability.[4] I discuss each in turn.

### 1. Injury in Fact

To satisfy the injury-in-fact requirement, a plaintiff must show he has "suffered 'an invasion of a legally protected interest'

---

[4] As for the Majority's decision to analyze redressability and traceability together, I agree that those two elements are *often* correlated. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81, 144 S. Ct. 1540, 1555 (2024). But as the Supreme Court warns, "while traceability and redressability are *often* flip sides of the same coin, that is not *always* the case." *Murthy*, 603 U.S. at 74 n.11, 144 S. Ct. at 1996 n.11 (citation and internal quotation marks omitted); *see also Hippocratic Med.*, 602 U.S. at 381 n.1, 144 S. Ct. at 1555 n.1 ("Redressability can . . . pose an independent bar" to standing, such as when "a plaintiff . . . suffers injuries caused by the government[,] . . . because the case may not be of the kind 'traditionally redressable in federal court.'" (citations omitted)). Sometimes, as here, a plaintiff can satisfy traceability and fail to establish redressability.

that is "concrete and particularized' and 'actual or imminent.'"
*Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 136 S. Ct. 1540, 1548 (2016)
(quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136). For an injury to
be concrete, we "assess whether [it] has a 'close relationship' to a
harm 'traditionally' recognized as providing a basis for a lawsuit in
American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424, 141
S. Ct. 2190, 2204 (2021) (quoting *Spokeo, Inc.*, 578 U.S. at 341, 136 S.
Ct. at 1549). While an "exact duplicate" is unnecessary, a plaintiff
must identify a "close historical or common-law analogue for [his]
asserted injury." *Id.* And "traditional harms may also include harms
specified by the Constitution itself." *Id.* at 425, 141 S. Ct. at 2204.

For an injury to be particularized, "the injury must affect the
plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1,
112 S. Ct. at 2136 n.1. An "undifferentiated" or "generalized griev-
ance" is not enough. *Id.* at 575, 112 S. Ct. at 2144 (quoting *United
States v. Richardson*, 418 U.S. 166, 176–77, 94 S. Ct. 2490, 2946 (1974)
(internal quotation marks omitted)).

And finally, an injury must also be actual or imminent, rather
than "conjectural or hypothetical." *Id.* at 560, 112 S. Ct. at 2136 (ci-
tation and internal quotation marks omitted). An actual injury is a
harm that the plaintiff has already sustained. *See Sierra v. City of
Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021). Conversely,
an imminent injury is one that the plaintiff has not yet suffered but
that is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149,
158, 110 S. Ct. 1717, 1724–25 (1990) (citations and internal quota-
tion marks omitted). A plaintiff seeking damages must allege an

8                    TJOFLAT, J., Dissenting in Part              22-14031

actual injury, while one seeking an injunction must show an immi-
nent one. *Sierra*, 996 F.3d at 1113.

### 2. Redressability

It is not enough for a plaintiff to have pleaded an injury.
Standing also requires that a plaintiff show "a likelihood that the
requested relief will redress the alleged injury." *Steel Co. v. Citizens
for a Better Env't*, 523 U.S. 83, 103, 118 S. Ct. 1003, 1017 (1998). "Re-
lief that does not remedy the injury suffered cannot bootstrap a
plaintiff into federal court." *Id.* at 107, 118 S. Ct. at 1019.

Like injury in fact, the Supreme Court has consulted history
when analyzing redressability. To determine whether the relief
sought will redress the plaintiff's alleged injury, the Supreme court
has "look[ed] to the forms of relief awarded at common law."
*Uzuegbunum v. Preczewski*, 592 U.S. 279, 285, 141 S. Ct. 792, 797–98
(2021). That is, a court must determine whether the type of relief
sought was traditionally available to redress the alleged harm. To
take an obvious example, a plaintiff's "belief that a favorable judg-
ment will make him happier" is not "an acceptable Article III rem-
edy because it does not redress a cognizable Article III injury." *Steel
Co.*, 523 U.S. at 107, 118 S. Ct. at 1019.

Similarly, "a decision [that] might persuade actors who are
not before the court" to alter their conduct is not enough for re-
dressability. *Haaland v. Brackeen*, 599 U.S. 255, 294, 143 S. Ct. 1609,
1639–40 (2023). "Redressability requires that the court be able to
afford relief *through the exercise of its power*, not through the persua-
sive or even awe-inspiring effect of the opinion *explaining* the

exercise of its power." *Id.* at 294, 143 S. Ct. at 1639 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825, 112 S. Ct. 2767, 2788 (1992) (Scalia, J., concurring in part and concurring in judgment) (internal quotation marks omitted)). Said differently, "'it must be *the effect of the court's judgment on the defendant*'—not an absent third party— 'that redresses the plaintiff's injury, whether directly or indirectly.'" *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (citations omitted). That means the relief sought must "affec[t] the behavior of the defendant towards the plaintiff." *Uzuegbunum*, 592 U.S. at 291, 141 S. Ct. at 801 (citations and internal quotation marks omitted).

This redressability requirement may seem like a high bar to meet. Maybe so. But the Supreme Court has cautioned that the "assumption that if [the appellant] ha[s] no standing to sue, no one would have standing, is not a reason to find standing." *Clapper*, 568 U.S. at 420, 133 S. Ct. at 1154 (citations and internal quotation marks omitted). The Framers deliberately left many disputes to the political process, not the courts. *See Hippocratic Med.*, 602 U.S. at 380, 144 S. Ct. at 1555. It is not within our discretion as judges to alter that design.

### III.    The Majority's Missteps

With these foundational standing principles in mind, I turn to the Majority's analysis. Despite acknowledging the requirements for standing, the Majority departs from them in two fundamental ways: first, by recasting Polelle's claims to find an injury,

and second, by attenuating redressability beyond its limits. Neither approach comports with precedent.

## A. Injury in Fact

The District Court found that Polelle alleged no legally cognizable injury. It reasoned that his "associational interest in selecting the candidate of a group to which [he] does not belong[] falls far short of a constitutional right, if indeed it can even fairly be characterized as an interest." *Polelle v. Byrd*, No. 8:22-CV-1301-SDM-AAS, 2022 WL 17549962, at *1 (M.D. Fla. Nov. 3, 2022) (quoting *California Democratic Party v. Jones*, 530 U.S. 567, 573 n.5, 120 S. Ct. 2402, 2407 n.5 (2000) (internal quotation marks omitted)). The Majority disagrees.

In his complaint, Polelle described his injury as a "suppression of his primary vote in selecting political candidates who are obligated to represent all citizens of the United States and Florida." Polelle equated this primary vote to "his fundamental right to vote in elections" and claimed that he does not "hav[e] the same opportunity to affect the outcome of a general election to the same extent as members of political parties." Under the most liberal construction of his complaint, Polelle argued that because Florida limits participation in its primaries to party members, the general election is less meaningful for him—depriving him of a fully effective vote. Or put another way, Polelle is dissatisfied with the way candidates are selected for the general election.

That complaint is not cognizable for a simple reason: Polelle has the same vote in the general election as every other eligible

22-14031        TJOFLAT, J., Dissenting in Part        11

voter in his county. He has not alleged, much less established, any impediment to casting a ballot for his preferred candidate or otherwise engaging in the political process. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1246 (11th Cir. 2020). His real grievance is not that Florida prevents him from voting—it is that he dislikes the political landscape in which he must cast his vote. And as this Court has long recognized, "[v]oters have no judicially enforceable interest in the *outcome* of an election." *Id.* (citing *Raines*, 521 U.S. at 819, 824, 830, 117 S. Ct. at 2317, 2319–20, 2322–23).

The Majority sidesteps this practical reality by conflating primary elections and general elections to manufacture an injury where none exists. But here, Polelle's right to vote means the right to participate on equal footing in the general election—it does not entitle him to shape the primary process of a political party he refuses to join. *See id.* at 1247 ("[A] citizen is not injured by the simple fact that a candidate for whom []he votes loses or stands to lose an election."). If Polelle's views prevail in the general election, he will be represented by a political candidate aligned with his interests. If other voters disagree, he will not be. That is how elections work in a representative democracy.

The Majority has no real answer to this. It protests that Polelle's grievance is about *opportunity*, not *outcome*. Maj. Op. at 27. But when it comes to standing, wordplay cannot create an injury where none exists. "Opportunity" to what end? To influence an election's outcome—exactly what we have long held is not a cognizable injury. The Majority's opinion supports this—it finds the

need to grant Polelle's motion to supplement the record and cite
online sources that support propositions such as that "Republican
primaries, for instance, 'have determined the outcome of most Sar-
asota County's partisan elections since 1968.'" Maj. Op. at 5 (quot-
ing Carrie Seidman, *In Sarasota County, Voters May Find It's Better To
Switch Than Stick,* Sarasota Herald-Trib. (May 10, 2024),
[https://perma.cc/YV62-R7KW]).

    Still, the Majority insists that Polelle's claims are "identical"
to those where courts adjudicated election-law challenges on the
merits. Maj. Op. at 36. But that is wrong. Unlike this case, the deci-
sions the Majority cites involved cognizable injuries—vote dilu-
tion, exclusion from primary elections on racial grounds, and harm
from other election laws designed to disadvantage racial minori-
ties. The differences are glaring. Unlike the plaintiffs in those cases,
Polelle faces no obstacle to voting, no dilution of his vote, and no
statutory restriction that makes his ballot count less than others.

    Again, the Majority doubles down. To justify why racially
discriminatory voting practices are analogous constitutional inju-
ries here, the Majority says:

> For voters to show that their "right . . . to vote" is
> "denied or abridged . . . on account of race," they
> must show that their "right . . . to vote" is "denied or
> abridged." U.S. Const. amend. XV, § 1. Equally so,
> under the Fourteenth Amendment, plaintiffs gener-
> ally "prove purposeful discrimination" by establish-
> ing that they "have less opportunity to participate in
> the political processes and to elect candidates of their

> choice." *Rogers v. Lodge*, 458 U.S. 613, 624 (1982); *accord Osburn*, 369 F.3d at 1288. So the abridgment that Polelle alleges—exclusion from an outcome-determinative election—"deprive[s]" him "of voting rights." *Terry*, 345 U.S. at 470 (opinion of Black, J.).

Maj. Op. at 31–32.

This is a sleight of hand. The Majority seizes on isolated phrases from constitutional provisions and cases, splices them together, and pretends that the Supreme Court has recognized a broad constitutional injury whenever a voter claims his right to vote in any election has been "denied" or "abridged." But the Supreme Court has never held that.

The Fifteenth Amendment prohibits denying or abridging the right to vote *"on account of race, color, or previous condition of servitude"*—not political dissatisfaction with a state's election laws. U.S. Const. amend. XV, § 1. The Fourteenth Amendment requires proof of purposeful *discrimination*—not proof that a voter dislikes his general-election choices. *See, e.g., Jones v. Governor of Fla.*, 975 F.3d 1016, 1030 (11th Cir. 2020). And *Terry* addressed actual vote denial—not a plaintiff's complaint that the primary he wishes to vote in might be "outcome-determinative." *See Terry v. Adams*, 345 U.S. 461, 469–70, 73 S. Ct. 809, 813–14 ("The effect of the whole procedure . . . is to do precisely that which the Fifteenth Amendment forbids—strip [Black voters] of every vestige of influence in selecting the officials who control the local county matters that intimately touch the daily lives of citizens.").

14          TJOFLAT, J., Dissenting in Part          22-14031

The Majority is not applying precedent; it is manufacturing it. It plucks a clause from one case, a fragment from another, and stitches them together to conjure up a broad category of constitutional injury whenever a voter faces a disadvantage compared to others—while ignoring the context in which that language was used. But constitutional injuries require actual precedent, and here, the decisions the Majority invokes do not support its argument. I turn to a few of those next.

*     *     *

First, *Osburn v. Cox*, 369 F.3d 1283 (11th Cir. 2004). The Majority claims that the voters there had standing because their "claims plainly concerned disadvantage[s] to the voters as individuals." Maj. Op. at 21. (citation and internal quotation marks omitted). According to the Majority,

> To state claims for relief, we explained, the voters had to show that, under the open primary system, *"they* lack[ed] the equal opportunity to participate in the political process," *Osburn*, 369 F.3d at 1288 (Fourteenth Amendment) (emphasis added), and that *"they* '[had] less opportunity than other members of the electorate to participate in the political process and to elect representatives of *their* choice,'" *id.* (emphasis added) (quoting 52 U.S.C. § 10301(b)).

Maj. Op. at 21–22. The Majority is correct that the phrases it quotes appeared in *Osburn*. But its assertion that "Polelle asserts a claim here that's analogous to the *Osburn* plaintiffs' Fourteenth Amendment, Fifteenth Amendment, and [Voting Rights Act (VRA)]

22-14031          TJOFLAT, J., Dissenting in Part                15

claims: that the closed primary limits the effectiveness of *his vote*,"
Maj. Op. at 22, is flat out wrong.

It is wrong because the portion of *Osburn* that the Majority
quotes was discussing the VRA. And not just any part of the VRA,
but specifically the standard for proving a Section 2 violation,
which is limited to claims of racial discrimination in voting. Here is
what *Osburn* actually said:

> A violation of Section 2 is established only if, based on
> the totality of the circumstances, minority plaintiffs
> can prove that they "have less opportunity than other
> members of the electorate to participate in the politi-
> cal process and to elect representatives of their
> choice." 42 U.S.C. § 1973(b); *see also Chisom v. Roe-
> mer,* 501 U.S. 380, 397, 111 S.Ct. 2354, 2365, 115
> L.Ed.2d 348 (1991)("the inability to elect representa-
> tives of their choice is not sufficient to establish a [Sec-
> tion 2] violation unless, under the totality of the cir-
> cumstances, it can also be said that the members of
> the protected class have less opportunity to partici-
> pate in the political process").

*Osburn,* 369 F.3d at 1289. Nowhere in that passage—nowhere in
*Osburn*—does this Court say that dissatisfaction with a state's pri-
mary structure is a constitutional injury. The *Osburn* plaintiffs al-
leged racial discrimination under the VRA. Polelle does not. He
does not claim he is part of a protected class, he does not allege
racial discrimination, and he does not bring a VRA claim.

The Majority offers no response. Instead, it seizes on a
phrase that refers to minority plaintiffs under the VRA, strips it of

16                TJOFLAT, J., Dissenting in Part        22-14031

its statutory context, and wields it as if it applied to every voter who
dislikes the electoral process. But the VRA is not some free-floating
guarantee that every voter's ballot is maximally "effective." It is an
anti-discrimination provision. *See* 52 U.S.C. § 10301(a) ("No voting
qualification or prerequisite to voting .... shall be imposed . . . in a
manner which results in a denial or abridgement of the right . . . to
vote on account of *race or color*." (emphasis added)); *see also* Michael
T. Morley, *Voting Rights: Litigating Materiality Under the Civil Rights
Act*, 76 Fla. L. Rev. 1807, 1809 (2024) (explaining that the VRA "pro-
hibit[s] not only unconstitutional *racial discrimination* but also
many other elections procedures and requirements with *racially
disparate impacts*" (emphasis added)).

        Second, *Jacobson v. Florida Secretary of State*, 974 F.3d 1236
(11th Cir. 2020). The *Jacobson* plaintiffs challenged the Florida law
setting forth the rules for determining candidates' order on ballots.
*Id.* at 1241. "The statute requires the candidate of the party that
won the last gubernatorial election to appear first beneath each of-
fice listed on the ballot, with the candidate of the second-place
party appearing second." *Id.* at 1242 (citing Fla. Stat.
§ 101.151(3)(a)). The plaintiffs argued that this arrangement con-
ferred an unfair advantage to candidates and diluted the weight of
their votes. *Id.* We rejected that theory, holding that a voter's right
is to cast a ballot and have it counted—not to have the electoral
process maximize the chances of his preferred candidate winning.
*Id.* at 1246–47.

The Majority, however, invokes *Jacobson* to claim that Polelle has alleged an injury—namely "that Florida's closed-primary statute limits *his* 'ability to vote' in certain primary elections and ensures that *his* 'vote [is not] given the same weight as any other.'" Maj. Op. at 11 (quoting *Jacobson*, 974 F.3d at 1246). That is misleading. *Jacobson* had nothing to do with primary elections. The statement the Majority lifts from *Jacobson* referred to a voter's "interest in [his] ability to vote and in [his] vote being given the same weight as any other" in a *general election*. *See* 974 F.3d at 1246. Yet the Majority repeats this misreading—twice more—each time erasing the crucial distinction between a general election and a primary. Maj. Op. at 14, 18.

That distinction matters. A general election selects *officeholders* from among competing candidates within a defined electorate. A primary, by contrast, serves an entirely different function: it allows party members to select *candidates* who best represent their shared political beliefs. *See* Julia E. Guttman, Note, *Primary Elections and the Collective Right of Freedom of Association*, 94 Yale L.J. 117, 125–26 (1984) [hereinafter Guttman, *Primary Elections*]. The Majority ignores this basic reality. Instead, it treats *Jacobson* as endorsing a broad rule that any restriction affecting a voter's "interest in [his] ability to vote" is constitutionally suspect, regardless of the election at issue. But *Jacobson* says no such thing—nor does any case the Majority cites.

And finally, *Nader v. Schaffer*, 417 F. Supp. 837 (D. Conn. 1976), *aff'd*, 429 U.S. 989, 97 S. Ct. 516 (1976) (mem.). There, a

USCA11 Case: 22-14031    Document: 54-1    Date Filed: 03/11/2025    Page: 102 of 112

three-judge district court upheld a closed-primary system against a constitutional challenge by voters. *Id.* at 850. The Majority leans on *Nader* as if it were a definitive ruling on standing. It was not. In the Supreme Court, *Nader* was a memorandum decision—affirmed without a written decision—so it is "of extraordinarily flimsy precedential value." *O'Hair v. White*, 675 F.2d 680, 697 (5th Cir. 1982) (en banc) (Tjoflat, J., concurring in part and dissenting in part). More importantly, the Supreme Court's silent affirmance said nothing about standing, leaving the issue open. In fact, the Supreme Court has explicitly cautioned against relying on cases like *Nader* as a source of standing precedent. *See Allen v. Wright*, 468 U.S. 737, 764, 104 S. Ct. 3315, 3331 (1984) (explaining that a prior decision had "little weight as a precedent on the law of standing" because it "was merely a summary affirmance" and therefore "could hardly establish principles contrary to those set out in opinion issued after full briefing and argument").[5]

---

[5] The Majority mischaracterizes my objection to its reliance on *Nader*. My point is simple: *Nader* carries little, if any, weight as a precedent on the law of standing. Yet the Majority insists that *Nader* is "canonical" and "frequently cited" by the Supreme Court in "this area of the law." Maj. Op. at 33 n.14. But what area is that, exactly? Certainly not standing. The Majority does not, because it cannot, refute this. Instead, it pivots to the observation that *Nader* was decided after *Schlesinger* and *Warth*, as if proximity in time supplies an implied holding. But precedent is not absorbed by osmosis. What matters is what a case says, not when it was decided. And *Nader*—a summary affirmance on the merits—says nothing at all about an injury in fact. That is why the Supreme Court warns against giving such decisions undue weight in standing law. *See Allen* 468 U.S. at 764, 104 S. Ct. at 3331. The Majority waves that concern away

22-14031        TJOFLAT, J., Dissenting in Part                19

Regardless, standing jurisprudence has evolved considerably
since *Nader*, particularly in requiring a concrete and particularized
injury. The Majority's attempt to extract an Article III holding from
nothing more than silence is not how precedent works. Had the
three-judge panel in *Nader* applied modern standing doctrine, it
would likely have agreed with me. The court cautioned against
transforming policy preferences into constitutional claims:

> The presently popular course of raising a federal con-
> stitutional question and seeking a change in the law
> by judicial fiat, is quicker, more academically attrac-
> tive and perhaps more thorough. But such action
> tends in itself to work in derogation of the separation
> of powers and our democratic system of government.
> The courts should not use this power for the purpose
> of exercising some amorphous, general supervision of
> the operations of government, but only to redress vi-
> olations of basic human rights to which federal con-
> stitutional protections have been extended or to cor-
> rect governmental action which otherwise conflicts
> with express provisions of the Constitution. The
> plaintiffs' case does not fall within these designations.

*Nader*, 417 F. Supp. at 850 (citations and internal quotation marks
omitted).

---

without a meaningful response. If *Nader* is a standing precedent, then so is
every summary affirmance in history. But the Supreme Court tells us other-
wise.

20              TJOFLAT, J., Dissenting in Part              22-14031

That reasoning applies even more forcefully today. Polelle's claim is not about a deprivation of voting rights, but a preference for a different electoral system—exactly the kind of policy dispute that Article III does not entertain.[6]

### B. Redressability

Even if Polelle pleaded a cognizable injury (he has not), he must still show that a court order could redress it. He cannot.

---

[6]      The Majority conjures a hypothetical statute to argue that my position—that Polelle lacks an injury in fact—would deny standing even where Congress explicitly created a statutory cause of action. Maj. Op. at 30 n.12. The hypothetical assumes that if Congress passed a law barring "outcome-determinative primaries that exclude voters by party affiliation" and granted individuals the right to enforce that rule in court, then plaintiffs in such cases would necessarily have standing. But that assumption mistakes a statutory violation for a constitutional injury. A statutory right of action does not automatically confer Article III standing. That is what *TransUnion* held: Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion* 594 U.S. at 426, 141 S. Ct. at 2205. To establish standing, a plaintiff must still demonstrate a *concrete harm* akin to one traditionally recognized at common law. *Id.* at 425, 141 S. Ct. at 2204. The Majority's hypothetical does not answer the critical question: *what is the concrete harm?*

Hypotheticals aside, the problem is not that a voter challenging an exclusionary election process *could never* have standing. It is that Polelle does not have standing *in this case* because he has not suffered a legally cognizable injury.

22-14031          TJOFLAT, J., Dissenting in Part          21

### 1. Polelle's Redressability Theories

Polelle has identified no remedy that would redress his purported injury. Start with what he asked for. Polelle's complaint sought three forms of relief:

(1) a declaration that Florida's closed-primary law (Fla. Stat. § 101.021) and its universal-primary exception (Fla. Const. art. VI, § 5(b)) violate the First and Fourteenth Amendments, both facially and as applied to him;

(2) a permanent injunction prohibiting, among others, Supervisor Turner from enforcing the closed-primary law, the universal-primary exception, and "any other statute, law, regulation, or custom which prohibits [him] from voting in future Florida election primaries solely because of his choice to remain" an NPA voter; and

(3) "[a]ny other relief th[e] Court deems just and proper."

The first request—a declaratory judgment—gets Polelle nowhere. The Supreme Court has made clear that a mere declaration of a law's unconstitutionality does not itself confer jurisdiction.[7] *See*

---

[7] The Supreme Court has recognized that a declaratory judgment alone may redress an injury in limited circumstances. Namely, a declaratory judgment can satisfy redressability by establishing a "preclusive effect on a traditional lawsuit that is imminent." *Brackeen*, 599 U.S. at 293, 143 S. Ct. at 1639 (citation and internal quotation marks omitted). The paradigmatic example of a permissible declaratory judgment is that which a court issues to resolve a dispute between an insurer and insured over the existence or extent of coverage. *See, e.g., Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 243–44, 57 S. Ct. 461, 465 (1937).

22                    TJOFLAT, J., Dissenting in Part              22-14031

*California v. Texas*, 593 U.S. 659, 672–73, 141 S. Ct. 2104, 2115–16
(2021). The Majority does not seriously dispute this—nor could it.
That leaves only Polelle's request for an injunction. If an injunction
will not redress his alleged injury, Polelle has no standing to sue.

But what kind of injunction does Polelle want? That de-
pends on when you ask him.[8] At first, Polelle sought an order bar-
ring Supervisor Turner from enforcing Florida's closed-primary
law. He claimed this would let NPA voters join primaries once lim-
ited to party members, effectively turning Florida's closed

---

[8]    Polelle has recharacterized the relief he seeks throughout litigation.
That he should not do. Courts adjudicate concrete disputes; they do not chase
a moving target. Standing is assessed at the outset and cannot be manufac-
tured midstream by retrofitting the relief sought to patch up jurisdictional de-
fects. *See Lujan*, 504 U.S. at 566, 112 S. Ct. at 2139 ("Standing is not an ingenious
academic exercise." (citation and internal quotation marks omitted)). Were it
otherwise, standing doctrine would collapse into a game of advocacy and its
gatekeeping function reduced to a matter of strategic pleading. And a plaintiff
who keeps reworking the relief sought only underscores that the supposed
injury was never clearly defined—raising serious doubt about whether there
was ever a justiciable controversy at all.

The Majority, for its part, "fail[s] to see how a position Polelle has
pressed since his response to Defendants' motions to dismiss . . . is a mid-liti-
gation switch." Maj. Op. at 46. I fail to see how the Majority can call an alter-
native remedy raised for the first time in response to a motion to dismiss any-
thing *but* a mid-litigation switch. By definition, a switch of remedy in response
to a motion to dismiss is a mid-litigation switch. *See* Fed. R. Civ. P. 7(a) (defin-
ing pleadings).

22-14031          TJOFLAT, J., Dissenting in Part          23

primaries into open primaries.[9] But once Polelle realized that such an order might violate political parties' First Amendment rights, he shifted course—and for good reason. The Supreme Court has recognized that political parties have a right to control their nominations. *See Jones*, 530 U.S. at 574–75, 120 S. Ct. at 2408; *see also Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121–22, 101 S. Ct. 1010, 1019 (1981); Guttman, *Primary Elections*, at 125–26. A state's interest in protecting the associational rights of political parties justifies closed primaries. *Jones*, 530 U.S. at 574–75, 120 S. Ct. at 2408. It follows that if an injunction effectively forces parties to associate with non-members, it may violate the parties' First Amendment rights.[10]

---

[9] There are three types of primaries: (1) closed, where only party members may vote; (2) open, where any registered voter may vote in one party's primary without affiliating; and (3) blanket, where voters can choose candidates across parties, like in a general election. Guttman, *Primary Elections*, at 117 n2

[10] True, as the Majority notes, *Jones* left unresolved whether open primaries are unconstitutional. Maj. Op. at 24, 40; *Jones*, 530 U.S. at 577 n.8, 120 S. Ct. at 2410 n.8 ("This case does not require us to determine the constitutionality of open primaries."). But that does not mean we cannot answer the question, especially given *Jones*'s strong recognition of political parties' associational rights. Said differently, that *Jones* did not decide the issue does not mean the Supreme Court has foreclosed the conclusion that open primaries are unconstitutional—if anything, *Jones* points in that direction. And the Majority does not refute this; it simply dodges the question. Maj. Op. at 40–41. Instead, the Majority says that I—as the dissent—must show this theory's unavailability. Maj. Op. at 40 n.15 ("[The Dissent] must address the extent of the burden issuing Polelle a partisan ballot would place on a political party's First Amendment rights before determining that Polelle's injury is not redressable in that

24                     TJOFLAT, J., Dissenting in Part          22-14031

That matters. A court cannot redress an alleged injury by granting relief that is itself unlawful. A plaintiff must show that the relief he seeks is legally available. *See Uzuegbunam*, 592 U.S. at 292, 141 S. Ct. at 801–02. If an injunction would violate political parties' associational rights, it cannot redress Polelle's purported injury.

Realizing this, Polelle tried another tack: if courts cannot not force open primaries, they should scrap Florida's entire primary system instead. That way, he speculates, the Florida legislature *might* create a new scheme that allows him to vote in a primary.[11]

The problem is that Polelle's theory of redressability impermissibly rests on sheer speculation: that striking down Florida's closed primary law *might* cause the Legislature to enact a new

---

way.") That is wrong. Polelle, as "[t]he party invoking federal jurisdiction," is the one who "bears the burden of establishing" redressability. *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136. Having all but abandoned that theory, Polelle has failed to carry that burden.

[11] In the alternative, Polelle argues he has adequately pleaded municipal taxpayer standing. The problem for Polelle is that he failed to adequately plead any standing elements sufficient to invoke the doctrine. For example, he did not adequately plead that county funds were expended on the allegedly unconstitutional aspect of the primary elections. *See Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1279–82 (11th Cir. 2008) (stating that the municipal taxpayer standing doctrine requires a plaintiff to show that public funds were used in an allegedly unlawful manner that caused him direct harm). So while Polelle alleged that he paid *ad valorem* property tax, he did not show how holding the closed primary elections put him "out of pocket" sufficient to confer standing. *See Doremus v. Bd. of Ed. of Hawthorne*, 342 U.S. 429, 433, 72 S. Ct. 394, 397 (1952).

primary regime that *might* give Polelle the right to vote in the primary elections that he wants to. But precedent casts doubt on redressability theories that depend on "unfettered choices made by independent actors not before the courts." *See Lujan*, 504 U.S. at 562, 112 S. Ct. at 2137. Redressability requires a judicial ruling to remedy the plaintiff's injury—it cannot rest on speculation about how third parties might respond. *See Brackeen*, 599 U.S. at 294, 143 S. Ct. at 1639–40; *see also Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" (citation omitted)). Yet Polelle's reasoning hinges on just that: a "speculative chain of possibilities," *Clapper*, 568 U.S. at 414, 133 S. Ct. at 1150, in which enjoining a county election official *might* trigger legislative action, which then *might* result in Polelle getting to vote in a primary in a way that makes his vote "effective." That logic flouts Supreme Court and Eleventh Circuit precedent.

Because Polelle has not sought any relief that would redress his alleged injury, he lacks standing. That should be the end of it.

2. The Majority's Redressability Theories

Rather than reject Polelle's flawed redressability theories, the Majority forges ahead, crafting an alternative theory of redressability that is as novel as it is wrong.

First, the Majority claims that Polelle initially requested "an injunction requiring the Supervisor to issue and accept Polelle's partisan ballot." Maj. Op. at 40. That is false. Polelle's complaint asked the District Court to bar enforcement of the closed primary

26          TJOFLAT, J., Dissenting in Part          22-14031

law—not to compel Supervisor Turner to hand him a ballot. In other words, Polelle sought an injunction restraining, not compelling Supervisor Turner. At no point did Polelle seek the affirmative injunction the Majority imagines.

Even if he had, the Majority concedes that such relief may be unconstitutional. *Id.* ("[W]e may not be able to order the Supervisor to include Polelle in a partisan primary election if doing so would severely burden political parties' associational rights."). Yet rather than resolve that issue, it pivots to another: that Polelle now seeks an injunction "ordering Supervisor Turner to conduct an alternative primary scheme," which theoretically could include a non-partisan, or "blanket," primary.[12] Maj. Op. at 40 n.15, 43. But Polelle never requested that either. In response to the defendants motions to dismiss, Polelle emphasized that "[n]owhere in his Complaint does Plaintiff suggest the adoption of a 'blanket primary' in which voters belonging to an opposing party are allowed to participate in another party's primary."

Even if Polelle had sought such an order, the Majority identifies no authority—constitutional, statutory, or otherwise—empowering a federal court to command a county election supervisor

---

[12] This is not the only time the Majority has fluctuated in describing Polelle's alternative request for relief. At one point, the Majority asserts that Polelle "requests in the alternative that we 'command[]' Supervisor Turner 'to do nothing more than refrain from violating federal law' by not conducting partisan primaries as Florida law otherwise instructs him to do." How is an injunction barring Supervisor Turner from conducting partisan primaries the same as an injunction ordering him to create and run a new primary system?

to invent an election regime from scratch. *See id.*. And for good reason—because, to my knowledge, none exists.

Indeed, Florida law does not empower Supervisor Turner to reshape the state's primary system. That authority belongs to the legislature. *See* Fla. Const. art. VI, § 1 ("Registration and elections shall . . . be regulated by law."); *Grapeland Heights Civic Ass'n v. City of Miami*, 267 So.2d 321, 324 (Fla. 1972) ("'[L]aw' in our constitution means an enactment by the State Legislature . . . not by a city Commission or any other political body."); *Orange County v. Singh*, 268 So.3d 668, 670 (Fla. 2019) ("The *Legislature* regulates elections through the Florida Election Code." (emphasis added)). Supervisor Turner's role is limited to administering election in Sarasota County as prescribed by Florida law. *See* § 98.015(10)–(11). None of the powers delegated to Supervisor Turner include deciding the structure of primary elections. In other words, Florida's primary structure is not subject to local discretion—it is dictated by the state legislature.

## IV.   Conclusion

As judges of an inferior federal court, "we remain bound by precedents and must respect both the limits of our jurisdiction and principles of party presentation." William H. Pryor, Jr., *Modesty in Originalism*, 77 Fla. L. Rev. 345, 355 (2025). The Constitution tasks federal courts with deciding real cases—not rewriting election laws. Under binding precedent, Polelle has suffered no legally cognizable injury, and no court order could redress his complaint. The Majority sidesteps these limits by rebranding political

28              TJOFLAT, J., Dissenting in Part              22-14031

dissatisfaction as a justiciable harm and a broad injunction as likely redress. That is not Article III standing—it is judicial overreach.

Because the Majority takes a different view, I respectfully dissent from its conclusion that Polelle has standing to sue Supervisor Turner.[13]

---

[13] Because courts have no jurisdiction to reach the merits when a plaintiff lacks standing, I take no position on the Majority's merits analysis. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

luded for domestic and many international destinations.

**insurance.\*\***

onally, a customs declaration form is required.

ertain items. For details regarding claims
Mail Manual at *http://pe.usps.com.*

ual at *http://pe.usps.com* for availability and

**UNITED STATES POSTAL SERVICE** | **PRIORITY MAIL**

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

**FROM:**

MICHAEL J. POLELLE
1102 BEN FRANKLIN DRIVE
UNIT 511
SARASOTA, FL. 34236

**TO:**

CLERK OF COURT
U.S. COURT OF APPEALS
for THE ELEVENTH CIRCUIT
56 FORSYTH STREET, N.W.
ATLANTA, GA. 30303

Label 228, December 2023          FOR DOMESTIC AND INTERNATIONAL USE

**Retail**

**UNITED STATES POSTAL SERVICE**

**US POSTAGE PAID**

**$15.40**

Origin: 34230
03/24/25
1184290300-13

**PRIORITY MAIL®**

4 Lb 2.70 oz

**RDC 03**

EXPECTED DELIVERY DAY:  03/27/25

**C007**

SHIP
TO:     56 FORSYTH ST NW
        ATLANTA GA 30303-2218

**USPS TRACKING® #**

9505 5144 0354 5083 3658 16

CLEARED SECURITY

M:  ~e  )25

U.S. MARSHALS SERVICE
Atlanta, GA

**VISIT US AT USPS.COM**
ORDER FREE SUPPLIES ONLINE